IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Tina Wilson | § | |
| | § | |
| | § | |
| vs. | § | Case No. 24-40553-elm7 |
| | § | Chapter 7 |
| | § | |
| Jacob Cannon, Jr. | § | |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Tina Wilson, plaintiff herein, files this Motion for Summary Judgment pursuant to Fed. R.

Civ. P. 56., incorporated by Fed. R. Bankr. P. 7056, and for cause would show the following:

**I.     Introduction**

This adversary proceeding was filed by the plaintiffs against the defendant-debtor to obtain a

determination that his debt to them is nondischargeable. Jacob Cannon Jr. is Tina Wilson's stepfather.

From the ages of nine to sixteen, Tina Wilson was repeatedly raped and impregnated by Jacob

Cannon. Exhibit 4. Despite multiple miscarriages and forced abortions, she had a child by him.

Exhibit 4. Tina Wilson sued Jacob Cannon, Jr. on 07/01/2021 for assault, specifically continuous

sexual abuse of a child, in *Tina Wilson v. Jacob Cannon*, Cause No. CC-21-02654-D in the County

Court at Law No. 4 of Dallas County, Texas. Tina Wilson prevailed at a bench trial on 10/11/2023.

Exhibit 2. The trial court rendered a final judgment on 10/25/2023 for $7,500,000 in actual damages

and $750,000 in punitive damages. Exhibit 2.

**II.     Exhibits**

The following exhibits are attached to this motion:

| | |
|---|---|
| Exhibit 1: | Original Petition from *Tina Wilson v. Jacob Cannon*, Cause No. CC-21-02654-D in the County Court at Law No. 4 of Dallas County, Texas |
| Exhibit 2: | Final Judgment from *Tina Wilson v. Jacob Cannon*, Cause No. CC-21-02654-D in the County Court at Law No. 4 of Dallas County, Texas |
| Exhibit 3: | Unsworn Declaration of Jonathan Wharton |

Exhibit 4:     Reporter's Record from *Tina Wilson v. Jacob Cannon*, Cause No. CC-21-02654-D in the County Court at Law No. 4 of Dallas County, Texas

## III.   Argument and Authorities

Summary judgment is available in adversary proceedings. Fed. R. Bnkr. P. 7056. Summary judgment is appropriate if the movant shows that there are no genuine disputes as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Under 11 U.S.C. § 523(a)(6), a debt is not dischargeable if it is for "willful and malicious injury by the debtor to another entity or to the property of another entity." "Willful and malicious injury" means acts done with the actual intent to cause injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The acts committed by Jacob Cannon, Jr. were done with the intent to cause injury, as established by the state court's judgment. The trial court found in favor of the plaintiff, and her only cause of action was based on the allegation that the defendant continuously sexually assaulted her as a child. Exhibit 1. The trial court awarded punitive damages, which were only available in this case if the Plaintiff proved malice, meaning "a specific intent by the defendant to cause substantial injury or harm to the claimant." Exhibit 2; Tex. Civ. Prac. & Rem. Code § 41.003(a); Tex. Civ. Prac. & Rem. Code § 41.001(7). The other legal bases for awarding punitive damages, gross negligence and fraud, have no meaning in the context of sexual assault. Tex. Civ. Prac. & Rem. Code § 41.003(a); Tex. Civ. Prac. & Rem. Code § 41.001(6) & (11). Additionally, the allegations by Tina Wilson at trial entirely consisted of sexual assault, acts that cannot be committed by accident. Exhibit 4 at 12-18. There were no other allegations in the record. *See* Exhibit 4. The defense, which was rejected, was that he did not commit the acts involved. Exhibit 4 at 8-10; Exhibit 4 at 73-75.

## IV.   Conclusion and Prayer

Tina Wilson seeks a determination that the debt owed by Jacob Cannon, Jr. to her in *Tina Wilson v. Jacob Cannon*, Cause No. CC-21-02654-D in the County Court at Law No. 4 of Dallas

County, Texas, is not dischargeable.

Dated: 01/22/2026

Respectfully submitted,

BRAD THOMAS LAW OFFICE, PLLC
P.O. Box 190446
Dallas, TX 75219
Tel. (903) 931-3616
Fax (903) 900-4727
E-mail: jonwhartonlaw@gmail.com

By:___/s/ Jonathan Wharton_____

    JONATHAN WHARTON
    STATE BAR NO. 24075764

ATTORNEY FOR PLAINTIFF, TINA
WILSON

## CERTIFICATE OF SERVICE

I hereby certify that on 01/22/2026, a true and correct copy of the above document was served via electronic means through the Court's ECF system to all counsel of record.

By:___/s/ Jonathan Wharton_____

    JONATHAN WHARTON
    STATE BAR NO. 24075764

# EXHIBIT 1

FILED
7/1/2021 3:30 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO. _CC-21-02654-D_____

| | | |
|---|---|---|
| **TINA WILSON** | § | **COUNTY COURT AT LAW NO. ___** |
| | § | |
| | § | |
| **VS.** | § | **IN AND FOR** |
| | § | |
| | § | |
| **JACOB CANNON** | § | **DALLAS COUNTY, TEXAS** |

## ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW TINA WILSON, Plaintiff, and files this Original Petition against Defendant, JACOB CANNON, and for cause of action would respectfully show the Court as follows:

### VENUE AND JURISDICTION
### I.

Venue is appropriate in Dallas County pursuant to Section 15.002(2) of the Texas Civil Practice & Remedies Code, as the Defendant resides in this county.

The Court has jurisdiction over the controversy because the damages are in excess of the minimum jurisdictional limits of the Court. The Plaintiff seeks only monetary relief over $1,000,000.

### DISCOVERY CONTROL PLAN
### II.

This suit may proceed under Discovery Level 3.

### PARTIES AND SERVICE
### III.

Defendant JACOB CANNON may be served at 925 W. Bear Creek Rd., Glenn Heights, TX 75154.

## FACTS
## IV.

Jacob Cannon is Tina Wilson's stepfather. From the ages of nine to sixteen, Tina Wilson was repeatedly raped and impregnated by Jacob Cannon. Despite multiple miscarriages and forced abortions, she had a child by him.

## LIABILITY
## V.

Jacob Cannon is liable for assault (continuous sexual abuse of a child).

## DAMAGES
## VI.

The Plaintiff may recover past and future pain and suffering; past and future mental anguish; past and future medical expenses; and past and future loss of enjoyment of life. The Plaintiff may also recover punitive damages.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendant Jacob Cannon be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for damages in amount within the jurisdictional limits of the Court; together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by low; post-judgment interest at the legal rate; costs of court; and for such other and further relief, general and special, at law or in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,

BRAD THOMAS LAW OFFICE, PLLC
P.O. Box 472027
Fort Worth, TX 76147

Tel.: (903) 931-3616
Fax: (903) 900-4727
E-mail: jon@bradthomaslawoffice.com


BY: ___/s/ Jonathan Wharton_____
      JONATHAN WHARTON
      STATE BAR NO. 24075764
      ATTORNEY FOR PLAINTIFF,
      TINA WILSON

# EXHIBIT 2

Cause No. CC-21-02654-D

| TINA WILSON | § | IN THE COUNTY COURT |
|---|---|---|
| | § | |
| | § | |
| VS. | § | AT LAW NO.4 |
| | § | |
| | § | |
| | § | |
| JACOB CANNON | § | DALLAS COUNTY, TEXAS |

## FINAL JUDGMENT

BE IT REMEMBER that, on October 11, 2023, came on to be heard the above-entitled

and numbered cause. Plaintiff TINA WILSON appeared by and through her attorney Jonathan

Wharton and announced ready. Defendant JACOB CANNON appeared by and through his

attorney Okwy Maduforo and announced ready.

A jury was not requested, and a bench trial proceeded. The Court has considered the

pleadings and official records, exhibits and arguments of the parties on file in this cause and is of

the opinion that judgment should be rendered for the Plaintiff.

It is therefore ORDERED, ADJUDGED, and DECREED that Plaintiff is entitled to a

judgment, pursuant to Texas law, it is further, ORDERED, ADJUDGED, and DECREED that

Plaintiffs TINA WILSON shall recover from Defendant, JACOB CANNON the following sums:

$500,000 in past pain and suffering;
$6,000,000 in past mental anguish;
$1,000,000 in future mental anguish; and
$750,000 in punitive damages.

1 Final Judgement – CC-21-02654-D



CC-21-02654-D
COJ
ORDER - JUDGMENT
2771631

This is a Final JUDGMENT DISPOSING OF ALL ISSUES AND ALL PARTIES, AND
this judgment is appealable.

SIGNED on this _____ day of _October_ 2023.

_Wennot Cone_

JUDGE PRESIDING

2 Final Judgement – CC-21-02654-D

# EXHIBIT 3

## UNSWORN DECLARATION OF JONATHAN WHARTON

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

"My name is Jonathan Wharton. I am of sound mind and over 21 years of age, and I have personal knowledge of all matters described herein.

I represent the Plaintiff, Tina Wilson, in *Tina Wilson v. Jacob Cannon, Jr.*, Case No. 24-40553-elm7 in the United States Bankruptcy Court for the Northern District of Texas, as well as in *Tina Wilson v. Jacob Cannon*, Cause No. CC-21-02654-D in the County Court at Law No. 4 of Dallas County, Texas, and the appeal from that state court case, Jacob Cannon, Jr. v. Tina Wilson, Case No. 05-23-01185-CV in the 5th Court of Appeals of Dallas, Texas.

Exhibit 1 is a true and correct copy of the Original Petition in Cause No. CC-21-02654-D.

Exhibit 2 is a true and correct copy of the Final Judgment in Cause No. CC-21-02654-D.

Exhibit 4 is a true and correct copy of the Reporter's Record in Case No. 05-23-01185-CV.

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I am making this unsworn declaration in lieu of an affidavit. My name is Jonathan Whitlock Wharton, my date of birth is November 24, 1984, and my address is P.O. Box 190446, Dallas, TX 75219, USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant County, State of Texas, on 01/21/2026."

/s/ Jonathan Wharton
_____
JONATHAN WHARTON

# EXHIBIT 4

1                    REPORTER'S RECORD

2              VOLUME 1 OF 1 VOLUME        FILED IN
                                      5th COURT OF APPEALS
3          APPELLATE NO. 05-23-01185-CV  DALLAS, TEXAS
                                      1/3/2024 4:39:45 PM
4        TRIAL COURT CAUSE NO. CC-21-026Ruben Morin
                                           Clerk
5   TINA WILSON                  ) IN THE COUNTY COURT
            Plaintiff,           )
6                                )
    VS.                          ) AT LAW NO. 4
7                                )
    JACOB CANNON                 )
8          Defendant.            ) DALLAS COUNTY, TEXAS

9

10       _____

11                  TRIAL BEFORE THE COURT

12       _____

13       On the 12th day of October, 2023, the following

14  proceedings came on to be heard in the above-titled and

15  numbered cause before the Honorable Dianne K. Jones,

16  Judge Presiding, held in Dallas, Dallas County, Texas.

17       Proceedings reported by computerized stenotype

18  machine.

19           VEARNEAS W. FAGGETT, TEXAS CSR #3129

20                 Official Court Reporter

21               County Court at Law No. 4

22                     214.779.7034

23

24

25

1                           A P P E A R A N C E S

2    FOR THE PLAINTIFF:
          Mr. Jonathan Wharton
3         Texas State Bar No. 24075764
          jonwhartonlaw@gmail.com

4

5         The Law Office of Jonathan W. Wharton
          P. O. Box 472027
6         Forth Worth, Texas   76147
          Tel: 903.931.3616
7         Fax: 214.462.6401

8

9

10   FOR THE DEFENDANT:
          Mr. Okwy C. Maduforo
11        Texas State Bar No. 24047703
          ocmaduforo@outlook.com

12

13        Law Offices of Maduforo & Osimiri, PLLC
          1111 W. Mockingbird Ln., Ste. 1410 650
14        Dallas, Texas   75247
          Tel: 214.267.0103

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2  OCTOBER 12, 2023                              PAGE   VOL

3  Proceedings ..................................    5    1

4  Defense Motion for Continuance ...............    5    1

5  Court's Ruling ...............................    6    1

6  Plaintiff's Opening Statements ...............    7    1

7  Defense's Opening Statements .................    8    1

8  PLAINTIFF'S WITNESS   DIR   CROSS   REDIR   RECROSS   VD

9  Wilson, Tina          12    42     50                 1

10 Plaintiff Rests ..............................   70    1

11 Defense Motion for Instructed Verdict ........   70    1

12 Court's Ruling ...............................   72    1

13 DEFENSE'S WITNESS     DIR   CROSS   REDIR   RECROSS   VD

14 Wilson, Birdie        72    87     94                 1

15 Defense Rests ................................   96    1

16 PLAINTIFF'S WITNESS   DIR   CROSS   REDIR   RECROSS   VD

17 Jones, Roderick       97   104    108                 1

18 Reporter's Certificate ......................  112    1

19 Disclosure ..................................  113    1

20

21

22

23

24

25

```
 1              E X H I B I T   I N D E X

 2    Description              Offered    Admitted    Vol

 3    Plaintiff's No.

 4    1 - Jacob Cannon, Jr. Depo      10          11          1

 5    2 - Sharon Jackson George Depo  10          11          1

 6    3 - Gerald Miller Depo          10          11          1

 7    4 - Gerald Wayne Wilson, Jr. Depo 10        11          1

 8    5 - Photo                      110         110          1

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| | 1 | P R O C E E D I N G S |
| | 2 | (October 12, 2023; 9:59 a.m.) |
| 9:59AM | 3 | THE COURT:  This is Cause Number |
| 9:59AM | 4 | CC-21-02654-D, Tina Wilson versus Jacob Cannon. |
| 9:59AM | 5 | MR. WHARTON:  Jon Wharton for the |
| 9:59AM | 6 | Plaintiff, Your Honor. |
| 9:59AM | 7 | MR. MADUFORO:  Okwy C. Maduforo, for the |
| 9:59AM | 8 | Defendant Jacob Cannon. |
| 9:59AM | 9 | THE REPORTER:  Can you spell your last |
| 9:59AM | 10 | name? |
| 9:59AM | 11 | MR. MADUFORO:  Sure.  M-A-D-U-F-O-R-O. |
| 9:59AM | 12 | Thank you. |
| 9:59AM | 13 | THE COURT:  Okay.  And what's the basis of |
| 9:59AM | 14 | your continuance? |
| 9:59AM | 15 | MR. MADUFORO:  Your Honor, it's just a |
| 9:59AM | 16 | couple of things.  One of them is already taken care of |
| 9:59AM | 17 | and I appreciate your patience with me.  I had a prior |
| 9:59AM | 18 | scheduled hearing in Denton County, just rushing down |
| 9:59AM | 19 | from there this morning. |
| 9:59AM | 20 | And then, too, the former attorney who |
| 9:59AM | 21 | recently officially withdrew from the case and now I'm |
| 9:59AM | 22 | here with Mr. Jacob.  And I reached out to plaintiff's |
| 10:00AM | 23 | counsel to see probably if we can find a way to engage in |
| 10:00AM | 24 | some collaborative maybe proceedings to see if we can |
| 10:00AM | 25 | resolve this, or some of the other issues maybe that we |

| 10:00AM | 1 | have in this case.  Because we haven't had a chance to do |
| 10:00AM | 2 | that. |
| 10:00AM | 3 | And being that I'm still new pursuant to |
| 10:00AM | 4 | the withdrawal of the previous attorney, I wanted to see |
| 10:00AM | 5 | if I could have a little more attorney prep time and |
| 10:00AM | 6 | ultimately we might be able to resolve this. |
| 10:00AM | 7 | THE COURT:  Well, I'm going to deny your |
| 10:00AM | 8 | motion.  This case was filed on July 1st, 2023.  This is |
| 10:00AM | 9 | October the 12th -- I'm sorry -- October 12th, 2023. |
| 10:00AM | 10 | This was filed on July 1st, 2020.  It's been set for |
| 10:00AM | 11 | several months in this courtroom and your motion for |
| 10:00AM | 12 | continuance wasn't even filed until two days ago.  I |
| 10:01AM | 13 | don't know when you took over the case but I guess you |
| 10:01AM | 14 | took over the case two days ago... |
| 10:01AM | 15 | MR. MADUFORO:  I was not aware, I think, |
| 10:01AM | 16 | up until I believe late last month by Mr. Shawn Laney was |
| 10:01AM | 17 | on the case, I believe. |
| 10:01AM | 18 | THE COURT:  But your client represented to |
| 10:01AM | 19 | the Court that you were the original attorney on this |
| 10:01AM | 20 | case. |
| 10:01AM | 21 | MR. MADUFORO:  Until I was fired and then |
| 10:01AM | 22 | rehired. |
| 10:01AM | 23 | THE COURT:  Right, which means you're very |
| 10:01AM | 24 | familiar with the case, so we will proceed at this time. |
| 10:01AM | 25 | MR. MADUFORO:  Thank you, Judge. |

| | | |
|---|---|---|
| 10:01AM | 1 | THE COURT:  Does anybody want to do an |
| 10:01AM | 2 | opening statement? |
| 10:01AM | 3 | MR. WHARTON:  Yes, Your Honor. |
| 10:01AM | 4 | MR. MADUFORO:  Yes, Your Honor. |
| 10:01AM | 5 | THE COURT:  Mr. Wharton, you may proceed |
| 10:01AM | 6 | first. |
| 10:01AM | 7 | PLAINTIFF'S OPENING STATEMENTS |
| 10:01AM | 8 | MR. WHARTON:  Thank you, Your Honor. |
| 10:02AM | 9 | This is a sexual assault of a minor case. |
| 10:02AM | 10 | So, Tina Wilson, when she was a child, |
| 10:02AM | 11 | beginning at the age of about nine, she was living with |
| 10:02AM | 12 | her mother's husband, Jacob Cannon, and he had sex with |
| 10:02AM | 13 | her for years.  He impregnated her multiple times.  She |
| 10:02AM | 14 | had a series of abortions. |
| 10:02AM | 15 | Ultimately, at the age of 12, she carried |
| 10:02AM | 16 | one of those children to term.  That child is named |
| 10:02AM | 17 | Jaquita, after Jacob; Jaquita Cannon. |
| 10:02AM | 18 | Mr. Cannon has been deposed.  He pled the |
| 10:02AM | 19 | Fifth for every question relating to sexual contact with |
| 10:03AM | 20 | Tina Wilson or the parentage of Jaquita. |
| 10:03AM | 21 | We have depositions from Ms. Wilson's |
| 10:03AM | 22 | brother as well as her father and her stepmother, |
| 10:03AM | 23 | basically her -- so, they never -- there's no evidence on |
| 10:03AM | 24 | the other side.  They have no defense, as far as I can |
| 10:03AM | 25 | tell.  They've never produced any evidence.  There's no |

| | | |
|---|---|---|
| 10:03AM | 1 | witnesses.  They have -- there's nothing. |
| 10:03AM | 2 | So the Court will be hearing from |
| 10:03AM | 3 | Ms. Wilson.  Unfortunately, I sort of anticipated this |
| 10:03AM | 4 | might go through a different way, but she is going to |
| 10:03AM | 5 | have to testify.  And, you know, that's what we'll be |
| 10:03AM | 6 | doing primarily.  And I'll be introducing the depositions |
| 10:03AM | 7 | from the witnesses.  And the way that I would prefer to |
| 10:04AM | 8 | do that is just in writing to make this as brief -- this |
| 10:04AM | 9 | part as brief as possible. |
| 10:04AM | 10 | As far as damages, what we'll be asking |
| 10:04AM | 11 | for, it doesn't really I don't think in a practical sense |
| 10:04AM | 12 | make much difference whether it's 5 million or |
| 10:04AM | 13 | 500 million or whatever.  I don't think on a practical |
| 10:04AM | 14 | level it's going to make much difference. |
| 10:04AM | 15 | The value of Tina's mental anguish for |
| 10:04AM | 16 | going through that for years, for living with that, is |
| 10:04AM | 17 | beyond anything that money could possibly change. |
| 10:04AM | 18 | So I don't think that -- well, we'll get |
| 10:04AM | 19 | through it.  Thank you, Your Honor. |
| 10:04AM | 20 | THE COURT:  Counselor. |
| 10:04AM | 21 | DEFENSE'S OPENING STATEMENTS |
| 10:04AM | 22 | MR. MADUFORO:  Your Honor, thank you. |
| 10:04AM | 23 | This case, as unfortunate as it sounds, is |
| 10:05AM | 24 | not about an actual incident that occurred.  It's about |
| 10:05AM | 25 | what can I get from my stepfather.  It's about do this |

```
10:05AM    1   for me or else.
10:05AM    2                  Testimony from Mr. Cannon will show what a
10:05AM    3   loving, caring, and straightforward human being he is.
10:05AM    4                  Testimony from Mr. Cannon will show to the
10:05AM    5   point where the petitioner in this case, plaintiff in
10:05AM    6   this case, I'm sorry, left the house after threatening,
10:05AM    7   if you don't give me XYZ amount of money and build a
10:05AM    8   house for me, I'll make your life a living hell, for lack
10:05AM    9   of a better word.  This is about what we can get and not
10:06AM   10   actually what happened.
10:06AM   11                  You will never hear testimony that an
10:06AM   12   incident like this occurred, that there was any part of
10:06AM   13   investigation, police report, CPS issues alleged that it
10:06AM   14   happened while she was still a minor.  That never
10:06AM   15   happened.
10:06AM   16                  And, by the way, Mr. Cannon's beloved wife
10:06AM   17   used to work for the County.  She is very much aware of
10:06AM   18   the process.  This is her biological child.  That
10:06AM   19   complaint was never, never, it never came -- be put in
10:06AM   20   words a series of abuse unfortunately to the plaintiff by
10:06AM   21   her dads' relatives, by the cousin.
10:07AM   22                  You will not hear testimony from Mr. Jacob
10:07AM   23   that this occurred.  You will not hear testimony that
10:07AM   24   there was an investigation.  You will not hear testimony
10:07AM   25   that this man was convicted by any chance of these
```

```
10:07AM   1   events.

10:07AM   2                You will not hear testimony that his wife

10:07AM   3   threatened to divorce him or leave him because he was

10:07AM   4   abusing her biological child.

10:07AM   5                At the end of the day, Your Honor, we are

10:07AM   6   asking that judgment be awarded against them and they

10:07AM   7   don't take nothing from the plaintiff -- I mean

10:07AM   8   respondent in this case.  Thank you.

10:07AM   9                THE COURT:  Please call your first

10:07AM  10   witness, Mr. Wharton.

10:07AM  11                MR. WHARTON:  Yes, Your Honor.  And I

10:07AM  12   would like to begin by just introducing the four

10:07AM  13   depositions.  So these, for streamlining the process, it

10:08AM  14   will be easier than reading them or playing them.

10:08AM  15                THE COURT:  I'm supposed to read them or

10:08AM  16   play them sometime later?

10:08AM  17                MR. WHARTON:  Yes, Your Honor.

10:09AM  18                THE COURT:  So any objections?

10:09AM  19                MR. MADUFORO:  Yes, Your Honor.  Is this

10:09AM  20   all one exhibit?

10:09AM  21                MR. WHARTON:  There are four different

10:09AM  22   ones, four depositions.

10:09AM  23                MR. MADUFORO:  So I don't have objection

10:09AM  24   or objections on three of those.  But I do have -- on one

10:10AM  25   I don't see a certification of the transcript by the
```

| 10:10AM | 1 | transcriber.  Okay, I see here it is signature.  I don't |
|---|---|---|
| 10:10AM | 2 | see any -- |
| 10:10AM | 3 | THE COURT:  Mr. Wharton? |
| 10:10AM | 4 | MR. WHARTON:  I have the certification |
| 10:10AM | 5 | here, electronically, and physically I can show Your |
| 10:10AM | 6 | Honor what we're looking at.  May we approach? |
| 10:10AM | 7 | THE COURT:  Sure. |
| 10:10AM | 8 | MR. WHARTON:  So this is the deposition |
| 10:10AM | 9 | and this is the certification page.  It looks like she |
| 10:10AM | 10 | didn't fill the date out on that one. |
| 10:10AM | 11 | THE COURT:  But she signed. |
| 10:10AM | 12 | MR. WHARTON:  Yeah, and then I have the |
| 10:10AM | 13 | date on here. |
| 10:10AM | 14 | THE COURT:  Well, admitted.  It goes to |
| 10:11AM | 15 | the weight, so all four exhibits are admitted. |
| 10:11AM | 16 | MR. WHARTON:  We'll label them 1 through |
| 10:11AM | 17 | 4, Your Honor. |
| 10:11AM | 18 | (Plaintiff's Exhibits 1 - 4 admitted.) |
| 10:11AM | 19 | MR. WHARTON:  We call Tina Wilson. |
| 10:11AM | 20 | THE COURT:  Please raise your right hand, |
| 10:11AM | 21 | ma'am. |
| 10:11AM | 22 | Do you swear or affirm to tell the truth, |
| 10:11AM | 23 | the whole truth, and nothing but the truth so help you |
| 10:11AM | 24 | God? |
| 10:11AM | 25 | THE WITNESS:  Yes, I do. |

Trial witness 12/12/2023
Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:11AM | 1 | <u>TINA M. WILSON,</u> |
| 10:11AM | 2 | was called as a witness by the Plaintiff, having been |
| 10:11AM | 3 | first duly sworn, testified as follows: |
| 10:11AM | 4 | <u>DIRECT EXAMINATION</u> |
| 10:11AM | 5 | BY MR. WHARTON: |
| 10:11AM | 6 | Q.   State your name for the record, please. |
| 10:12AM | 7 | A.   Tina Marie Wilson. |
| 10:12AM | 8 | THE COURT:  Mr. Wharton, I need you to sit |
| 10:12AM | 9 | down and speak into the microphone. |
| 10:12AM | 10 | MR. WHARTON:  Yes, Your Honor. |
| 10:12AM | 11 | Q.   (By Mr. Wharton)  State your name for the |
| 10:12AM | 12 | record, please. |
| 10:12AM | 13 | A.   Tina Marie Wilson. |
| 10:12AM | 14 | Q.   And let's start with how you came to live in |
| 10:12AM | 15 | Jacob Cannon's house. |
| 10:12AM | 16 | A.   My mother and Jacob were dating.  I moved in |
| 10:12AM | 17 | shortly after they started dating, around the age of nine |
| 10:12AM | 18 | or ten. |
| 10:12AM | 19 | Q.   What was Jacob like initially? |
| 10:13AM | 20 | A.   He was real nice.  He was -- he was just really |
| 10:13AM | 21 | nice at first until things started happening. |
| 10:13AM | 22 | Q.   Okay.  Tell me about that.  What things started |
| 10:13AM | 23 | happening? |
| 10:13AM | 24 | A.   Around the same age of nine or ten, I was in -- |
| 10:13AM | 25 | we were staying in Wildflower Apartments in Midland, |

trial wilson 05/12/2023
Direct Examination by Mr. Wharton

10:13AM   1   Texas.  I was in the bathtub.  I believe I was crying.

10:13AM   2   He walked in.  He asked me was I okay.  I said yes.  I

10:13AM   3   got out of the bathtub.  We had a water bed at the time.

10:13AM   4   I got out of the bathtub and I was drying off, and that's

10:13AM   5   when I noticed him looking at me.

10:13AM   6          He, himself, told me that's what attracted him

10:14AM   7   to me.  And shortly after that, around -- my first time

10:14AM   8   ever having a miscarriage, I was 11 years old.  I had my

10:14AM   9   first miscarriage at 11, had my first abortion at 11, and

10:14AM  10   I got pregnant and had -- I got pregnant several times

10:14AM  11   and I had a total of two abortions and five -- I'm sorry,

10:14AM  12   I apologize -- I had two miscarriages and five abortions

10:14AM  13   by Jacob until I turned the age of 14.  And at the age of

10:14AM  14   14, I got pregnant with my daughter Jaquita Cannon.

10:14AM  15       Q.   And how did you name Jaquita?

10:14AM  16       A.   Jacob named Jaquita.  Jaquita means Jacob in

10:14AM  17   African Hebrew form.  It means the same as Jacob the

10:14AM  18   father.

10:14AM  19       Q.   Why did your mother never intervene?

10:15AM  20       A.   I feel like my mother stayed with Jacob based

10:15AM  21   on money.  I feel like my mother allowed these things to

10:15AM  22   happen.  My mother was also very abusive to me.  I

10:15AM  23   believe she did it because Jacob has money.

10:15AM  24              THE COURT:  Well, let me stop you.  If you

10:15AM  25   are going to prove your case, you are going to need to

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:15AM | 1 | prove your case.  I was a child abuse prosecutor for a |
| 10:15AM | 2 | year and a half and so far I haven't heard anything. |
| 10:15AM | 3 | MR. WHARTON:  Yes, Your Honor. |
| 10:15AM | 4 | Q.   (By Mr. Wharton)  So, going through it, the |
| 10:15AM | 5 | first time that Jacob initiated sexual contact with you, |
| 10:15AM | 6 | and again in detail, can you tell the Court what exactly |
| 10:15AM | 7 | happened? |
| 10:15AM | 8 | A.   The first time Jacob tried to penetrate me, he |
| 10:15AM | 9 | said that I was too tight.  He used a toothbrush.  He |
| 10:15AM | 10 | used Q-tips, anything to try to basically open me up. |
| 10:16AM | 11 | I didn't understand it at first.  Now that I'm |
| 10:16AM | 12 | older I do.  He told me -- it was several occasions where |
| 10:16AM | 13 | he told me we were married.  Just like in a lot of black |
| 10:16AM | 14 | marriages you have to jump over the broom.  I had to jump |
| 10:16AM | 15 | over a broom.  My last name was then changed from Wilson |
| 10:16AM | 16 | to Cannon.  He told me that we were married and that |
| 10:16AM | 17 | everything was okay. |
| 10:16AM | 18 | Q.   Let's go through in detail for these -- the |
| 10:16AM | 19 | actual sexual experiences.  Did you kiss Jacob?  Did Jacob |
| 10:16AM | 20 | kiss you? |
| 10:16AM | 21 | A.   Yes. |
| 10:16AM | 22 | Q.   Did he touch you? |
| 10:16AM | 23 | A.   Yes. |
| 10:16AM | 24 | Q.   Okay.  Where did he touch you? |
| 10:16AM | 25 | A.   He touched me all over.  He touched my breasts, |

10:16AM  1    he touched my vagina.  He touched me all over.  He would

10:17AM  2    basically do it before -- my mom, she -- she worked for

10:17AM  3    the school district.  She would have to leave for work

10:17AM  4    early in the morning and that's a lot of times when it

10:17AM  5    would start, around 6 or 6:30 in the morning.

10:17AM  6        Q.   Your brother described y'all as -- and Jacob in

10:17AM  7    particular, as acting like puppy love, like a lot of

10:17AM  8    playing?

10:17AM  9        A.   Yes.

10:17AM  10       Q.   Is that how he would initiate sexual contact

10:17AM  11   with you?

10:17AM  12       A.   Yes.

10:17AM  13       Q.   How regularly would he have sexual relations

10:17AM  14   with you, like penetration?

10:17AM  15       A.   I can't really just give you like how many

10:17AM  16   times a week, but it was a lot.  It was a lot.  I thought

10:17AM  17   that was something regular before I went to school.  I

10:18AM  18   was literally only in the fourth or fifth grade when this

10:18AM  19   started.  I didn't know any better.

10:18AM  20       Q.   How many years did it last for?

10:18AM  21       A.   It lasted, I would say, up until almost my

10:18AM  22   senior year of high school.

10:18AM  23       Q.   What time of day did the actual sex itself most

10:18AM  24   commonly occur?

10:18AM  25       A.   Early in the morning.

Direct Examination by Mr. Wharton

10:18AM   1        Q.   Where was your mother at this time?

10:18AM   2        A.   Sometimes she would be at work.

10:18AM   3             On one occasion I remember it was a big

10:18AM   4   altercation between my mom and Jacob.  He locked her

10:18AM   5   outside of the house.  He called me in his bedroom.  I

10:18AM   6   don't know how my mom end up getting in the house but she

10:18AM   7   actually walked in on him on top of me.  She then -- she

10:19AM   8   shut the door and walked away.

10:19AM   9        Q.   Is this an incident involving marks on your

10:19AM   10  neck?  Did this ever leave marks on your neck?

10:19AM   11       A.   No.

10:19AM   12       Q.   Okay.  When did that incident occur?

10:19AM   13       A.   That incident occurred on one occasion when I

10:19AM   14  actually tried to fight Jacob off and Jacob got angry.

10:19AM   15  He -- we were actually laying on the floor.  When he did

10:19AM   16  have -- when he did touch me while my mother was there,

10:19AM   17  she would either be in her room or she would be in

10:19AM   18  another part of the house.

10:19AM   19            Our houses were not small houses.  Our houses

10:19AM   20  were big houses.  And he would tell me to lay on the

10:19AM   21  threshold of between my bed and the hallway, and he

10:19AM   22  would -- so that way he could see when she was coming.

10:19AM   23            And the one time that I did try to fight Jacob

10:19AM   24  back, that's when he got physical.  And I remember coming

10:20AM   25  home after school that day and him apologizing and him

Direct Examination by Mr. Wharton

10:20AM  1    telling me he was wrong, he won't never do that again.

10:20AM  2    But it was always he was sorry, I won't do it again.  And

10:20AM  3    it still happened.

10:20AM  4        Q.   Do you know of any incident where your mother

10:20AM  5    ended up getting marks on her neck?

10:20AM  6        A.   No.

10:20AM  7        Q.   Okay.  Are -- were there any other times where

10:20AM  8    Jacob physically forced you, was physically violent with

10:20AM  9    you?

10:20AM 10        A.   When you say physically violent, do you mean

10:20AM 11    like where he struck me and hit me and made me do it?

10:20AM 12        Q.   Yes.

10:20AM 13        A.   No.  He would just -- he told me that this was

10:20AM 14    natural and this was his way of showing me that he loved

10:20AM 15    me and that he didn't -- he didn't -- he was with my mom

10:20AM 16    because of me and that he really wanted to be with me.

10:20AM 17             And once I got older and I was able to move

10:21AM 18    out, he started acting strange.  He did weird things.

10:21AM 19    Like he would -- I was messing with someone, my little

10:21AM 20    girl's father.  He would leave bras in his car or --

10:21AM 21    because my little girl's father did have a girlfriend at

10:21AM 22    that time.  He would leave bras in his car.  He would

10:21AM 23    come to my house late at night.  He would tell me that I

10:21AM 24    broke his heart, that -- you know, things of that nature.

10:21AM 25    It was just all -- it was all weird.

Direct Examination by Mr. Wharton

10:21AM   1                    THE COURT:  So who's your little girl's

10:21AM   2     father?

10:21AM   3                    THE WITNESS:  My oldest daughter, Jacob.

10:21AM   4                    THE COURT:  You were talking about your

10:21AM   5     little girls.

10:21AM   6                    THE WITNESS:  No, I have three children.

10:21AM   7     I have two girls.  My youngest daughter, Iceland, her

10:21AM   8     father, when I started dating him.

10:21AM   9          Q.    (By Mr. Wharton)  Who is her father?

10:21AM  10          A.    His name is Corey Haynes.

10:21AM  11          Q.    How -- how did Jacob sexually -- when he began

10:22AM  12     having sex with you, how did he do it?  Did he kiss and

10:22AM  13     touch you?

10:22AM  14          A.    Yes.

10:22AM  15          Q.    Okay.  Did he engage in oral sex with you?

10:22AM  16          A.    No.

10:22AM  17          Q.    All right.  Did you engage in oral sex with him?

10:22AM  18          A.    Yes.

10:22AM  19          Q.    How often did that happen?

10:22AM  20          A.    That happened maybe two or three times.

10:22AM  21          Q.    Can you tell me in detail about those incidents?

10:22AM  22          A.    Jacob just had a way of manipulating the

10:22AM  23     situation.  Jacob had a way of using his money to get

10:22AM  24     what he wanted.  So, whatever was popular for kids then,

10:23AM  25     I always got it.  Whatever outfits were out then, I

Direct Examination by Mr. Wharton

10:23AM   1    always got it.  I had more jewelry on my body than most

10:23AM   2    women had on their fingers from them -- from their

10:23AM   3    husbands buying them.  For every finger I had a piece of

10:23AM   4    jewelry on my finger.  And that was his way of saying,

10:23AM   5    hey, I got you something, now you give me something.

10:23AM   6        Q.   Can you tell me in detail -- I know this is

10:23AM   7    uncomfortable -- can you tell me in detail about the

10:23AM   8    incidents where there was actual oral sex occurring?

10:23AM   9        A.   I never forget it.  One time we were living on

10:23AM   10   County Road 56.  He told me he wanted me to try something

10:23AM   11   different.  He did it.  He ejaculated in my mouth and

10:23AM   12   that was basically the end of it.

10:23AM   13          After every sexual occurrence, like I said, I

10:24AM   14   would get something.  Even before, most of the time I

10:24AM   15   would get something.

10:24AM   16          I was in the fifth and sixth grade getting my

10:24AM   17   nails done every two weeks.  I was like -- it wasn't

10:24AM   18   nothing that I couldn't ask for.  It was times where if

10:24AM   19   it was my turn to wash the dishes, he would be the one in

10:24AM   20   there washing the dishes and telling me, okay, I'll wash

10:24AM   21   the dishes as long as you come play with me.

10:24AM   22       Q.   When did you first have a normal boyfriend?

10:24AM   23       A.   I didn't.  I didn't.  The boyfriend that I

10:24AM   24   liked his name was Roderick Jones but Jacob even paid him

10:24AM   25   to say that he was Jaquita's father.  To this day, I've

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:24AM | 1 | never ever had sex with that young man. |
| 10:24AM | 2 | Q.   Tell me about going to get the first abortion. |
| 10:25AM | 3 | A.   It was shortly after a custody battle between |
| 10:25AM | 4 | my mom and my dad.  That was one of the times that my |
| 10:25AM | 5 | last -- my whole name was changed.  And the only part of |
| 10:25AM | 6 | the name that I remember was Talley (phonetic).  It was |
| 10:25AM | 7 | here in Dallas.  After that, the other abortions happened |
| 10:25AM | 8 | in Odessa. |
| 10:25AM | 9 | Q.   And did you give a fake name? |
| 10:25AM | 10 | A.   I don't know what name they gave.  I never |
| 10:25AM | 11 | filled out the paperwork. |
| 10:25AM | 12 | THE COURT:  Who is "they"? |
| 10:25AM | 13 | THE WITNESS:  My mom and Jacob. |
| 10:25AM | 14 | Q.   (By Mr. Wharton)  Tell me about getting an |
| 10:25AM | 15 | abortion.  Walk me through arriving at the clinic and how |
| 10:25AM | 16 | it actually occurred. |
| 10:25AM | 17 | A.   One of the abortions that I remember most |
| 10:25AM | 18 | vividly, Jacob was actually in the room with me.  He held |
| 10:25AM | 19 | my hand during the whole abortion process.  The man told |
| 10:26AM | 20 | me that I was pregnant with a little boy.  That one stuck |
| 10:26AM | 21 | out the most to me because I actually knew the gender of |
| 10:26AM | 22 | the baby.  I actually knew -- okay, this is not just me |
| 10:26AM | 23 | bleeding on my bedroom floor and me calling my mom and |
| 10:26AM | 24 | telling her, hey, something is not right.  It means I |
| 10:26AM | 25 | just said, hey, this is just me laying on the floor.  I |

Trial witness 04/12/2023
Direct Examination by Mr. Wharton

10:26AM  1  actually had a kid and I actually knew the sex of my

10:26AM  2  child.  So, for me, that stuck out the most and he sat

10:26AM  3  there and he held my hand during that whole process.  So

10:26AM  4  the abortions were hard.

10:26AM  5        It put -- everybody -- everybody thought, well,

10:26AM  6  Tina has everything.  Tina is spoiled.  Tina gets

10:26AM  7  whatever she wants.  But Tina was the meanest kid that

10:27AM  8  you could ever run into.  Tina was a bully.  Tina was

10:27AM  9  hurting inside because everybody that Tina turned to,

10:27AM  10  nobody believed me.

10:27AM  11        So, after awhile, you just learn to shut up and

10:27AM  12  you deal with it.  You put on that fake smile and you

10:27AM  13  just roll with the punches.  Then you wonder why your

10:27AM  14  mother hates you.

10:27AM  15     Q.  Can you describe the room you were in when Jacob

10:27AM  16  was there with you for that abortion?

10:27AM  17     A.  He sat in the corner.  It was a white room just

10:27AM  18  like any OB/GYN.  White room.  The doctor, he was a white

10:27AM  19  guy, bald head.  He had a beard.

10:27AM  20        I remember his head.  He wasn't just bald where

10:27AM  21  you know you could see his hair trying to grow back.  He

10:28AM  22  had a clean, waxy-type cut to it.  I say the doctor

10:28AM  23  probably was maybe 5' 11".  He wasn't quite six foot

10:28AM  24  tall.  He wasn't fat but he was kind of medium built.

10:28AM  25        This doctor gave -- besides the abortion that I

Direct Examination by Mr. Wharton

10:28AM   1   came to Dallas to have, he gave me every one of my

10:28AM   2   abortions after this -- after the one in Dallas.

10:28AM   3                  THE COURT:  How old were you?

10:28AM   4                  THE WITNESS:  When I had the abortion?

10:28AM   5   The first one, I was 11.  The first miscarriage I was 11.

10:28AM   6   The second miscarriage I was 12.  Second abortion I was

10:28AM   7   12.

10:28AM   8                  I had literally had an abortion every year

10:28AM   9   up until the age of 14, when that same doctor told them I

10:28AM   10  cannot give this kid another abortion.

10:28AM   11      Q.   (By Mr. Wharton)  And I believe I misspoke

10:28AM   12  earlier and said that you were 12 when you were pregnant

10:28AM   13  with Jaquita.  How old were you when you were pregnant

10:28AM   14  with Jaquita?

10:28AM   15      A.   I got pregnant with Jaquita October the 14th.

10:29AM   16  And the reason I know I got pregnant with Jaquita October

10:29AM   17  the 14th is because that is my aunt's birthday.  On that

10:29AM   18  particular night --

10:29AM   19      Q.   Hold on.  How old were you?

10:29AM   20      A.   I got pregnant when I was 14 and I had her when

10:29AM   21  I was 15.

10:29AM   22      Q.   And so tell me about the night that happened.

10:29AM   23      A.   On that particular night, it was my first time

10:29AM   24  ever, you know, ever trying to cook.  I cooked a steak

10:29AM   25  that was not the best steak in the world.  It was

Direct Examination by Mr. Wharton

10:29AM   1   basically raw.  Jacob had told me that my mom had went to

10:29AM   2   go check on my aunt because she was in the hospital.

10:29AM   3   That's the story he had told me at that time.  They were

10:29AM   4   actually going out to eat for my aunt's birthday.

10:29AM   5          Jacob then, he started touching me, had sex

10:29AM   6   with me, and then he got up and he said, well, now I have

10:29AM   7   to go meet your mom and check on your Aunt Maime and he

10:29AM   8   left.  He left the house.  Because my mom wasn't there

10:30AM   9   that night.

10:30AM  10      Q.   Can you tell me are there any other incidents

10:30AM  11   that really stick out in your mind in terms of just the

10:30AM  12   details of what occurred?

10:30AM  13      A.   That was basically how I remember that night.

10:30AM  14      Q.   Okay.  Are there any other incidents, any other

10:30AM  15   nights, that really stick out in your memory?

10:30AM  16      A.   He would just basically try to wait until my

10:30AM  17   mom went to work.  She worked in the cafeteria at Lamar

10:30AM  18   Elementary.  And whenever she would leave for work, he

10:30AM  19   would come in my room.  He was the one responsible for

10:30AM  20   taking me to and from school.  Sometimes I would ride the

10:30AM  21   school bus, but majority of the time Jacob took me to

10:30AM  22   school.

10:30AM  23      Q.   How did Jacob avoid prosecution for this?

10:31AM  24      A.   One of the reasons is because I remember when I

10:31AM  25   was in the sixth grade, I went to Dr. McAffee (phonetic).

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:31AM | 1 | He was the school principal at Peace Elementary.  Me and |
| 10:31AM | 2 | my mom had -- me and my mom, growing up, we didn't have |
| 10:31AM | 3 | the best relationship.  She was very abusive as well. |
| 10:31AM | 4 | I told Dr. McAffee.  Dr. McAffee then told me, |
| 10:31AM | 5 | he said -- he went -- he got out of his office and he |
| 10:31AM | 6 | went in where the main part of the office was and he told |
| 10:31AM | 7 | them, he said, don't believe nothing this child has to |
| 10:31AM | 8 | say.  Her mother says she's a compulsive liar. |
| 10:31AM | 9 | I even told my grandmother at one time.  She |
| 10:31AM | 10 | told me, Honey, don't you love seeing your mom happy? |
| 10:31AM | 11 | One time I did lie to my mom and I told her |
| 10:32AM | 12 | that it was a guy in a park that touched me.  Then she |
| 10:32AM | 13 | drove me -- it was me, her, and my Aunt Othalene was |
| 10:32AM | 14 | driving us around Emerson Elementary looking for that |
| 10:32AM | 15 | guy. |
| 10:32AM | 16 | She took me back home and she said, I'm gonna |
| 10:32AM | 17 | beat the hell out of you if you don't tell me the truth. |
| 10:32AM | 18 | Jacob was sitting right there and I told her. |
| 10:32AM | 19 | I said, it's no guy, it's actually Jacob. |
| 10:32AM | 20 | My mom -- we stayed in between Midland and |
| 10:32AM | 21 | Odessa.  My mom beat me all the way to my grandmother's |
| 10:32AM | 22 | house and told me that I was lying.  Told me that I was |
| 10:32AM | 23 | trying to ruin her relationship. |
| 10:32AM | 24 | Even as an adult, when we moved to DeSoto, the |
| 10:32AM | 25 | conversation came back up and she told me, I don't care |

Direct Examination by Mr. Wharton

10:32AM  1    about what happened.  I am never going to leave him, so

10:32AM  2    just deal with it.

10:32AM  3           When you have somebody like that and nobody

10:32AM  4    believes you, you learn to shut up.  You learn to be

10:32AM  5    quiet.

10:33AM  6        Q.   Okay.  Did your father know?

10:33AM  7        A.   I don't know.  I can't -- I can't just answer

10:33AM  8    that, but I do know that his ex-wife, she was very vocal

10:33AM  9    about it.  She went to CPS about it.  She told me she

10:33AM 10    went to CPS about it.

10:33AM 11           But at the time her story that when she went to

10:33AM 12    CPS, it wasn't about me.  It was about my daughter,

10:33AM 13    Jaquita.  So I wasn't -- I was more upset with her by

10:33AM 14    saying that I touched my daughter.  And I was like, no,

10:33AM 15    this is not -- this is not -- this is not the truth.

10:33AM 16        Q.   And what is her name?

10:33AM 17        A.   My step-mom?

10:33AM 18        Q.   Yes.

10:33AM 19        A.   Sharon Jackson.

10:33AM 20        Q.   Okay.  Sharon Jackson George?

10:33AM 21        A.   Yes.

10:33AM 22        Q.   Okay.  We have her deposition.

10:33AM 23        A.   Uh-huh.

10:33AM 24        Q.   Your father, what is his name?

10:33AM 25        A.   Gerald Miller.

10:33AM   1        Q.    And your brother, what is his name?

10:34AM   2        A.    Gerald Wilson, Junior.

10:34AM   3        Q.    Gerald Miller, Junior?

10:34AM   4        A.    No.  My brother has -- we don't have our

10:34AM   5    father's last name.  We have our mom's last name.

10:34AM   6        Q.    So he goes by Gerald Wilson, Junior?

10:34AM   7        A.    Yes.

10:34AM   8        Q.    When the defense lawyer was talking about you

10:34AM   9    demanding a house, do you know what he's referring to?

10:34AM   10       A.    Back when we were staying in Midland, if you

10:34AM   11   know me I'm not -- before I met my husband, I wasn't good

10:34AM   12   at paying nobody's bills.  Jacob then came to me, he

10:34AM   13   said, I'm tired of you getting evicted from apartments.

10:34AM   14   I'm going to build you and the kids a house.  I said,

10:34AM   15   great.  He built that house.  He sold that house.  It was

10:34AM   16   still in his name.  I didn't go to him and I didn't ask

10:34AM   17   him to build me anything.

10:34AM   18       Q.    How old were you when that happened?

10:35AM   19       A.    I'd say around maybe 29, 30 years old.  I'm not

10:35AM   20   really for sure.

10:35AM   21       Q.    All right.  How old are you right now?

10:35AM   22       A.    I am 42.

10:35AM   23       Q.    What is your date of birth?

10:35AM   24       A.    March 26 of 1981.

10:35AM   25       Q.    Tell me about the effect this has had on your

10:35AM  1  life.

10:35AM  2      A.   When I first moved down there, I was -- I've

10:35AM  3  been living in Dallas eight years.  I really thought I

10:35AM  4  was okay.  I really thought I was fine, until you have

10:35AM  5  triggers.

10:35AM  6           You know, I met someone that was basically in

10:35AM  7  the same boat that I was.  And then I started looking at

10:36AM  8  my family.  My cousin Tamika, my uncle Jay, they started

10:36AM  9  asking questions.  Me and my uncle Jay had a conversation

10:36AM  10  before.  He said, I don't know why your mama didn't do

10:36AM  11  nothing; but, niece, you have to get through it.  You

10:36AM  12  have to get over it.

10:36AM  13           And it started a process in my head that I have

10:36AM  14  a whole bunch of hypocrites in my family that are willing

10:36AM  15  to tell me to get over something that they never had to

10:36AM  16  heal from.  I have a bunch of people in my family that

10:36AM  17  are willing to sell me down the drain just so they can be

10:36AM  18  able to borrow money from Jacob.  Just so they can still

10:36AM  19  have their sister in their life.

10:36AM  20           This mentally has not been good for my health,

10:36AM  21  but mentally it has made me stronger.  It has made me be

10:36AM  22  willing to speak up for myself and give other little

10:37AM  23  girls a voice, other little girls that don't have nobody

10:37AM  24  to speak up for them.

10:37AM  25      Q.   Tell me how this has affected you in terms of

Trial - 12/12/2023
Direct Examination by Mr. Wharton

10:37AM   1   depression.

10:37AM   2       A.   I have nightmares.  I have most -- most of my

10:37AM   3   nightmares sometimes is about my mom's physical abuse.

10:37AM   4   Sometimes I wake up and I think somebody is touching me

10:37AM   5   when they're not.  I think that every guy that sees me

10:37AM   6   wants to have sex with me, wants to touch me.

10:37AM   7           I feel like sometimes that a lot of my

10:37AM   8   emotional problems I take them out on my husband and I

10:37AM   9   try not to.  I sometimes ask myself why did my mom not

10:37AM   10   stand up for me.  Why did my mama not say, hey, you don't

10:37AM   11   go to parties, you don't go to dances, you don't have a

10:37AM   12   boyfriend.  How are you coming up pregnant?

10:37AM   13           Why didn't my mama stand up for me?  Why wasn't

10:38AM   14   she the mother that I would definitely be for my kids?

10:38AM   15   Why wouldn't she be the mother that I would be for a

10:38AM   16   stranger's kid?  Why did my mother fail me?  Why did that

10:38AM   17   man do that to me?

10:38AM   18       Q.   Does that make you feel worthless or insecure?

10:38AM   19       A.   At this moment, no, it does not.  Before, it

10:38AM   20   did.  I think the whole process of -- from the point that

10:38AM   21   I decided to sue Jacob, that even though we had to go

10:38AM   22   through this process from 2020 to now, I think that God

10:38AM   23   has given me strength for this day.

10:38AM   24           I think that the way I view things and the way

10:38AM   25   I see things are totally different.  I feel like if I

Trial Transcript 12/12/2023
Direct Examination by Mr. Wharton

10:38AM  1   could tap into that little girl, I would tell her to
10:38AM  2   fight.  I would tell her to keep screaming.  I would tell
10:38AM  3   her to keep telling.  I would tell her not to give up.  I
10:38AM  4   would tell her to prosecute.  Go to the police and both
10:39AM  5   prosecute her mother and Jacob.
10:39AM  6       Q.   As far as your internal pain, your discomfort,
10:39AM  7   the daily disruption to your life, how has this
10:39AM  8   affected -- I mean, obviously it occurred so early that
10:39AM  9   it's hard to say what your life would have been like
10:39AM  10  otherwise, but tell me how this has affected your daily
10:39AM  11  life.  How does it affect the way you feel on a daily
10:39AM  12  basis?
10:39AM  13      A.   I used to didn't think God loved me.  Because
10:39AM  14  shortly after I got out of my parents' house, I was a
10:39AM  15  side chick for 13 and a half years because that man was
10:39AM  16  the first man to tell me that I was pretty.  That man was
10:39AM  17  the first man to tell me that he loved me.  So I
10:39AM  18  gravitated to it.  I said okay.  Because I never heard
10:39AM  19  those words before.
10:39AM  20          When you are growing up and either you're being
10:40AM  21  name called or when certain people come -- when Jacob's
10:40AM  22  family came around, my mom turned into a whole different
10:40AM  23  person.  She acted like she didn't like me.
10:40AM  24      Q.   Let's focus on your life after this occurred,
10:40AM  25  the affect this had on you emotionally.

10:40AM  1      A.   I think I traumatized my children.  I think I

10:40AM  2  traumatized my children because every bad thing that

10:40AM  3  happened to me, I thought about that.  I think that I

10:40AM  4  should have got my children out of these peoples' lives.

10:40AM  5  I think I should have ran away with my children and not

10:40AM  6  allowed them to see their mother in that state.

10:40AM  7         I think I should have been strong enough -- I

10:40AM  8  wish I could have been strong enough for my children

10:40AM  9  even -- especially my oldest daughter and took her away

10:40AM  10  from them where they didn't have to raise her, and said

10:40AM  11  just because this happened to me, doesn't mean that I

10:40AM  12  have to continue to be a victim and be victimized by it.

10:41AM  13         It doesn't mean that because the rest of my

10:41AM  14  family are going -- every event that we have is literally

10:41AM  15  at their house.  So I should have learned how to separate

10:41AM  16  myself from them and become my own person instead of

10:41AM  17  living a lie.

10:41AM  18      Q.   And here what I am asking you is about your

10:41AM  19  personal feelings from this, not -- you know, these

10:41AM  20  questions aren't really -- this part isn't for, you know,

10:41AM  21  how you could have lived your life differently or the

10:41AM  22  regrets and all that.  I'm looking for just your personal

10:41AM  23  anguish.

10:41AM  24         Obviously, you're crying here today, right?

10:41AM  25      A.   Uh-huh.

Transcript of 12/12/2023
Direct Examination by Mr. Wharton

10:41AM  1      Q.    Have you cried before about this?

10:41AM  2      A.    Yes.

10:41AM  3      Q.    Okay.  How often were you crying?

10:41AM  4      A.    Several times.  Several times.  It was times

10:41AM  5  where I couldn't go to sleep because I was asking myself

10:41AM  6  why.  It was times where I thought what could I have done

10:42AM  7  different to be that perfect little girl.

10:42AM  8            It was times where I asked myself what was

10:42AM  9  wrong with me.  What made a person want to do this to me.

10:42AM 10  Why didn't nobody stand up for me.  Why didn't my mama

10:42AM 11  come hold me and tell me that it was going to be okay,

10:42AM 12  that that man is not going to touch you no more.

10:42AM 13            And I really can't answer that question because

10:42AM 14  every time I look back at it, if you know me, if you know

10:42AM 15  the essence of me, Tina is the most forgiving and loving

10:42AM 16  person ever.

10:42AM 17            Yes, I can be mean.  Yes, I can be a little

10:42AM 18  dramatic.  But all I wanted was them two people to love

10:42AM 19  me.  I didn't care about how much money he got.  I don't

10:42AM 20  care about the cars he drive.  All I wanted was them two

10:43AM 21  people to love me, especially my mama.

10:43AM 22      Q.    Did you suffer on a daily basis from these

10:43AM 23  feelings?

10:43AM 24      A.    Excuse me.  I'm sorry.

10:43AM 25      Q.    Have you suffered on a daily basis from these

Direct Examination by Mr. Wharton

10:43AM   1   feelings?

10:43AM   2        A.   Yes, I have.

10:43AM   3        Q.   Okay.  Since it occurred until now, obviously?

10:43AM   4        A.   Yes.

10:43AM   5        Q.   And there's no -- I mean, obviously, you've done

10:43AM   6   some counseling and so forth, right?

10:43AM   7        A.   Yes.

10:43AM   8        Q.   Has it helped at all?

10:43AM   9        A.   Yes, it has.  It has helped a lot.

10:43AM  10        Q.   You are still obviously having these feelings,

10:43AM  11   right?

10:43AM  12        A.   Yes, I do.  I just -- I believe that when you

10:43AM  13   go through something like that, when you think you are

10:43AM  14   over it, something can trigger it.  When you think you

10:44AM  15   are over it, you can hear somebody else's story or watch

10:44AM  16   the wrong movie and you can think that, hey, that

10:44AM  17   happened to me.

10:44AM  18            And if you've ever watched the movie Precious

10:44AM  19   or the movie, Tyler Perry, Family Reunion, you have

10:44AM  20   watched my life.  Because that was my life.

10:44AM  21            Imagine your mother being completely jealous of

10:44AM  22   you.  Imagine your mother hating you.  Imagine a man ten

10:44AM  23   times bigger than you on top of you and there's nothing

10:44AM  24   you can do about it.  So you just learn to lay there.

10:44AM  25        Q.   How old -- by the way, how old is Jacob?

Direct Examination by Mr. Wharton

10:44AM  1        A.   I want to say he might be 65.  I'm not for

10:44AM  2   sure.  I know he's in his 60s.

10:45AM  3        Q.   Were you familiar with the incident with Gerald

10:45AM  4   Wilson, Junior, where he ended up running away bloody from

10:45AM  5   the house?

10:45AM  6        A.   Yes.

10:45AM  7        Q.   Tell me about that incident.

10:45AM  8        A.   Because he walked in on Jacob on top of me.

10:45AM  9   Himself and Jacob had words.  My brother is very

10:45AM 10   overprotective of me.  My brother doesn't like anybody to

10:45AM 11   touch me.  My brother doesn't like anybody -- if you --

10:45AM 12   my brother -- at the time he was a big kid.  And he's

10:45AM 13   very strong and he can get very violent.

10:45AM 14            And when that happened, guns were pulled and my

10:45AM 15   brother ran across the street.  We were all looking for

10:45AM 16   him.  We were all in front of the house.  Because we

10:45AM 17   lived in the country.  From our house to the mailbox

10:45AM 18   seemed like 3 miles.  You see what I am saying?

10:45AM 19            So, from our house to the city limits, if you

10:46AM 20   walk, you are going to be walking for like five or six

10:46AM 21   hours.

10:46AM 22            So he went across the street.  And I remember

10:46AM 23   the neighbor across the street leaving, but we don't talk

10:46AM 24   to that guy, we didn't know if my brother was in that car

10:46AM 25   and he's the one who took my brother to my Aunt Brenda's

Trial Wilson 12/12/2023
Direct Examination by Mr. Wharton

10:46AM  1   house and that's how that happened.

10:46AM  2       Q.   All right.  Is there anything -- any other major

10:46AM  3   memories that you have about the abuse itself?

10:47AM  4       A.   I have -- a lot of it comes from -- when I

10:47AM  5   would tell Jacob no and I would fight against him, he

10:47AM  6   would make up a story to my mom, and I would get beat

10:47AM  7   when she came home.

10:47AM  8           I still have a scar on my forehead where she

10:47AM  9   hit me upside my head with a skillet.  When I would defy

10:47AM 10   Jacob, he would make sure that my mom beat me.

10:47AM 11           If I gave in and I gave him what he wanted,

10:47AM 12   Tina had jewelry, Tina had the nicest clothes.  I had

10:47AM 13   every, every pair of shoes to match the outfit.  I had

10:47AM 14   everything until I decided to move out.

10:47AM 15       Q.   And when did that happen?

10:47AM 16       A.   When I was around 20, 21 years old.

10:47AM 17       Q.   And what happened then?

10:48AM 18       A.   Jacob started -- he would -- with Corey Haynes,

10:48AM 19   one night Corey, like I said, he had a girlfriend.  He

10:48AM 20   wasn't supposed to be spending the night at my house.

10:48AM 21   But he ended up spending the night at my house, and the

10:48AM 22   next morning he woke up and there was a bra in his car.

10:48AM 23           Jacob even went so far as to tell Corey's

10:48AM 24   girlfriend that me and Corey was messing around.  Jacob

10:48AM 25   told -- he actually started crying to me telling me how I

10:48AM  1   broke his heart and how he wished that I would move back

10:48AM  2   in.

10:48AM  3          And I think that over the years he finally just

10:48AM  4   got over it.  I'm not going to say that from that point

10:48AM  5   to this point -- I actually -- I've asked Jacob several

10:48AM  6   times for an apology.  I asked Jacob for -- I told him

10:48AM  7   all I want from you is an apology.

10:49AM  8          Before I decided to sue Jacob, I called Jacob.

10:49AM  9   And at that time I wasn't even welcome at their house

10:49AM 10   because me and my mom had got into it.  She told me the

10:49AM 11   furthest I could come was to that gate.

10:49AM 12          And he said, I don't know why you can't --

10:49AM 13   actually, I was calling him to check on my oldest

10:49AM 14   daughter.  She didn't answer her phone and she was

10:49AM 15   staying with them at the time.  And I asked him, I said,

10:49AM 16   is Jaquita there?  He said, yeah, she's in her room,

10:49AM 17   she's working.  He said, why don't you come over and see

10:49AM 18   her?  I said, no, because I was told not to come back

10:49AM 19   over there.

10:49AM 20          And the statement, he said, I don't know what's

10:49AM 21   going on with you and your mama.  Your family say that

10:49AM 22   you've always been like this.  And I asked him, I said,

10:49AM 23   you don't know why?  And he said, no, tell me.  I said,

10:49AM 24   it's because of you.  I said, it's because of what you

10:49AM 25   did.  And he hung up in my face.

Trial witness 12/2023
Direct Examination by Mr. Wharton

10:49AM  1          And in that moment, all of those feelings came

10:49AM  2  rushing back.  I felt like he was telling me that I

10:50AM  3  deserved it.  I felt like for years that I have to

10:50AM  4  forgive two people that never had the audacity to tell me

10:50AM  5  that they're sorry.

10:50AM  6          And I am tired of forgiving people, two people

10:50AM  7  that I loved the most, because I don't hate Jacob, I

10:50AM  8  don't.  I actually love the guy because he has helped me

10:50AM  9  with my children.  He has done things for me.  All I

10:50AM  10  asked him for was an apology, a genuine, sincere apology

10:50AM  11  and all of us go to counseling and we fix the dysfunction

10:50AM  12  in our relationship.

10:50AM  13          This is bigger than me.  This is about breaking

10:50AM  14  generational curses.  This is about showing my children

10:50AM  15  that they finally get to see their mother happy.  And

10:50AM  16  this is about making people take accountability for what

10:50AM  17  they have done to me.

10:50AM  18                  THE COURT:  Can I ask a question?

10:50AM  19                  MR. WHARTON:  Yes, Your Honor.

10:50AM  20                  THE COURT:  So you're saying that Jaquita

10:51AM  21  lives with him.

10:51AM  22                  THE WITNESS:  Not anymore.  She's 27 years

10:51AM  23  old.  She has her own apartment.  At that time when I did

10:51AM  24  call Jacob and ask him about -- when me and him had that

10:51AM  25  conversation, yes, she was staying there with him.

Direct Examination by Mr. Wharton

10:51AM  1              THE COURT:  How many years did she live

10:51AM  2  with him?

10:51AM  3              THE WITNESS:  They raised Jaquita.

10:51AM  4              THE COURT:  Okay.  And so you are saying

10:51AM  5  you were sexually abused but you left your daughter in

10:51AM  6  the house with them?

10:51AM  7              THE WITNESS:  Yes, I did.

10:51AM  8              THE COURT:  Okay.

10:51AM  9              Keep going.

10:51AM  10     Q.   (By Mr. Wharton)  And has Jaquita ever had a

10:51AM  11  paternity test, DNA test?

10:51AM  12     A.   No.

10:51AM  13     Q.   All right.  And based on your understanding, is

10:51AM  14  it now impossible to force a DNA test?

10:51AM  15     A.   When it comes to this case, I really just want

10:51AM  16  my kids to stay out of it.  I've asked that from day one.

10:52AM  17  Me and my daughter Jaquita just recently just started

10:52AM  18  talking again because of this case.

10:52AM  19     Q.   Do you know whether or not you can force Jaquita

10:52AM  20  as an adult --

10:52AM  21     A.   I don't want to.

10:52AM  22     Q.   I understand you don't want to now, but do you

10:52AM  23  know can you force --

10:52AM  24     A.   No, I can't.  She's an adult.  I can't force

10:52AM  25  her to do anything she doesn't want to do.

10:52AM   1          Q.   All right.  And obviously Jaquita has struggled

10:52AM   2     with this fact about her life, right?

10:52AM   3          A.   Yes, she has.

10:52AM   4          Q.   All right.  And how did she respond to it?

10:52AM   5          A.   Jaquita was very angry.  Jaquita, she called me

10:52AM   6     when I guess Jacob showed her the letter that you had

10:52AM   7     sent to him.  She called me and she was very angry.  She

10:52AM   8     told me that -- go ahead.

10:52AM   9          Q.   I'm sorry to interrupt.  When I sent a letter to

10:52AM  10     Jacob about this, Jaquita responded?

10:52AM  11          A.   Yes.

10:53AM  12               THE COURT:  Can we clarify what the letter

10:53AM  13     said?

10:53AM  14               THE WITNESS:  It was a letter saying that

10:53AM  15     I was suing Jacob.  The letter, I guess, that my attorney

10:53AM  16     sent to Jacob about him being sued.

10:53AM  17               THE COURT:  Was she ever told that he was

10:53AM  18     her father supposedly?

10:53AM  19               THE WITNESS:  Yes, she's been told that,

10:53AM  20     yes, ma'am.  I told Jaquita that when she was I want to

10:53AM  21     say 11 years old, when she came to me and she asked me

10:53AM  22     why does other kids have a dad and not me.

10:53AM  23               I had never went -- I don't feel like I

10:53AM  24     should ever go into full detail with my children about

10:53AM  25     what I just spoke about in this court, but I did tell

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:53AM | 1 | Jaquita how I got pregnant with her. |
| 10:53AM | 2 | THE COURT:  You may proceed. |
| 10:53AM | 3 | Q.   (By Mr. Wharton)  So the letter to Jacob ended |
| 10:53AM | 4 | up in Jaquita's hands? |
| 10:53AM | 5 | A.   He showed it to her, because he said is this |
| 10:53AM | 6 | some type of joke?  This is -- her telling me this, is |
| 10:53AM | 7 | this some type of joke?  Call your mom and see if she |
| 10:54AM | 8 | being funny. |
| 10:54AM | 9 | Q.   And so you were -- I interrupted you earlier. |
| 10:54AM | 10 | You can go on.  What were you saying about your |
| 10:54AM | 11 | conversation with Jaquita? |
| 10:54AM | 12 | A.   Oh, when she called me she was very angry.  She |
| 10:54AM | 13 | told me that, if I pursue this case, she wasn't never |
| 10:54AM | 14 | going to talk to me again. |
| 10:54AM | 15 | MR. MADUFORO:  Your Honor, I would object |
| 10:54AM | 16 | to that as hearsay. |
| 10:54AM | 17 | THE COURT:  Sustained. |
| 10:54AM | 18 | Q.   (By Mr. Wharton)  But at this point you are |
| 10:54AM | 19 | talking to Jaquita.  Without going into what you said, you |
| 10:54AM | 20 | are talking with Jaquita? |
| 10:54AM | 21 | A.   Yes. |
| 10:54AM | 22 | Q.   Has anyone ever acknowledged her -- or claimed |
| 10:54AM | 23 | her paternity of her? |
| 10:54AM | 24 | A.   Jacob has. |
| 10:54AM | 25 | Q.   And how did he do that? |

10:54AM  1        A.   Like me and him have had conversations about

10:54AM  2   it.  He knows that he's her father.

10:55AM  3        Q.   And how old were you when Jacob and your mother

10:55AM  4   were raising Jaquita as their child, basically?

10:55AM  5        A.   I was 15.  I was still living in their house.

10:55AM  6   I was a minor.

10:55AM  7        Q.   When you left, why did you not take Jaquita with

10:55AM  8   you?

10:55AM  9        A.   Because he told me he would take custody of my

10:55AM 10   daughter from me.  And I don't have money.  I didn't have

10:55AM 11   money at all.  He told me that this was the best place

10:55AM 12   and that he would take me to court.

10:55AM 13        Q.   As far as you're aware, has Jacob ever abused

10:55AM 14   Jaquita?

10:55AM 15        A.   No.

10:55AM 16        Q.   Did you have a concern that Jacob was going to

10:55AM 17   abuse Jaquita?

10:55AM 18        A.   I've asked all three of my children before on a

10:55AM 19   regular basis has he ever touched them.  They all said

10:56AM 20   no.  I sat down and I talked to them and I asked them.

10:56AM 21   You know, they said no.  They all -- at one point they

10:56AM 22   all laughed at me and said my papa wouldn't do nothing

10:56AM 23   like that to us, mama.  We understand what he did to you.

10:56AM 24   Our papa wouldn't touch us like that.

10:56AM 25                  MR. WHARTON:  All right.  Pass the

| | | |
|---|---|---|
| 10:56AM | 1 | witness. |
| 10:56AM | 2 | THE COURT:  Counsel?  Mr. Maduforo? |
| 10:56AM | 3 | MR. MADUFORO:  Thank you, Judge. |
| 10:56AM | 4 | THE COURT:  Actually, let's take a few |
| 10:56AM | 5 | minutes break, if anybody needs to go to the rest room or |
| 10:56AM | 6 | anything.  If you want to step down and take a break, |
| 10:56AM | 7 | ma'am. |
| 10:56AM | 8 | MR. WHARTON:  Yes, Your Honor. |
| 10:56AM | 9 | (Recess taken.) |
| 10:56AM | 10 | CROSS-EXAMINATION |
| 10:56AM | 11 | BY MR. MADUFORO: |
| 11:12AM | 12 | Q.   Ms. Wilson, just a few questions to clarify your |
| 11:12AM | 13 | initial testimony, okay. |
| 11:12AM | 14 | You did testify that Mr. Cannon, Jacob, abused |
| 11:12AM | 15 | you.  When was the first time that this happened? |
| 11:12AM | 16 | A.   Around the age of nine or ten. |
| 11:12AM | 17 | Q.   Around the age of nine? |
| 11:12AM | 18 | A.   Or ten. |
| 11:12AM | 19 | Q.   Okay.  Or ten, okay. |
| 11:12AM | 20 | And tell the Court who all was living in the |
| 11:12AM | 21 | house then. |
| 11:12AM | 22 | A.   Me, my mom, and Jacob. |
| 11:12AM | 23 | Q.   And you say you got pregnant the first time at |
| 11:12AM | 24 | what age? |
| 11:12AM | 25 | A.   Eleven. |

11:12AM   1        Q.   Eleven years old.  And you had an abortion or

11:12AM   2   miscarriage?

11:12AM   3        A.   I had a miscarriage.

11:12AM   4        Q.   You had a miscarriage.

11:12AM   5             And who took you to abort the baby?

11:12AM   6        A.   My mom and Jacob.

11:13AM   7                  THE COURT:  Who took you what?

11:13AM   8                  MR. MADUFORO:  Who took you to abort the

11:13AM   9   child?

11:13AM  10                  THE COURT:  Well, she said she had a

11:13AM  11   miscarriage.

11:13AM  12                  THE WITNESS:  The first time I had -- when

11:13AM  13   I was 11 --

11:13AM  14                  THE COURT:  Hold on.

11:13AM  15                  MR. MADUFORO:  I'll withdraw that

11:13AM  16   question.

11:13AM  17        Q.   (By Mr. Maduforo)  So you had a miscarriage

11:13AM  18   around 11?

11:13AM  19        A.   Uh-huh.

11:13AM  20        Q.   Okay.  And you had abortion when?

11:13AM  21        A.   At the same age, 11.

11:13AM  22        Q.   Eleven.  Okay.  Now the question then is who

11:13AM  23   took you to abort that baby?

11:13AM  24        A.   Every abortion I was taken to was by my mom and

11:13AM  25   Jacob.

Cross-Examination by Mr. Maduforo

```
11:13AM   1        Q.   How many abortions have you had?

11:13AM   2        A.   Four to five abortions and two miscarriages.

11:13AM   3        Q.   Four to five abortions?

11:13AM   4        A.   Yes.

11:13AM   5        Q.   Okay.

11:13AM   6        A.   And two miscarriages.

11:13AM   7        Q.   Do you recall the place that they took you to?

11:13AM   8        A.   The miscarriages, when I had my first

11:13AM   9   miscarriage, I was actually bleeding on my bedroom floor.

11:13AM  10   My mom came in.  That was the first time she -- the first

11:13AM  11   time when I had the miscarriage she was initially

11:14AM  12   concerned.  After that, she -- it was during the custody

11:14AM  13   battle with my dad and --

11:14AM  14              THE COURT:  Ma'am, he asked you where did

11:14AM  15   they take you.

11:14AM  16              THE WITNESS:  The first time I had my

11:14AM  17   first initial abortion was here in Dallas County.  The

11:14AM  18   other ones were in Odessa, Texas.

11:14AM  19        Q.   (By Mr. Maduforo)  Okay.  And where were you

11:14AM  20   living then?

11:14AM  21        A.   With my -- with Jacob and my mom.

11:14AM  22        Q.   Where?

11:14AM  23        A.   In their house.

11:14AM  24        Q.   I know in the house.  What city?

11:14AM  25        A.   In Midland, Texas.
```

11:14AM 1     Q.    Okay.  So in Midland, Texas, they brought you

11:14AM 2  down to Dallas for the abortion?

11:14AM 3     A.    Uh-huh.

11:15AM 4     Q.    And when you had the miscarriage, do you recall

11:14AM 5  your parents then taking you to see a doctor out of

11:14AM 6  concern?

11:14AM 7     A.    What do you mean a doctor out of consent?

11:14AM 8     Q.    You had a miscarriage.  You were bleeding.

11:14AM 9     A.    The first miscarriage, I was taken to Midland

11:14AM 10 Memorial Hospital.

11:14AM 11            MR. WHARTON:  He said "concern" by the

11:14AM 12 way.  He said "out of concern."

11:14AM 13            THE WITNESS:  Like, I'm not understanding

11:14AM 14 what you are saying.

11:15AM 15            THE COURT:  Ma'am, the question was when

11:15AM 16 you had a miscarriage, where did you go.  You said

11:15AM 17 Midland Memorial Hospital.

11:15AM 18            Okay.  Ask another question, please.

11:15AM 19            MR. MADUFORO:  Thank you, Judge.

11:15AM 20    Q.    (By Mr. Maduforo)  Now, did your mom report this

11:15AM 21 issue to the police?

11:15AM 22    A.    No, she did not.

11:15AM 23    Q.    Did she make any report to the CPS?

11:15AM 24    A.    No, she did not.

11:15AM 25    Q.    Did she make any report to your teacher, your

11:15AM   1   principal, your priest by any chance?

11:15AM   2       A.   The only thing she told my principal was that I

11:15AM   3   was a compulsive liar.

11:15AM   4                 MR. MADUFORO:  Objection, Your Honor,

11:15AM   5   nonresponsive.

11:15AM   6                 THE COURT:  Okay.  It's overruled.  He

11:15AM   7   asked her did your mom tell the police.

11:15AM   8                 THE WITNESS:  No.

11:15AM   9                 THE COURT:  Can I ask a question?

11:15AM   10                 MR. MADUFORO:  Yes, Your Honor.

11:15AM   11                 THE COURT:  So, ma'am, you went to a

11:15AM   12   hospital.  Did anybody call CPS from the hospital?

11:15AM   13                 THE WITNESS:  No, ma'am.

11:16AM   14                 THE COURT:  Okay.  Keep going.

11:16AM   15                 MR. MADUFORO:  Thank you.

11:16AM   16       Q.   (By Mr. Maduforo)  And just a few questions

11:16AM   17   regarding when the actual time this started.  You said

11:16AM   18   your mom worked then at the school district?

11:16AM   19       A.   She worked at the school district, yes.

11:16AM   20       Q.   Do you recall what school or what district

11:16AM   21   office she worked at?

11:16AM   22       A.   She worked at Lamar Elementary in the

11:16AM   23   cafeteria.

11:16AM   24       Q.   Okay, in the cafeteria.  What time did she go to

11:16AM   25   work?

11:16AM  1        A.   She would leave around 5:30 or 6 in the
11:16AM  2   morning.
11:16AM  3        Q.   And is that the same elementary school you go
11:16AM  4   to?
11:16AM  5        A.   I did not attend Lamar Elementary.
11:16AM  6        Q.   That's not the same elementary school?
11:16AM  7        A.   No, I did not attend that school.
11:16AM  8        Q.   Okay.  And what time would you go to school at
11:16AM  9   that point?
11:16AM 10        A.   I would have to be at school at around, I would
11:16AM 11   say, 8:30, 8 o'clock.  I'm not really for sure.
11:16AM 12        Q.   Is that 8:30 or are you not really for sure?
11:17AM 13        A.   It was around the 8 o'clock hour.
11:17AM 14        Q.   Then you lived with Mr. Cannon and your mom up
11:17AM 15   until what age?
11:17AM 16        A.   Until I moved out.  I was, I want to say,
11:17AM 17   around 20.
11:17AM 18        Q.   Did you have any other child or children before
11:17AM 19   you moved out?
11:17AM 20        A.   No.  I had my son after I moved out.
11:17AM 21        Q.   And did you move back in afterwards?
11:17AM 22        A.   I did my six weeks of post partum at their
11:17AM 23   house.  Yes, I did.
11:17AM 24        Q.   Okay.  And you were taken care of by your
11:17AM 25   parents?

Cross-Examination by Mr. Maduforo

11:17AM   1       A.    What do you mean taken care of?

11:17AM   2       Q.    You did your post partum at their house.

11:17AM   3       A.    Yes, because I had a C-section.

11:17AM   4       Q.    Okay.  And your mom was helping you then?

11:17AM   5       A.    Yes.

11:17AM   6       Q.    Was Jacob helping you at that point also?

11:17AM   7       A.    No.

11:18AM   8       Q.    Okay.  Let's go back to where you have lived.

11:18AM   9  Take me back to where you have lived in the past 10 years.

11:18AM  10  Have you, by chance, lived with Mr. Cannon and your mom in

11:18AM  11  the past 10 years?

11:18AM  12       A.    Yes, I did.

11:18AM  13       Q.    When was the last time you actually moved out of

11:18AM  14  their house?

11:18AM  15       A.    When I first moved to Dallas County, I had a

11:18AM  16  hysterectomy and they had sent for my youngest daughter

11:18AM  17  because I couldn't -- when I had the hysterectomy, the

11:18AM  18  doctor cut my kidney.  I didn't work for two years.

11:18AM  19           So I didn't want to just send all three of my

11:18AM  20  kids down here.  I did move in with them.  I stayed with

11:18AM  21  them maybe up until my mom put me out, maybe I'd say

11:18AM  22  about three months.

11:18AM  23           After that, I lived in my car until my

11:18AM  24  boyfriend found out and he told me to come stay with him.

11:18AM  25  And I been -- I been with my now husband ever since then.

11:19AM   1   And I've been living in Dallas for the past eight years.

11:19AM   2        Q.   So are you saying that the past eight years,

11:19AM   3   that's the last time you lived with them?

11:19AM   4        A.   Yes.

11:19AM   5        Q.   Okay.  And does any of your children live --

11:19AM   6   apart from Jaquita, does any of your other children live

11:19AM   7   with your parents?

11:19AM   8        A.   Yes.

11:19AM   9        Q.   What is the name of --

11:19AM  10        A.   Mark and Iceland.

11:19AM  11        Q.   Mark and Iceland.  Two of your children live

11:19AM  12   currently with them?

11:19AM  13        A.   Yes.

11:19AM  14        Q.   So they raised those children?

11:19AM  15        A.   No.  My son is an adult.  My son is 21 years

11:19AM  16   old.  He is not a minor.  Iceland just graduated out of

11:19AM  17   school.  Iceland moved in with them because Iceland got

11:19AM  18   in trouble.  I told Iceland she can come back home.  She

11:19AM  19   did not want to come back home.  I have repeatedly told

11:19AM  20   Iceland to come back home because of the way that they

11:19AM  21   treat her at their house.

11:19AM  22            And so Iceland is the one who refuses to come

11:19AM  23   back home.  It's not because I put my children out or

11:19AM  24   that I could not take care of my children.  She is the

11:20AM  25   one who refused to come back home.  She's 18.

11:20AM  1      Q.   Okay.  And when was the first time, the initial

11:20AM  2  time she started living with the Cannons, how old was

11:20AM  3  Iceland and Mark?

11:20AM  4      A.   Mark -- okay, mark moved down here with them

11:20AM  5  when they came and they asked me because Mark was getting

11:20AM  6  in a lot of trouble at school and --

11:20AM  7               MR. MADUFORO:  Objection, Your Honor,

11:20AM  8  nonresponsive.

11:20AM  9               THE COURT:  What was the question?  Hold

11:20AM 10  on.  What was the question?

11:20AM 11      Q.   (By Mr. Maduforo)  The question is how old were

11:20AM 12  those children when the first time they started living

11:20AM 13  with them?

11:20AM 14      A.   Mark was 11 years old.

11:20AM 15      Q.   Okay.

11:20AM 16      A.   And Iceland moved in with them her senior year.

11:20AM 17      Q.   Fifteen, 16?

11:20AM 18      A.   Iceland graduated when she was 18 years old, so

11:20AM 19  it was around 17.

11:20AM 20      Q.   And they still live with them?

11:20AM 21      A.   Uh-huh.

11:20AM 22      Q.   Okay.  All right.

11:20AM 23           And you testified initially that before you

11:21AM 24  filed this lawsuit, you talked to Jacob, correct?

11:21AM 25      A.   Yes.

Cross-Examination by Mr. Maduforo

11:21AM  1        Q.   Okay.  And after this lawsuit have you -- if you
11:21AM  2   recall, have you ever lived with them?  Have you ever gone
11:21AM  3   over there to see them?
11:21AM  4        A.   After this lawsuit?
11:21AM  5        Q.   Yes.
11:21AM  6        A.   No.
11:21AM  7        Q.   You have never been?
11:21AM  8        A.   When I -- I go to their fence to pick up my
11:21AM  9   daughter.  I have to take her something to eat almost on
11:21AM 10   a regular basis.  I pick her up if she has to go to the
11:21AM 11   doctor's appointment.  I pick her up.  If she needs to
11:21AM 12   go -- when she was working, I had to take her to work.
11:21AM 13   That's -- I do not communicate with Jacob.  I do not have
11:21AM 14   any -- I haven't spoken with Jacob.
11:21AM 15                THE COURT:  How old is she?
11:21AM 16                THE WITNESS:  She's 18.
11:21AM 17                THE COURT:  And you have to take food to
11:21AM 18   her and pick her up?
11:21AM 19                THE WITNESS:  Yes, because they won't feed
11:21AM 20   her.
11:21AM 21                THE COURT:  Is she out of school?
11:21AM 22                THE WITNESS:  Yes.  As far as high school,
11:21AM 23   yes, ma'am.
11:21AM 24        Q.   (By Mr. Maduforo)  You just testified that you
11:22AM 25   asked your children if Jacob and your mom were taking care

11:22AM   Page 64 of 205   12/2023

Cross-Examination by Mr. Maduforo

11:22AM  1   of them and the answer was yes.

11:22AM  2        A.   I did not testify to that.  I was asked has he

11:22AM  3   ever touched my children.  That's what I was asked.  I

11:22AM  4   did not testify that -- that they have never taken care

11:22AM  5   of them.  That's what I was asked.

11:22AM  6        Q.   Okay.  So do you trust, then, Jacob and your mom

11:22AM  7   to take care of the children?

11:22AM  8        A.   Do I trust them to take care of my children?

11:22AM  9   In what manner?

11:22AM  10        Q.   In any manner.

11:22AM  11        A.   If I have to take my children food every day

11:22AM  12   and I have to take care of my child, my child just

11:22AM  13   resides with them.  I take care of my daughter.

11:22AM  14        Q.   Okay.  You testified there was an incident

11:22AM  15   involving Gerald Williams?

11:22AM  16        A.   Wilson.

11:22AM  17        Q.   Gerald Wilson.  And who is Gerald Wilson?

11:22AM  18        A.   My brother.

11:22AM  19        Q.   Your brother.  And there was a physical

11:22AM  20   altercation to the point of scratches on Jacob's bottom

11:22AM  21   when he caught Jacob on top of you; is that correct?

11:22AM  22        A.   I did not testify to that.  What I testified

11:22AM  23   was that they had a -- my brother walked in on Jacob and

11:23AM  24   it was a physical altercation.  I never said that it was

11:23AM  25   bruises or anything.  All I said that it was a physical

11:23AM  1    altercation.

11:23AM  2           My brother then walked across the street to the

11:23AM  3    neighbor's house, got in the neighbor's car and the

11:23AM  4    neighbors took him to my Aunt Brenda's house.  That's

11:23AM  5    what I testified.  I never said that there was any

11:23AM  6    bruises.  I never said any of that.

11:23AM  7       Q.   Okay.  So he walked in on Jacob doing what?

11:24AM  8       A.   He was on top of me.

11:23AM  9       Q.   Okay.  All right.  Did he call the cops?

11:23AM  10      A.   No.  He told my dad.

11:23AM  11               THE COURT:  Did you have clothes on or

11:23AM  12   clothes off?

11:23AM  13               THE WITNESS:  No.  My clothes were halfway

11:23AM  14   off.

11:23AM  15      Q.   (By Mr. Maduforo)  Let me ask you this.  You

11:23AM  16   were in that household for some time when all of this

11:23AM  17   alleged abuse was going on.  Do you know who your

11:23AM  18   neighbors were?

11:23AM  19      A.   No, I don't.

11:23AM  20      Q.   Okay.  Do you ever recall a police officer

11:23AM  21   living next door to you guys then?

11:23AM  22      A.   No, they never did.

11:24AM  23      Q.   You never did or they never did?

11:24AM  24      A.   They never did.

11:24AM  25      Q.   Okay.  But -- do you recall how old you were at

Cross-Examination by Mr. Maduforo

```
11:24AM   1   that point?
11:24AM   2        A.   At what point?
11:24AM   3        Q.   At the point -- the very day of the physical
11:24AM   4   altercation --
11:24AM   5        A.   No, I don't.
11:24AM   6        Q.   Okay.  Did you tell anybody else about Jacob
11:24AM   7   abusing you that day and the fact that your brother caught
11:24AM   8   him on top of you, got mad and started fighting with him?
11:24AM   9        A.   No, I did not.
11:24AM  10             THE COURT:  I think guns were pulled.
11:24AM  11             THE WITNESS:  Yes.  Jacob pulled a gun out
11:24AM  12   on my brother.
11:24AM  13        Q.   (By Mr. Maduforo)  I'm sorry.  Gerald Wilson?
11:24AM  14        A.   Gerald Wilson.  Yes, on Gerald.
11:24AM  15        Q.   Yes.  Did you tell anybody about that incident?
11:24AM  16        A.   My mother was there.  I was still -- I was
11:24AM  17   still a minor.  My mother was there.
11:24AM  18        Q.   Okay.  What if anything did your mom did?
11:24AM  19        A.   She didn't do anything.
11:24AM  20        Q.   Okay.  Let me ask you this.  You are a mom,
11:24AM  21   correct?
11:24AM  22        A.   Yes.
11:24AM  23        Q.   You love your children?
11:24AM  24        A.   Very much.
11:25AM  25        Q.   And you come back in the house, you saw -- I
```

11:25AM   1   don't care what man it is, your husband, your kids'

11:25AM   2   stepfather, somebody else, a stranger on top of your

11:25AM   3   children, on top of your daughter, tell me what if

11:25AM   4   anything would you do?

11:25AM   5        A.   I'm speaking for on my behalf, not my mother's,

11:25AM   6   right?

11:25AM   7        Q.   Yes.  You are speaking on your behalf.

11:25AM   8        A.   He would be dead.

11:25AM   9        Q.   He would be dead.  Okay.  All right.

11:25AM   10            Did you ever ask your mom when all of these

11:25AM   11   things were happening, did you for one day -- apparently

11:25AM   12   this happened over a period of time.  Did you for one day

11:25AM   13   ask your mom, mom, why are you not protecting me?

11:25AM   14        A.   Yes, I did.

11:25AM   15        Q.   What, if anything, was said?

11:25AM   16        A.   All my mom told me at one point, we were

11:25AM   17   sitting in the kitchen, she told me that -- it's nothing

11:26AM   18   really that I can do, but I am sorry that you had to go

11:26AM   19   through all those abortions.

11:26AM   20        Q.   Okay.  She never called the police?

11:26AM   21        A.   No.

11:26AM   22        Q.   She never reported it to CPS?

11:26AM   23        A.   No.

11:26AM   24        Q.   She never reported it to any of her relatives?

11:26AM   25        A.   No.

Cross-Examination by Mr. Maduforo

11:26AM 1      Q.   She never confronted Jacob about it?

11:26AM 2      A.   No.

11:26AM 3      Q.   You don't think it's kind of weird?

11:26AM 4      A.   Not -- for her?  I don't know.  You would have

11:26AM 5 to ask her that.  I can't speak for her.

11:26AM 6      Q.   You are familiar with Jacob's house; am I

11:26AM 7 correct?

11:26AM 8      A.   I didn't understand the question.

11:26AM 9      Q.   You are familiar with Jacob's house?

11:26AM 10     A.   Yes.

11:26AM 11     Q.   His current house?

11:26AM 12     A.   Yes.

11:26AM 13     Q.   Does it have cameras in that house?

11:26AM 14     A.   I couldn't tell you what he has in his house.

11:26AM 15     Q.   Would it surprise you by any chance if there's

11:26AM 16 footage of you in that house two days ago?

11:26AM 17     A.   Yeah, it would.

11:26AM 18     Q.   So you are saying you did not go over there --

11:26AM 19     A.   I have not -- like I said, the furthest that I

11:27AM 20 have went over Jacob's house is just the front of his

11:27AM 21 gate and I probably never even get out of my car, not

11:27AM 22 unless I'm handing Iceland her food.

11:27AM 23          I did drop Iceland off -- what is today? --

11:27AM 24 Tuesday after going to -- taking her to Sam's and taking

11:27AM 25 her grocery shopping.  And she got out of the car -- in

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:27AM | 1 | fact, Birdie was behind me, and -- on Monday and on |
| 11:27AM | 2 | Tuesday when I took my child back over there. |
| 11:27AM | 3 | Q.   Let's go back -- I'm sorry.  Let's go back to |
| 11:27AM | 4 | how you were affected by this issue.  Have you sought any |
| 11:27AM | 5 | kind of counseling? |
| 11:27AM | 6 | A.   Yes, I have. |
| 11:27AM | 7 | Q.   Did you submit that to your lawyer? |
| 11:27AM | 8 | A.   I didn't think that I had to. |
| 11:27AM | 9 | Q.   Okay.  Have you shared that with your lawyer? |
| 11:27AM | 10 | A.   Yes, I have. |
| 11:27AM | 11 | Q.   Okay.  All right.  And we are supposed to |
| 11:27AM | 12 | believe you that you went to counseling. |
| 11:27AM | 13 | A.   I don't know if you are supposed to or not. |
| 11:27AM | 14 | You just asked me a question. |
| 11:27AM | 15 | Q.   Do you know the name of the counselor you went |
| 11:27AM | 16 | to? |
| 11:27AM | 17 | A.   Yes.  Her name is Daphne Sims. |
| 11:28AM | 18 | Q.   And how many times do you go to her? |
| 11:28AM | 19 | A.   I see her -- I don't -- first of all, I don't |
| 11:28AM | 20 | see her.  I Zoom call her. |
| 11:28AM | 21 | Q.   Okay.  How many times whichever way? |
| 11:28AM | 22 | A.   Probably close to like this year alone, maybe |
| 11:28AM | 23 | seven or eight times. |
| 11:28AM | 24 | Q.   This year alone? |
| 11:28AM | 25 | A.   Yes. |

11:28AM   1        Q.   Okay.  So all this way you have not done

11:28AM   2   until --

11:28AM   3        A.   No, I just said this year alone.

11:28AM   4        Q.   When was the first time you started --

11:28AM   5        A.   The first time that I initially seen Daphne was

11:28AM   6   maybe two weeks after I filed the lawsuit.

11:28AM   7        Q.   Okay.  Whose name is on Jaquita's birth

11:28AM   8   certificate?

11:28AM   9        A.   Mine.

11:28AM  10        Q.   Whose name is on your son's birth certificate?

11:28AM  11        A.   Mine.

11:28AM  12        Q.   Whose name is on your last daughter's, Iceland?

11:28AM  13        A.   All three of my children only have my name only

11:29AM  14   on their birth certificates.

11:29AM  15        Q.   Okay.  And your name is Tina Wilson, correct?

11:29AM  16        A.   Yep, it is.

11:29AM  17        Q.   When did you change to Tina Wilson?

11:29AM  18        A.   Jacob had my mother change my name when I was

11:29AM  19   in sixth grade to Cannon.

11:29AM  20             MR. MADUFORO:  Nonresponsive, Your Honor.

11:29AM  21   I'm sorry, objection.  Nonresponsive, sorry.

11:29AM  22             THE COURT:  Okay.  Sustained.

11:29AM  23        Q.   (By Mr. Maduforo)  So let's go back.  Do you

11:29AM  24   recall the name on your birth certificate?

11:29AM  25        A.   My name?

| 11:29AM | 1 | Q. | Yes. |

11:29AM   1        Q.    Yes.

11:29AM   2        A.    My name is Tina Marie Cannon at that time.

11:29AM   3        Q.    That was the name on your birth certificate?

11:29AM   4        A.    At that time.

11:29AM   5              On my birth certificate?

11:29AM   6        Q.    Yes.

11:29AM   7        A.    It has Tina Marie Wilson because that is my

11:29AM   8  birth certificate.

11:29AM   9              Now, on my children's birth certificate, is

11:29AM  10  that what you are asking me?

11:29AM  11        Q.    No.  I asked you the name on your birth

11:29AM  12  certificate.

11:29AM  13        A.    On my birth certificate, my personal birth

11:29AM  14  certificate, it says Tina Marie Wilson.

11:30AM  15        Q.    Have you had other names apart from Tina Marie

11:30AM  16  Wilson?

11:30AM  17        A.    Yes, I have.

11:30AM  18        Q.    Which names?

11:30AM  19        A.    Tina Marie Cannon.

11:30AM  20        Q.    When was the name changed?

11:30AM  21        A.    Sixth grade.

11:30AM  22        Q.    Sixth grade?

11:30AM  23        A.    Yes.

11:30AM  24        Q.    Okay.  And when did you change the name back to

11:30AM  25  Wilson?

11:30AM   1       A.   I changed my name back to Wilson shortly after

11:30AM   2   I had my son.  So that was back in 2021, '22.

11:30AM   3       Q.   All right.  It's a good thing that you are

11:30AM   4   speaking to a counselor.

11:30AM   5            Did you speak to any other person about this

11:30AM   6   incident beyond the counselor?

11:30AM   7       A.   I spoke to several people about it.

11:30AM   8       Q.   Your relatives?

11:30AM   9       A.   Yes.

11:30AM  10       Q.   And is any of them in this courtroom?

11:30AM  11       A.   No.

11:30AM  12       Q.   Is any of them testifying on your behalf?

11:30AM  13       A.   No.

11:30AM  14       Q.   Did you tell any of them that you filed this

11:30AM  15   lawsuit?

11:30AM  16       A.   Yes, I did.

11:30AM  17       Q.   And did you ask any of them to come and be a

11:31AM  18   witness for you?

11:31AM  19       A.   I asked one person.

11:31AM  20       Q.   Okay.

11:31AM  21            You were quite emotional when you described

11:31AM  22   Jacob.  You even at one point said that you love him.

11:31AM  23   And how has he -- I mean, you did testify that he would

11:31AM  24   buy you things.  Now in your adult --

11:31AM  25       A.   I didn't testify that he would buy me things.

```
11:31AM   1   I testified that he built me a house.  That's what I
11:31AM   2   testified.  Now you are putting words in my mouth.  I
11:31AM   3   never testified that --
11:31AM   4               THE COURT:  Ma'am, ma'am, calm down.  You
11:31AM   5   testified that you had all kinds of clothes, jewelry
11:31AM   6   and --
11:31AM   7               THE WITNESS:  Yes, as a child.
11:31AM   8       Q.   (By Mr. Maduforo)  And as an adult was he still
11:31AM   9   buying you things besides building a house for you?
11:31AM  10       A.   No.
11:31AM  11       Q.   So he built you a house.  Are you living in that
11:32AM  12   house?
11:32AM  13       A.   No, I'm not.
11:32AM  14       Q.   Okay.  And when did you move out of that house?
11:32AM  15       A.   In 2014.
11:32AM  16       Q.   In 2014 you moved out of the house he built for
11:32AM  17   you.  How long did you live in that house before you moved
11:32AM  18   out?
11:32AM  19       A.   Maybe three to four years.
11:32AM  20       Q.   While you were living in that house, were you --
11:32AM  21   apparently, he built it.  So, if there was any mortgage,
11:32AM  22   he's paying it; am I correct?  Were you paying --
11:32AM  23       A.   It wasn't a mortgage on the house.
11:32AM  24       Q.   Were you paying any rent?
11:32AM  25       A.   At first I was and then he told me I didn't
```

11:32AM  1  have to.

11:32AM  2       Q.   And were you paying utilities?

11:32AM  3       A.   Yes.

11:32AM  4       Q.   Okay.  And when he asked you to move out of the

11:32AM  5  house, what was your feeling?

11:32AM  6       A.   He didn't never ask me to move out of the

11:32AM  7  house.

11:32AM  8       Q.   You moved out on your own?

11:32AM  9       A.   Yes, I did.

11:32AM  10      Q.   Okay.  All right.

11:32AM  11           But you said he built you a house.  You moved

11:32AM  12  out of the house?

11:32AM  13      A.   Okay.  When I got sick and I had to move down

11:32AM  14  here, the house is in Midland County, I can't bring the

11:33AM  15  house with me.

11:33AM  16      Q.   So what did you do with your property then if

11:33AM  17  you --

11:33AM  18      A.   He sold it.  The house was in his name.  The

11:33AM  19  house wasn't never legally mine.

11:33AM  20      Q.   Okay.  So is it fair to assume that he asked you

11:33AM  21  to live in the house?

11:33AM  22      A.   I'm sorry.  Repeat that.

11:33AM  23      Q.   Is it fair to assume that he asked you to live

11:33AM  24  in the house?

11:33AM  25      A.   He asked me to live in it?

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:33AM | 1 | Q.   Yes.  Stay in the house. |
| 11:33AM | 2 | A.   Yes. |
| 11:33AM | 3 | Q.   Okay.  All right. |
| 11:33AM | 4 | And has he helped you financially? |
| 11:33AM | 5 | A.   He built the house.  I guess that's... |
| 11:33AM | 6 | Q.   Have you asked him for financial favors -- |
| 11:33AM | 7 | A.   No. |
| 11:33AM | 8 | Q.   -- in your adult life? |
| 11:33AM | 9 | A.   Yes, I have. |
| 11:33AM | 10 | Q.   Okay.  Before you filed this lawsuit, did you |
| 11:33AM | 11 | ask him to give you a certain amount of money? |
| 11:33AM | 12 | A.   No, I did not. |
| 11:33AM | 13 | Q.   Did you ask him to go get you another house? |
| 11:33AM | 14 | A.   No, I did not. |
| 11:34AM | 15 | Q.   Okay.  Was there any conversation about doing |
| 11:34AM | 16 | favors for you? |
| 11:34AM | 17 | A.   No. |
| 11:34AM | 18 | Q.   Okay.  So I have not been a victim of sexual |
| 11:34AM | 19 | assault.  Apparently, you're alleging that you have, that |
| 11:34AM | 20 | you are.  But I want to know how is it that someone that |
| 11:34AM | 21 | did something entirely wrong to you, that you entrusted |
| 11:34AM | 22 | your children in his care and by extension your mother's |
| 11:34AM | 23 | care? |
| 11:34AM | 24 | A.   How can I trust him with my children? |
| 11:34AM | 25 | Q.   How is it that you did, because your children |

Cross-Examination by Mr. Maduforo

11:34AM   1    lived with them, still lives with them?

11:34AM   2        A.   Nine times out of ten, I was around him with my

11:34AM   3    children.  I just didn't -- my children just didn't -- I

11:34AM   4    didn't just drop my kids off and I was a dead-beat

11:34AM   5    mother.  I've always been active in my children's life.

11:34AM   6    Even when my children came to stay down here, I was

11:34AM   7    always active in my children's life.

11:35AM   8        Q.   Okay.  The question is someone that wronged you,

11:35AM   9    someone that did something that actually offends you so

11:35AM   10   bad, how is it that you let your children stay with those

11:35AM   11   or that individual in this case?

11:35AM   12       A.   I guess a lot of times when you're -- I'm not

11:35AM   13   going to speak for anybody else.  In my case, like I told

11:35AM   14   my attorney, I lived a false narrative most of my life.

11:35AM   15   I thought that everything -- like, as long as I brushed

11:35AM   16   it up under the rug, what I went through and the things

11:35AM   17   that I went through, it wouldn't never happen to my

11:35AM   18   children.

11:35AM   19            I've always questioned my children and asked my

11:35AM   20   children the appropriate questions.  And that's a lot of

11:36AM   21   things that I regret because my children have also asked

11:36AM   22   me that same question.

11:36AM   23       Q.   Okay.  You are currently married, right?

11:36AM   24       A.   Yes.

11:36AM   25       Q.   When did you get married?

Cross-Examination by Mr. Maduforo

11:36AM  1        A.    In 2018.

11:36AM  2        Q.    Did you have any ceremony?

11:36AM  3        A.    No.

11:36AM  4        Q.    Okay.  Were there witnesses when you got

11:36AM  5   married?

11:36AM  6        A.    Yes.

11:36AM  7        Q.    Where did you get married?

11:36AM  8        A.    In Lancaster, Texas.

11:36AM  9        Q.    In the courthouse?

11:36AM 10        A.    Yes.

11:36AM 11        Q.    Okay.  And who all was there when you got

11:36AM 12   married?

11:36AM 13        A.    It was Jacob, it was my three children, and it

11:36AM 14   was my best friend.  My mother was invited but she didn't

11:36AM 15   come.

11:36AM 16        Q.    Who was your husband's best man at that wedding?

11:36AM 17        A.    My husband didn't have one.

11:36AM 18        Q.    And did Jacob go up to the judge's bench with

11:36AM 19   you when you --

11:36AM 20        A.    No, he did not.

11:36AM 21        Q.    Okay.  You would consider a wedding as something

11:36AM 22   very important in one's life, right?

11:36AM 23        A.    A wedding?

11:36AM 24        Q.    Yes.

11:36AM 25        A.    Yes.

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:36AM | 1 | Q.   Yours was very important to you? |
| 11:37AM | 2 | A.   Yes. |
| 11:37AM | 3 | Q.   Now, why would you invite someone that inflicted |
| 11:37AM | 4 | pain on you -- |
| 11:37AM | 5 | A.   I invited my whole family and -- |
| 11:37AM | 6 | Q.   Okay. |
| 11:37AM | 7 | A.   And in that time and even now, Jacob's with -- |
| 11:37AM | 8 | he's with my mother.  So, if I invited her, I invited |
| 11:37AM | 9 | him. |
| 11:37AM | 10 | Q.   Okay. |
| 11:37AM | 11 | Was there any prior allegation of sexual |
| 11:37AM | 12 | assault against you by some other people? |
| 11:37AM | 13 | A.   Against me? |
| 11:37AM | 14 | Q.   Yes. |
| 11:37AM | 15 | A.   No. |
| 11:37AM | 16 | Q.   You never alleged that your cousin from your |
| 11:37AM | 17 | dad's side tried to assault you sexually? |
| 11:37AM | 18 | A.   No, I did not. |
| 11:37AM | 19 | Q.   Okay.  All right.  You never alleged that |
| 11:37AM | 20 | your -- that somebody else, another man besides Jacob |
| 11:37AM | 21 | tried to sexually assault you? |
| 11:37AM | 22 | A.   In the testimony that I just gave to my |
| 11:37AM | 23 | attorney, when my attorney asked, I did say that when my |
| 11:38AM | 24 | mother -- when I first tried to tell my mother, I did lie |
| 11:38AM | 25 | to my mother and tell her that a man at the school when I |

11:38AM   1   was -- I think I was like in the fourth or fifth grade,

11:38AM   2   she then took me riding around the school.  She told me

11:38AM   3   that there's nobody here.

11:38AM   4         She took me back home and she said if you don't

11:38AM   5   tell me the truth about who touched you, then I am -- she

11:38AM   6   said she's going to beat the hell out of me.  I said

11:38AM   7   Jacob was also in the room when me and her were having

11:38AM   8   this discussion and I told her it was Jacob.

11:38AM   9         Q.   So, first of all, you told her it was somebody

11:38AM   10  else and then finally --

11:38AM   11        A.   Yes, I did.

11:38AM   12        Q.   Okay.  All right.

11:38AM   13        And when you got pregnant do you recall your

11:38AM   14  mother making an appointment to get a DNA test to find

11:38AM   15  out --

11:38AM   16        A.   She never did that.

11:38AM   17        Q.   She never did that.

11:38AM   18        Then on three of your children, they do not

11:38AM   19  have the names of their fathers on the birth

11:39AM   20  certificates?

11:39AM   21        A.   Correct.

11:39AM   22        Q.   Only your name?

11:39AM   23        A.   Yes.

11:39AM   24        Q.   And -- but you are alleging that Jacob is the

11:39AM   25  father of Jaquita.

11:39AM  1      A.   He is.  I'm -- he is.

11:39AM  2      Q.   Okay.  Who is the father of your two other

11:39AM  3  children?

11:39AM  4      A.   One is Andre Turner is the father of my son

11:39AM  5  Mark Anthony.  Corey Haynes is the father of my daughter

11:39AM  6  Iceland Haynes.

11:39AM  7      Q.   Why did you not put the names of these men in

11:39AM  8  your life and the lives of your children --

11:39AM  9      A.   Because when I got pregnant --

11:39AM  10           THE COURT:  You both can't talk at the

11:39AM  11  same time.  And I didn't understand.  What was your

11:39AM  12  question and how is this relevant?

11:39AM  13      Q.   (By Mr. Maduforo)  So why did you not put their

11:39AM  14  names on the birth certificates?

11:39AM  15      A.   Why didn't I put -- because they weren't there.

11:40AM  16      Q.   Okay.  All right.

11:40AM  17           Do you mind telling the Court again the last

11:40AM  18  names of your two children besides Jaquita?

11:40AM  19      A.   Mark Anthony, my son's last name is Cannon, and

11:40AM  20  my daughter's last name is Haynes.

11:40AM  21      Q.   Okay.  All right.  Just to be straight, you

11:40AM  22  never complained to the cops about this abuse, you never

11:40AM  23  went to CPS?  You never reported to --

11:40AM  24      A.   I was a minor.  I told you when I went to

11:40AM  25  Dr. McAffee, what Dr. McAffee, the school principal of

| | | |
|---|---|---|
| 11:40AM | 1 | Peace Elementary did.  I was in the sixth grade. |
| 11:40AM | 2 | I also went to my grandmother.  She thought |
| 11:40AM | 3 | that -- she didn't do anything. |
| 11:40AM | 4 | Q.   And did you tell a teacher in high school? |
| 11:40AM | 5 | A.   Those are the two people that I told. |
| 11:40AM | 6 | Q.   Okay.  All right. |
| 11:41AM | 7 | And you started going to psychological |
| 11:41AM | 8 | evaluation just recently after the lawsuit -- |
| 11:41AM | 9 | A.   A psychological evaluation or therapy? |
| 11:41AM | 10 | Q.   The counselor -- I'm sorry. |
| 11:41AM | 11 | A.   Yes, I started going through therapy. |
| 11:41AM | 12 | MR. MADUFORO:  Okay.  I'll pass the |
| 11:41AM | 13 | witness, Your Honor. |
| 11:41AM | 14 | THE COURT:  Can I ask some questions? |
| 11:41AM | 15 | MR. WHARTON:  Yes, Your Honor. |
| 11:41AM | 16 | THE COURT:  Okay.  Ma'am, you said you had |
| 11:41AM | 17 | a hysterectomy and you moved down here because they cut |
| 11:41AM | 18 | your kidney? |
| 11:41AM | 19 | THE WITNESS:  Yes, ma'am. |
| 11:41AM | 20 | THE COURT:  Then you said three months |
| 11:41AM | 21 | later your mother put you out.  Why did she put you out? |
| 11:41AM | 22 | THE WITNESS:  We had an argument about |
| 11:41AM | 23 | this. |
| 11:41AM | 24 | THE COURT:  Okay.  So then you said |
| 11:41AM | 25 | you-all had family get-togethers and everything was at |

| | | |
|---|---|---|
| 11:41AM | 1 | their house.  What shifted that caused you to file this |
| 11:41AM | 2 | lawsuit? |
| 11:41AM | 3 | THE WITNESS:  All of my life I basically |
| 11:41AM | 4 | been asking why.  All I wanted to do -- was an apology. |
| 11:41AM | 5 | I wanted them to take accountability for what they -- for |
| 11:41AM | 6 | what my mom allowed him to do and what he did.  I wanted |
| 11:41AM | 7 | them to take accountability for it, instead of always |
| 11:42AM | 8 | hanging up in my face, always telling me that I deserved |
| 11:42AM | 9 | it or telling me that she wasn't going to leave him or -- |
| 11:42AM | 10 | or all of that. |
| 11:42AM | 11 | THE COURT:  What year did you have the |
| 11:42AM | 12 | hysterectomy? |
| 11:42AM | 13 | THE WITNESS:  I had the hysterectomy in |
| 11:42AM | 14 | 2014.  From 2014 to 2015, I had nine surgeries due to the |
| 11:42AM | 15 | doctor cutting my kidney. |
| 11:42AM | 16 | THE COURT:  Okay.  So when did you move |
| 11:42AM | 17 | down here in -- |
| 11:42AM | 18 | THE WITNESS:  In September of 2015. |
| 11:42AM | 19 | THE COURT:  So September 2015 you moved |
| 11:42AM | 20 | down here and that's when you stayed with them? |
| 11:42AM | 21 | THE WITNESS:  I'm sorry, Your Honor.  I |
| 11:42AM | 22 | take that back.  It was August 2015. |
| 11:42AM | 23 | THE COURT:  Okay.  And when did your |
| 11:42AM | 24 | mother put you out of the house? |
| 11:42AM | 25 | THE WITNESS:  It was the same year.  I |

| | | |
|---|---|---|
| 11:42AM | 1 | want to say around November, because it was a little bit |
| 11:42AM | 2 | before Christmas. |
| 11:42AM | 3 | THE COURT:  Of 2015? |
| 11:42AM | 4 | THE WITNESS:  Yes, ma'am. |
| 11:42AM | 5 | THE COURT:  Okay.  Thank you. |
| 11:42AM | 6 | Go ahead, Mr. Wharton. |
| 11:42AM | 7 | MR. WHARTON:  Nothing further, Your Honor. |
| 11:42AM | 8 | THE COURT:  Ma'am, you may step down. |
| 11:43AM | 9 | Do you have any other evidence? |
| 11:43AM | 10 | MR. WHARTON:  At this time, we rest our |
| 11:43AM | 11 | case, Your Honor. |
| 11:43AM | 12 | THE COURT:  Okay.  Thank you. |
| 11:43AM | 13 | What says the Defense? |
| 11:43AM | 14 | MR. MADUFORO:  Your Honor, I am going to |
| 11:43AM | 15 | move for a Motion for Instructed Verdict.  The plaintiff |
| 11:43AM | 16 | has stated -- |
| 11:43AM | 17 | THE COURT:  Let me just stop you.  I |
| 11:43AM | 18 | understand -- I got four transcripts I've got to read. |
| 11:43AM | 19 | So I can't really make a ruling at this point. |
| 11:43AM | 20 | MR. MADUFORO:  Okay. |
| 11:43AM | 21 | THE COURT:  I mean, you can put it on the |
| 11:43AM | 22 | record, but I've got to read four transcripts that have |
| 11:43AM | 23 | been admitted. |
| 11:43AM | 24 | MR. WHARTON:  Yes, Your Honor.  I -- you |
| 11:43AM | 25 | know, and given that this is a bench trial, I think we |

| | | |
|---|---|---|
| 11:43AM | 1 | can handle this at the end probably. |
| 11:43AM | 2 | THE COURT:  Okay.  You may proceed. |
| 11:43AM | 3 | MR. MADUFORO:  Okay, Judge.  I will go |
| 11:43AM | 4 | ahead and put this on the record.  I will make a Motion |
| 11:43AM | 5 | for Instructed Verdict on this case. |
| 11:43AM | 6 | Plaintiff has not -- I know you just told |
| 11:44AM | 7 | me that some transcripts that the Court will read.  But |
| 11:44AM | 8 | we don't have any kind of substantial evidence besides |
| 11:44AM | 9 | the oral testimony as alleged on the plaintiff's petition |
| 11:44AM | 10 | regarding the alleged abuse. |
| 11:44AM | 11 | A mere allegation without any kind of |
| 11:44AM | 12 | evidence is not going to suffice, especially in this kind |
| 11:44AM | 13 | of cases. |
| 11:44AM | 14 | This is a child molestation that we are |
| 11:44AM | 15 | talking about.  No CPS report, not from her biological |
| 11:44AM | 16 | mother that lives with the dad, with Ms. Cannon when this |
| 11:44AM | 17 | happened, her stepfather. |
| 11:44AM | 18 | No police report.  No prosecution of |
| 11:44AM | 19 | Mr. Cannon.  No medical report of any sort.  And |
| 11:45AM | 20 | plaintiff wants the Court to believe that she has |
| 11:45AM | 21 | undergone this kind of abuse. |
| 11:45AM | 22 | I do not think that the Court is -- not |
| 11:45AM | 23 | speaking for the Court -- is going to just take a mere |
| 11:45AM | 24 | allegation without substantial documentation or |
| 11:45AM | 25 | evidence into the account and rule in favor of the |

| | | |
|---|---|---|
| 11:45AM | 1 | plaintiff. |
| 11:45AM | 2 | That being said, I'm asking that the |
| 11:45AM | 3 | plaintiff's petition be stricken and she takes nothing |
| 11:45AM | 4 | out of this.  Thank you, Judge. |
| 11:45AM | 5 | THE COURT:  So do you have any other |
| 11:45AM | 6 | evidence?  Your -- whatever you just argued is denied. |
| 11:46AM | 7 | MR. MADUFORO:  Okay. |
| 11:46AM | 8 | Your Honor, we'll call Ms. Tina Wilson. |
| 11:46AM | 9 | I'm sorry.  Birdie Wilson. |
| 11:46AM | 10 | THE COURT:  Where is she? |
| 11:46AM | 11 | Come on up.  You can take the stand. |
| 11:46AM | 12 | Can you please raise your right hand. |
| 11:46AM | 13 | Do you swear or affirm to tell the truth, |
| 11:47AM | 14 | the whole truth, and nothing but the truth so help you |
| 11:47AM | 15 | God? |
| 11:47AM | 16 | THE WITNESS:  Yes. |
| 11:47AM | 17 | THE COURT:  You can be seated and speak |
| 11:47AM | 18 | loud into the microphone.  You might need to take your |
| 11:47AM | 19 | mask off to talk. |
| 11:47AM | 20 | You may proceed. |
| 11:47AM | 21 | MR. MADUFORO:  Thank you, Judge. |
| 11:47AM | 22 | BIRDIE LEE WILSON, |
| 11:47AM | 23 | was called as a witness by the Defense, having been |
| 11:47AM | 24 | first duly sworn, testified as follows: |
| 11:47AM | 25 | DIRECT EXAMINATION |

11:47AM  1    BY MR. MADUFORO:

11:47AM  2        Q.    Please tell the Court your name.

11:47AM  3        A.    Birdie Lee Wilson.

11:47AM  4        Q.    Ms. Wilson, I just have a few questions for you

11:47AM  5    regarding your daughter Tina Wilson's petition against

11:47AM  6    your husband.  Do you recall the first time you started

11:47AM  7    living together with Tina and your husband?

11:47AM  8        A.    I'm trying to think.

11:47AM  9              THE REPORTER:  Pull your microphone down.

11:47AM  10             THE WITNESS:  Probably -- I'm trying to

11:47AM  11   think.  '93 -- '92, '93.

11:48AM  12       Q.    (By Mr. Maduforo)  Okay.  And that's when you

11:48AM  13   married Jacob or when you got together with him?

11:48AM  14       A.    We were still dating.

11:48AM  15       Q.    Okay.  And you moved in with Tina and --

11:48AM  16       A.    It was Tina and my son.

11:48AM  17       Q.    Two of your children?

11:48AM  18       A.    And Jacob.

11:48AM  19       Q.    And Jacob.  Okay.

11:48AM  20             And just, if you can, please describe the

11:48AM  21   relationship Jacob had at that point with the children.

11:48AM  22       A.    When I met Jacob, just when I met him, I was

11:48AM  23   living with my mom in Midland on Mineola Street.  And at

11:48AM  24   the time when I met him, no, I did not bring my kids.

11:48AM  25   And we all moved in, it was probably a year and a half to

11:48AM  1   two years after I met Jacob or going on three years after

11:48AM  2   we were dating and my kids lived with me.

11:49AM  3        Tina was in elementary and she was probably in

11:49AM  4   the sixth getting ready to go to junior high.  Tina's

11:49AM  5   birthday put her -- like, she's born March the 26th,

11:49AM  6   1981.  And so that would put her -- she's probably about

11:49AM  7   11 -- 10, 11, somewhere off in there when we moved

11:49AM  8   together.

11:49AM  9        Q.   Okay.  Thank you.

11:49AM  10        And I'll go straight to the point.  So did you

11:49AM  11   suspect any sort of abuse of any kind from Jacob against

11:49AM  12   any of your children?

11:49AM  13        A.   No.

11:49AM  14        Q.   I'll ask you the same question specifically

11:49AM  15   against Tina.

11:49AM  16        A.   No.

11:49AM  17        Q.   Are you aware of Jacob sexually assaulting Tina?

11:50AM  18        A.   No.

11:50AM  19        Q.   Did that ever come to your knowledge?

11:50AM  20        A.   No.

11:50AM  21        Q.   Did you take Tina to have an abortion?

11:50AM  22        A.   No.

11:50AM  23        Q.   Are you aware of Tina having a miscarriage when

11:50AM  24   she was younger?

11:50AM  25        A.   Yes.

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:50AM | 1 | Q.   And do you recall what age she was? |
| 11:50AM | 2 | A.   Let's see.  She was probably in junior high.  I |
| 11:50AM | 3 | can recall the day that this happened.  Jacob, myself and |
| 11:50AM | 4 | Tina was out, had been working outside doing some |
| 11:50AM | 5 | Mesquite bushes. |
| 11:50AM | 6 | And Tina started having really bad pain in her |
| 11:50AM | 7 | stomach.  And it was -- I mean, it was awful.  I didn't |
| 11:50AM | 8 | know what was going on.  And so taking Tina to -- I'd |
| 11:50AM | 9 | taken Tina -- Jacob and myself taken Tina to Midland |
| 11:51AM | 10 | Memorial Hospital.  And they did an examination on Tina. |
| 11:51AM | 11 | And that's when I found out that she was pregnant and she |
| 11:51AM | 12 | had a miscarriage. |
| 11:51AM | 13 | And they called -- they did call in the CPS |
| 11:51AM | 14 | people because she was a minor.  And at that time I'm |
| 11:51AM | 15 | asking Tina, who did this to you?  And went on and -- I |
| 11:51AM | 16 | was in totally shock. |
| 11:51AM | 17 | And went on for hours trying to figure out how |
| 11:51AM | 18 | did this happen.  And that's when she told me that her -- |
| 11:51AM | 19 | her step-mom's son had did this.  And that's when the CPS |
| 11:51AM | 20 | investigation came in that rendered -- when they got |
| 11:51AM | 21 | through with their investigation, that Tina, the children |
| 11:51AM | 22 | that was there, left at the home by themselves, and at |
| 11:51AM | 23 | this time the boy, Adrian Jackson, which is Niecy |
| 11:51AM | 24 | Jackson's son, was a minor.  Both of them were minors. |
| 11:52AM | 25 | And that's what was told to me.  Never was it told to me |

11:52AM 1    that Jacob had did these things.

11:52AM 2            And did I ask, as a mom, have you been touched

11:52AM 3    inappropriately?  Yes.  Not only to her; her, my son.

11:52AM 4    You know, just asking of because the inappropriacy (sic)

11:52AM 5    that had happened.

11:52AM 6            Niecy and Gerald Miller, which is Tina's

11:52AM 7    father, was told that those kids cannot be left alone

11:52AM 8    from their investigation, you know, unsupervised.  Now,

11:52AM 9    CPS was called in on that case.

11:52AM 10       Q.   Okay.  And they did their own investigation?

11:52AM 11       A.   They did their own investigation.  And only

11:52AM 12   thing I can say is what she had told me, that that's who

11:52AM 13   did that.  And I have the right as the parent.  And did

11:53AM 14   the CPS people come into the hospital?  Yes, they did,

11:53AM 15   because it was a minor involved.

11:53AM 16       Q.   Okay.  All right.

11:53AM 17            Besides this particular incident, was there

11:53AM 18   other incidents about Tina being sexually assaulted?

11:53AM 19       A.   Tina have been -- it was another case before --

11:53AM 20   this happened before I met Jacob.  And she had told me

11:53AM 21   that her dad's cousin, which is -- we call him Sonny.

11:53AM 22   His name is Daniel Washington.  I can't -- that his whole

11:53AM 23   name.  That he had touched her.

11:53AM 24            And we had taken -- again, I had taken her to

11:53AM 25   the hospital and they did an examination on her and to

Burnett - Wilson - 05/12/2023
Direct Examination by Mr. Maduforo

11:53AM   1   see had she been penetrated or something like that.  And

11:53AM   2   at that time they came in and investigated and there was

11:54AM   3   no -- nothing found in those -- in that investigation.

11:54AM   4            And in all these things that -- I mean, and

11:54AM   5   her -- her step-mom having CPS coming into my life, it

11:54AM   6   didn't have anything to do with Jacob.  They were saying

11:54AM   7   that I had sexual assaulted my stepson Justin and

11:54AM   8   Jaquita, which was Tina's daughter.

11:54AM   9            That's the allegations that her step-mom kept

11:54AM   10  bringing up into the courts and having me -- like

11:54AM   11  Thanksgiving, I would be having dinner and the CPS people

11:54AM   12  came up, you know, like having family time and the CPS

11:54AM   13  people coming up and investigating me.

11:54AM   14            And at that time, Justin, Jacobs's middle son,

11:54AM   15  he lived with us also by then.  And I told the lady, I

11:55AM   16  said, there's Justin.  I hadn't even spoken to her about

11:55AM   17  what she was there for.  I said, questions that you are

11:55AM   18  asking me, ask him, and I would walk off.

11:55AM   19            You know, just saying this is wrong.

11:55AM   20  Nothing -- I hadn't spoken to him.  He didn't have the

11:55AM   21  slightest idea who the lady was at the door.  And the CPS

11:55AM   22  talked to Justin.

11:55AM   23            Justin -- Justin started laughing, like

11:55AM   24  Birdie -- he called me Birdie.  I'm his step-mom.  He

11:55AM   25  said, she did what?  She ain't never did nothing like

Direct Examination by Mr. Maduforo

11:55AM 1   that.

11:55AM 2          And at that time Jaquita was in the daycare.

11:55AM 3   And they were saying that I was the one who was having

11:55AM 4   sex with the children.

11:55AM 5      Q.   Okay.  So let's go back to Jaquita.  Now has

11:55AM 6   Tina ever mentioned who the father of Jaquita is?

11:55AM 7      A.   No, she did not.

11:55AM 8      Q.   Okay.

11:55AM 9      A.   And -- and -- go ahead, I'm sorry.

11:56AM 10     Q.   When she got pregnant with Jaquita, did you --

11:56AM 11  what did you do as the mother?

11:56AM 12     A.   I'd taken her to the doctor and got her checked

11:56AM 13  out, asking her who the father was, and she saying -- she

11:56AM 14  told me Roderick Jones or whatever his name was.  I'm

11:56AM 15  asking -- I even asked her questions like, how did you --

11:56AM 16  where did y'all do these things at?

11:56AM 17         Because I worked at Midland Correctional at

11:56AM 18  that time when she was pregnant with Jaquita.  She was in

11:56AM 19  the ninth grade.  And I worked at -- and he also would

11:56AM 20  catch the bus where I worked at the elementary.  I knew

11:56AM 21  Roderick.

11:56AM 22         And that's -- and he -- I'm asking him, I even

11:56AM 23  asked him myself, you the father of this baby?  And he

11:56AM 24  said, yes.  I still have the little glass shoes that he

11:56AM 25  brought to the hospital, where he had arrangements,

Burnett - 05/12/2023
Direct Examination by Mr. Maduforo

11:56AM  1   sitting in my washroom right now at the house that he

11:57AM  2   brought to the hospital 27 years ago when Jaquita was

11:57AM  3   born.

11:57AM  4                    THE COURT:  What does Roderick look like?

11:57AM  5                    THE WITNESS:  He's dark complected,

11:57AM  6   probably about 5' 7", if he's that tall.  I haven't seen

11:57AM  7   him in years.

11:57AM  8                    THE COURT:  What complexion is Jaquita?

11:57AM  9                    THE WITNESS:  She light skinned.  She's

11:57AM  10  your skin color and Jacob's.

11:57AM  11                   THE COURT:  Keep going.

11:57AM  12                   THE WITNESS:  That's what she had told me.

11:57AM  13      Q.   (By Mr. Maduforo)  And the presumed father of

11:57AM  14  Jaquita, was he a minor or adult?

11:57AM  15      A.   He was a minor.  His mom at the time brought

11:57AM  16  him to -- would bring him -- brought him -- that we were

11:57AM  17  having a DNA.  And she was bringing him and he never

11:57AM  18  came.  Roderick came to the hospital when Jaquita was

11:57AM  19  born.

11:57AM  20      Q.   Okay.  So you insisted on DNA to find out who

11:57AM  21  the actual father of the baby was at that time?

11:57AM  22      A.   Yes.

11:58AM  23      Q.   And that didn't happen?

11:58AM  24      A.   That didn't happen.

11:58AM  25      Q.   Okay.  And it was maybe not because of your

11:58AM 1   fault?

11:58AM 2     A.   Not my fault.

11:58AM 3     Q.   Okay.  And take me to the next time -- when was

11:58AM 4   that child born; when y'all were still living together or

11:58AM 5   when she has moved out?

11:58AM 6     A.   Tina had -- she had moved to an apartment but

11:58AM 7   she had came back and lived with us.

11:58AM 8     Q.   Okay.

11:58AM 9     A.   That was Mark.

11:58AM 10     Q.   Do you recall how old she was when she had the

11:58AM 11   second child?

11:58AM 12     A.   I believe she was 20, 21.

11:58AM 13     Q.   So she was an adult at that point.  Okay.  All

11:58AM 14   right.

11:58AM 15        So is it fair to assume that as a mom, you had

11:58AM 16   a teenage child that got pregnant and you the mom at that

11:58AM 17   point did everything you could to figure out how it

11:59AM 18   happened?

11:59AM 19     A.   Yes.

11:59AM 20     Q.   Okay.  And the only reason you did not discover

11:59AM 21   this was because it was a minor?

11:59AM 22     A.   Yes.  And the reason why, because I -- I'm

11:59AM 23   asking my daughter, you know, several times, who's the

11:59AM 24   father?  And she -- you getting older, you 15, 16 years

11:59AM 25   old, still telling me the same thing.  Even in your 20s,

Sunanne wilson 05/12/2023
Direct Examination by Mr. Maduforo

11:59AM   1   30s.

11:59AM   2         And I get home the day of this letter that Jake

11:59AM   3   had received was served from attorney -- however.  I work

11:59AM   4   in Red Oak.  However it was served.  And it was telling

11:59AM   5   me that he was having -- where we at today, this court.

11:59AM   6   That's what it was about.

12:00PM   7         Q.   Okay.

12:00PM   8         A.   And that's when I got the -- okay, you the

12:00PM   9   father?  Yeah.  I was like, what?  I was in total

12:00PM  10   disbelief.

12:00PM  11         My thing is -- Tina, the day before these

12:00PM  12   papers was served, Tina was at my house in my room with

12:00PM  13   the kids.  Say the papers were served today, she was at

12:00PM  14   my house yesterday, in my house, inside of my house, and

12:00PM  15   with the kids.

12:00PM  16         And her and Iceland, going back to -- just

12:00PM  17   getting -- Iceland has lived -- Mark -- I done raised all

12:00PM  18   three of my grandkids, basically.  Iceland lived with us

12:00PM  19   her senior year.  She had just left a year and a half

12:00PM  20   before then.  Tina had left her there.  And I would tell

12:00PM  21   Tina, you need to come and get Iceland.

12:00PM  22         Iceland lived with me when she was -- when Tina

12:01PM  23   moved here, she was in the fifth grade, sixth grade.  She

12:01PM  24   left probably seventh and came back eighth.  And she

12:01PM  25   just -- and she at my house now, her, and her mom.

12:01PM  1          If I did all of these horrible things and I'm

12:01PM  2  doing all of this abuse, why you leave your kids there?

12:01PM  3  They still there.

12:01PM  4          I have a 13-year-old little boy there I'm

12:01PM  5  raising.  I've been having him -- my son, whose son today

12:01PM  6  or whatever, I been having his baby since he was three

12:01PM  7  months old.  I have full custody of him.

12:01PM  8          And my thing, if I'm that bad of a person why

12:01PM  9  those kids at 18 and 21 -- Jaquita been gone away from

12:01PM  10  home probably about three years.  And when Tina moved

12:01PM  11  here, she had the rights.  I did not have any custody.

12:01PM  12          I made her pay me child support for Mark

12:01PM  13  because he hasn't paid.  And she paid child support.

12:02PM  14          She ain't never paid nothing for Iceland.

12:02PM  15  Iceland just graduated this past school year.  And you

12:02PM  16  can come get your children.

12:02PM  17     Q.    Okay.  So, along that route, do you and Jake

12:02PM  18  support Tina?

12:02PM  19     A.    Yes.  Jake bought Tina a car probably -- she

12:02PM  20  didn't have transportation.  We do a lot of things for

12:02PM  21  Tina.  Not because of Tina; trying to make sure that

12:02PM  22  those kids are taken care of.

12:02PM  23          I mean, since she been in Dallas he went and

12:02PM  24  got her a car, a little SUV something.  I can't think of

12:02PM  25  the model it was but he got it.

| | | |
|---|---|---|
| 12:02PM | 1 | When she had her Honda, she couldn't pay the |
| 12:02PM | 2 | car note; he helped pay for it. |
| 12:02PM | 3 | Q.   Okay.  And when you and Jake -- you said he |
| 12:03PM | 4 | helps to pay for her car note.  Do you guys give her |
| 12:03PM | 5 | money?  Do you guys buy her other things? |
| 12:03PM | 6 | A.   Yeah, he give her money.  She would come to the |
| 12:03PM | 7 | house and he would be out there on the property working. |
| 12:03PM | 8 | Oh, I need 20.  I don't care if it's 20, $30, a hundred. |
| 12:03PM | 9 | He would give her money.  I would give -- I mean, we |
| 12:03PM | 10 | helped her. |
| 12:03PM | 11 | THE COURT:  Sir, you got ten more minutes |
| 12:03PM | 12 | and the other side is going to have 15 minutes and we're |
| 12:03PM | 13 | going to stop at 12:30. |
| 12:03PM | 14 | Q.   (By Mr. Maduforo)  And when was the last time |
| 12:03PM | 15 | Tina was in the house? |
| 12:03PM | 16 | A.   At my house? |
| 12:03PM | 17 | THE COURT:  The day before this happened. |
| 12:03PM | 18 | Before he got served. |
| 12:03PM | 19 | MR. WHARTON:  I guess I'll start objecting |
| 12:03PM | 20 | to that. |
| 12:03PM | 21 | THE COURT:  That was her testimony.  The |
| 12:03PM | 22 | day before he got served -- |
| 12:03PM | 23 | THE WITNESS:  She was at my house.  And |
| 12:03PM | 24 | she comes -- I don't know if y'all -- to me, she comes to |
| 12:03PM | 25 | my house all the time, even to pick up the children. |

| | | |
|---|---|---|
| 12:03PM | 1 | THE COURT:  Now you can ask if she's been |
| 12:03PM | 2 | there since then, sir. |
| 12:03PM | 3 | Q.  (By Mr. Maduforo)  Has she been in the house |
| 12:03PM | 4 | since this lawsuit was filed? |
| 12:03PM | 5 | A.   No, not that I know of. |
| 12:04PM | 6 | Q.   Okay.  All right. |
| 12:04PM | 7 | Tina obviously did not tell you about this |
| 12:04PM | 8 | incident.  Did she tell you that she was seeking any |
| 12:04PM | 9 | counseling? |
| 12:04PM | 10 | A.   No.  She -- |
| 12:04PM | 11 | THE COURT:  The answer was yes or no. |
| 12:04PM | 12 | THE WITNESS:  No. |
| 12:04PM | 13 | I want to say -- |
| 12:04PM | 14 | THE COURT:  Ma'am, you don't -- wait for |
| 12:04PM | 15 | another question, please. |
| 12:04PM | 16 | THE WITNESS:  Okay. |
| 12:04PM | 17 | Q.  (By Mr. Maduforo)  In your own experience with |
| 12:04PM | 18 | your husband Jake, Jacob Cannon, and this whole |
| 12:04PM | 19 | allegation, what do you think this is all about? |
| 12:05PM | 20 | A.   Greed, money, anger, hatred. |
| 12:05PM | 21 | THE COURT:  And why does she have greed, |
| 12:05PM | 22 | money, anger, hatred towards Jacob? |
| 12:05PM | 23 | THE WITNESS:  I just don't understand it |
| 12:05PM | 24 | because up until then we were -- I mean, we were -- she |
| 12:05PM | 25 | was at my house.  We spent holidays together, even since |

| | | |
|---|---|---|
| 12:05PM | 1 | she done got married and right -- the Christmas before we |
| 12:05PM | 2 | got -- he got served, I got pictures of her and her |
| 12:05PM | 3 | husband at our house. |
| 12:05PM | 4 | And I'm just trying to -- and even like |
| 12:06PM | 5 | she have told me, if she could not -- she wants me |
| 12:06PM | 6 | instead of him.  If she could take anybody to jail, she |
| 12:06PM | 7 | would rather have me in jail. |
| 12:06PM | 8 | THE COURT:  So why does she want you in |
| 12:06PM | 9 | jail? |
| 12:06PM | 10 | THE WITNESS:  Just what I said.  I guess |
| 12:06PM | 11 | angry.  I mean, I went from being called mama to being |
| 12:06PM | 12 | called by my first name.  I got text messages I got on my |
| 12:06PM | 13 | phone being called bitches and hoes. |
| 12:06PM | 14 | I ain't did nothing to her but try to help |
| 12:06PM | 15 | her take care of her kids.  And I'm still doing it.  And |
| 12:06PM | 16 | I'm 61 and I'm tired.  But what I do?  I can't put them |
| 12:06PM | 17 | outside. |
| 12:06PM | 18 | THE COURT:  How old is the youngest one? |
| 12:06PM | 19 | THE WITNESS:  Her youngest one just turned |
| 12:06PM | 20 | 18.  She'll be 19 December the 3rd.  The youngest one I |
| 12:06PM | 21 | take care of is my grandson.  He's 13 now.  Yeah, I'm |
| 12:07PM | 22 | tired. |
| 12:07PM | 23 | THE COURT:  Thank you. |
| 12:07PM | 24 | Do you have any other questions? |
| 12:07PM | 25 | Q.   (By Mr. Maduforo)  One last question.  Did you |

12:07PM  1   abuse Tina when she was a minor?

12:07PM  2        A.   When she was a minor?

12:07PM  3        Q.   Yes.

12:07PM  4        A.   No.  Did I give spank -- give Tina whippings,

12:07PM  5   yes, being disrespectful, yes.  But just going around

12:07PM  6   what you call abusing kids or hitting her for no apparent

12:07PM  7   reason or just throwing her out on the street or leaving

12:07PM  8   her without things or anything, like -- like I'm taking

12:07PM  9   care of her kids and making sure they eat every day.  I

12:07PM 10   treated Tina -- I've taken care of her the same way.

12:07PM 11        Q.   Was anybody abusive to her when she was a minor

12:07PM 12   that you know of --

12:07PM 13        A.   No.

12:07PM 14        Q.   -- in your household?

12:07PM 15        A.   No.

12:07PM 16        Q.   Okay.

12:07PM 17             MR. MADUFORO:  Pass the witness, Your

12:07PM 18   Honor.

12:07PM 19             THE COURT:  You may proceed.

12:07PM 20             MR. WHARTON:  Thank you, Your Honor.

12:08PM 21             Just for a brief, you know, background on

12:08PM 22   this, the Defense never disclosed, never sent a

12:08PM 23   Disclosure.  We're not objecting to the witness being

12:08PM 24   called.  I'm just alerting the Court to where we are as

12:08PM 25   far as how we are approaching this.  There was never a

| 12:08PM | 1  | Disclosure. |
| 12:08PM | 2  | THE COURT:  Okay. |
| 12:08PM | 3  | CROSS-EXAMINATION |
| 12:08PM | 4  | BY MR. WHARTON: |
| 12:08PM | 5  | Q.   All right.  How tall is Jaquita? |
| 12:08PM | 6  | A.   She about 5'8", 5'7".  She about my height. |
| 12:08PM | 7  | Q.   And how tall is Jacob? |
| 12:08PM | 8  | A.   Jacob is probably about 5' 11", 6-foot tall. |
| 12:08PM | 9  | Q.   And, by the way, are you married to Jacob? |
| 12:08PM | 10 | A.   He's my husband. |
| 12:08PM | 11 | Q.   All right.  And when the CPS calls were made, |
| 12:08PM | 12 | when CPS came to the house and talked with y'all, did they |
| 12:09PM | 13 | ever figure out who the father of Jaquita is? |
| 12:09PM | 14 | A.   They were not there for the father of Jaquita. |
| 12:09PM | 15 | Q.   Now, you're saying that Tina had at least one |
| 12:09PM | 16 | miscarriage, right? |
| 12:09PM | 17 | A.   I know she did. |
| 12:09PM | 18 | Q.   And then abortions? |
| 12:09PM | 19 | A.   She had -- I haven't taken Tina on no five or |
| 12:09PM | 20 | six abortions.  Tina was having sex.  Yes, she had an |
| 12:09PM | 21 | abortion. |
| 12:09PM | 22 | Q.   How many abortions do you know of? |
| 12:09PM | 23 | A.   Probably two. |
| 12:09PM | 24 | Q.   And how old was she? |
| 12:09PM | 25 | A.   I think one when she was 16, and I believe the |

| | | |
|---|---|---|
| 12:09PM | 1 | other one was when she was probably 17. |
| 12:09PM | 2 | Q.   So you -- how do you know those were happening? |
| 12:10PM | 3 | A.   I'd taken her. |
| 12:10PM | 4 | Q.   So you took her for those abortions? |
| 12:10PM | 5 | A.   Yes. |
| 12:10PM | 6 | Q.   And you don't know who the father is? |
| 12:10PM | 7 | A.   No.  Tina was -- I take one of them back.  She |
| 12:10PM | 8 | was having sex with some -- with some boy that lived over |
| 12:10PM | 9 | there by her dad's house.  You have to ask Tina. |
| 12:10PM | 10 | Q.   Is that who you are claiming is Roderick Jones? |
| 12:10PM | 11 | A.   No. |
| 12:10PM | 12 | Q.   So who's this other one? |
| 12:10PM | 13 | A.   You have to ask Tina. |
| 12:10PM | 14 | THE COURT:  He's asking you.  We're in |
| 12:10PM | 15 | trial. |
| 12:10PM | 16 | THE WITNESS:  I don't -- I don't know who. |
| 12:10PM | 17 | I know she was pregnant, and I wasn't ready to take care |
| 12:10PM | 18 | of another baby, and she had an abortion. |
| 12:10PM | 19 | Q.   (By Mr. Wharton)  All right.  So -- okay.  Now, |
| 12:10PM | 20 | you were testifying earlier about a Niecy Jackson.  Is |
| 12:10PM | 21 | that Sharon Jackson? |
| 12:10PM | 22 | A.   Yes, George.  She was -- her maiden name is |
| 12:11PM | 23 | Jackson.  She was known as Sharon Jackson Miller George. |
| 12:11PM | 24 | Q.   Right.  And I'm under the impression that y'all |
| 12:11PM | 25 | have not seen her deposition.  Is that right? |

12:11PM  1        A.   I have not.

12:11PM  2        Q.   Okay.  Do you know why Sharon Jackson George

12:11PM  3   would testify that Tina's version of events is true and

12:11PM  4   not yours?

12:11PM  5        A.   Will you repeat that again, please?

12:11PM  6             THE COURT:  Don't ask -- ask a better

12:11PM  7   question.  Be specific, since she doesn't know...

12:11PM  8             MR. WHARTON:  Yes, Your Honor.

12:11PM  9        Q.   (By Mr. Wharton)  Now, your story with Sharon

12:11PM  10  Jackson George is not that she was calling about Tina, but

12:11PM  11  that she was calling on you specifically, right?

12:12PM  12            Do you understand my question?

12:12PM  13       A.   No.

12:12PM  14       Q.   You testified earlier that Sharon Jackson George

12:12PM  15  did call CPS, right?

12:12PM  16       A.   Yes.

12:12PM  17       Q.   And your testimony was that Sharon Jackson

12:12PM  18  George called CPS about you, not about Jacob?

12:12PM  19       A.   Yes.

12:12PM  20            Let me --

12:12PM  21            THE COURT:  No, you can't say anything.

12:12PM  22  You have to wait until he asks a question.

12:12PM  23       Q.   (By Mr. Wharton)  And your lawyer can ask any

12:12PM  24  question you need.

12:12PM  25            You're saying that CPS came and then you were

Cross-Examination by Mr. Wharton

12:12PM   1   there while CPS talked to Tina.

12:12PM   2        A.   No, I did not testify to that.

12:12PM   3        Q.   Okay.  Do you know if CPS talked to Tina

12:12PM   4   independently?

12:12PM   5        A.   No, I do not.  What I testified to, that CPS

12:12PM   6   came to my house and they were saying, allegedly saying,

12:12PM   7   that I had had sex with my stepson Justin and saying that

12:13PM   8   I was fondling Jaquita, which is Tina's daughter.

12:13PM   9        Q.   Did you say fundling or fondling?

12:13PM   10            THE COURT:  She said fondling.  I'm making

12:13PM   11   the ruling.  I remember the testimony.

12:13PM   12            MR. WHARTON:  I just didn't hear the word.

12:13PM   13   I'm sorry.  My apologies, Your Honor.

12:13PM   14            THE COURT:  That's what her testimony was,

12:13PM   15   that the allegations were against her regarding those two

12:13PM   16   children.

12:13PM   17            What do you want to ask her about

12:13PM   18   Ms. Sharon Jackson Miller George's statement?

12:13PM   19            MR. WHARTON:  Yes, Your Honor.

12:13PM   20        Q.   (By Mr. Wharton)  So you're saying that CPS came

12:13PM   21   because you were -- because the allegation was that you

12:13PM   22   were fondling Jaquita?

12:13PM   23        A.   I want to make sure.  It was Jaquita and

12:13PM   24   Justin.

12:13PM   25        Q.   Jaquita and Justin.

Cross-Examination by Mr. Wharton

12:13PM  1          And so they -- you're saying they were not

12:14PM  2  called ever about any allegation involving Tina?

12:14PM  3      A.   No.  We had several -- okay, I'm sorry.

12:14PM  4              THE COURT:  Go ahead.  You had several

12:14PM  5  what?

12:14PM  6              THE WITNESS:  We had -- the calls that

12:14PM  7  Niecy, Sharon or whatever, it was several times that she

12:14PM  8  have had the CPS come to my house.  And it was always

12:14PM  9  about -- it was always saying that I had did something to

12:14PM  10  the children.  It was -- it was allegedly that she was

12:14PM  11  saying that Birdie Lee Wilson, that's me.

12:14PM  12              THE COURT:  Okay.  Thank you.

12:14PM  13      Q.   (By Mr. Wharton)  All right.  And what about

12:14PM  14  during the custody trial with Gerald Miller; was CPS

12:15PM  15  called during that trial?

12:15PM  16      A.   Yeah, about the children.

12:15PM  17      Q.   About the other children?

12:15PM  18      A.   About all the children.

12:15PM  19              THE COURT:  Okay.  Hold on.

12:15PM  20              Ma'am, who is Gerald Lee Miller?

12:15PM  21              MR. WHARTON:  Gerald Miller is --

12:15PM  22              THE COURT:  Her father?

12:15PM  23              MR. WHARTON:  Her father, yes.

12:15PM  24              THE COURT:  You can't -- go ahead.  You're

12:15PM  25  talking about a custody case?

12:15PM   1           MR. WHARTON:  Yes.  There was a trial
12:15PM   2   involving --
12:15PM   3           THE WITNESS:  Okay.  Me and my kids' dad,
12:15PM   4   Tina's father, he had got custody -- he did not want
12:15PM   5   custody of Tina.  He just wanted custody of Gerald.
12:15PM   6   That's the son.  Gerald Wilson is my son.  Gerald Miller
12:15PM   7   is the father of my two children.
12:15PM   8       Q.   (By Mr. Wharton)  Right.
12:15PM   9       A.   Okay.  And the custody case was between me and
12:16PM  10   him.
12:16PM  11       Q.   And did they call CPS --
12:16PM  12       A.   That's when she was calling CPS --
12:16PM  13           THE COURT:  Hold on.  Let him ask the
12:16PM  14   question.
12:16PM  15       Q.   (By Mr. Wharton)  During that trial, did they
12:16PM  16   call CPS?  You can say yes or no.
12:16PM  17           MR. MADUFORO:  Your Honor --
12:16PM  18           THE COURT:  No.  She's yet to answer the
12:16PM  19   question.  Because her response was that it was about the
12:16PM  20   children and that the CPS case between a husband and wife
12:16PM  21   has to do with their own children.
12:16PM  22           So, ma'am, did they call CPS regarding
12:16PM  23   custody or anything during that custody case?
12:16PM  24           THE WITNESS:  Not that I know of, that I
12:16PM  25   can recall of.

Cross-Examination by Mr. Wharton

12:16PM  1      Q.   (By Mr. Wharton)  And what year was that?  You

12:16PM  2  don't have to give me the exact date.

12:17PM  3           Let me ask you this.  Was that occurring before

12:17PM  4  Jaquita was born?

12:17PM  5      A.   The custody case?  Yes.

12:17PM  6      Q.   So, if CPS was being called during the custody

12:17PM  7  case, it could not have been about you abusing Jaquita in

12:17PM  8  some way, right?

12:17PM  9      A.   The custody case is a different -- what I'm

12:17PM  10  testifying to --

12:17PM  11           THE COURT:  Ma'am, I'm going to interrupt

12:17PM  12  you.  The question is, was CPS called during the custody

12:17PM  13  case between you and your husband?  That's the question.

12:17PM  14           THE WITNESS:  Yes.

12:17PM  15           THE COURT:  And how old were the kids at

12:17PM  16  the time of that case?  If you don't know the year, how

12:17PM  17  old were they?

12:18PM  18           THE WITNESS:  Tina probably was -- I don't

12:18PM  19  know.

12:18PM  20           THE COURT:  Try real hard.  Because I

12:18PM  21  would hate for you to have to come back and remember a

12:18PM  22  week from now.  I'm not going to be here tomorrow.

12:18PM  23           THE WITNESS:  Maybe 10, 11.  I don't know.

12:18PM  24           THE COURT:  Thank you.

12:18PM  25           Now, Mr. Wharton, ask your next question.

Redirect Examination by Mr. Maduforo

| | | |
|---|---|---|
| 12:18PM | 1 | MR. WHARTON:  Thank you, Your Honor. |
| 12:18PM | 2 | Q.   (By Mr. Wharton)  And do you know, how did -- |
| 12:18PM | 3 | how did Tina get that scar on her forehead? |
| 12:18PM | 4 | A.   Oh, Tina got that scar on the forehead because |
| 12:18PM | 5 | I was in the kitchen cooking, and she came in going to |
| 12:18PM | 6 | hit me and I hit her.  It did not have anything to -- me |
| 12:18PM | 7 | being her mother and she going to hit me?  Yeah, I hit |
| 12:18PM | 8 | her. |
| 12:18PM | 9 | Q.   And how did that leave a scar, a permanent scar? |
| 12:18PM | 10 | A.   I hit her with a skillet.  Because I was in the |
| 12:18PM | 11 | kitchen, she picked up the skillet to hit me and she had |
| 12:19PM | 12 | it like this and I did it like that (indicating). |
| 12:19PM | 13 | Q.   Did you ever find Tina in her room bleeding on |
| 12:19PM | 14 | the floor? |
| 12:19PM | 15 | A.   No, sir. |
| 12:19PM | 16 | Q.   So there's no event where she was miscarrying, |
| 12:19PM | 17 | bleeding on the floor? |
| 12:19PM | 18 | A.   No. |
| 12:19PM | 19 | MR. WHARTON:  I'll pass the witness. |
| 12:20PM | 20 | THE COURT:  Anything? |
| 12:20PM | 21 | MR. MADUFORO:  Just one or two questions. |
| 12:20PM | 22 | REDIRECT EXAMINATION |
| 12:20PM | 23 | BY MR. MADUFORO: |
| 12:20PM | 24 | Q.   Just to be clear, when you took Tina to the |
| 12:20PM | 25 | abortion clinic, did she ever mention that Jacob was the |

12:20PM   1   father?

12:20PM   2        A.    No.

12:20PM   3        Q.    And the last question will be, you are aware

12:20PM   4   that Jacob was deposed regarding this case, correct?

12:20PM   5        A.    He was what?

12:20PM   6        Q.    He went for a deposition on this case?

12:20PM   7        A.    To a deposition, yes.

12:20PM   8        Q.    Yes.  Do you know if Jacob was informed of the

12:20PM   9   following individuals being deposed:  Sharon Jackson

12:20PM  10   George, Gerald Miller, and Gerald Wayne Wilson, Junior?

12:20PM  11        A.    No.

12:20PM  12        Q.    Okay.

12:20PM  13              MR. MADUFORO:  Pass the witness, Your

12:20PM  14   Honor.

12:20PM  15              MR. WHARTON:  Nothing further, Your Honor.

12:20PM  16              THE COURT:  Okay.

12:20PM  17              MR. MADUFORO:  Nothing further from the

12:20PM  18   Defense.

12:20PM  19              THE COURT:  I have a question.

12:21PM  20              Now, you said she had two abortions.  And

12:21PM  21   where did -- said you took her to both abortions.

12:21PM  22              THE WITNESS:  Yes, in Odessa.

12:21PM  23              THE COURT:  Did Jacob go?

12:21PM  24              THE WITNESS:  No.

12:21PM  25              THE COURT:  Anything else?

```
12:21PM   1              MR. MADUFORO:  Nothing further.

12:21PM   2              MR. WHARTON:  No, Your Honor.

12:21PM   3              THE COURT:  You may step down, ma'am.

12:21PM   4              MR. MADUFORO:  Defense rests, Your Honor.

12:21PM   5              MR. WHARTON:  And we are making an effort

12:21PM   6    to get Roderick Jones available by telephone if the Court

12:21PM   7    will permit him to testify remotely.

12:21PM   8              THE COURT:  Who's Roderick Jones?

12:21PM   9              MR. WHARTON:  Roderick Jones is the young

12:21PM  10    boy at the time that they were alleging was the father --

12:22PM  11    was the one getting Tina Wilson pregnant.

12:22PM  12              THE COURT:  Okay.  We're going to recess

12:22PM  13    until 1:30.  And if you can get him by 1:30, I'll allow

12:22PM  14    him to testify as a rebuttal witness.

12:22PM  15              MR. WHARTON:  Thank you, Your Honor.

12:22PM  16              THE COURT:  So we'll see y'all at 1:30.

12:22PM  17              MR. WHARTON:  To be clear, I think he

12:22PM  18    lives in another state.

12:22PM  19              THE COURT:  No, I understand.  He can

12:22PM  20    testify by phone if you can get him here by 1:30.

12:22PM  21              MR. WHARTON:  Thank you, Your Honor.

12:22PM  22              THE COURT:  If not, we're going to end

12:22PM  23    this case.

12:22PM  24              (Lunch recess.)

 1:27PM  25              MR. WHARTON:  We call Roderick Jones.
```

1:27PM  1              THE COURT:  Mr. Jones, please raise your

1:27PM  2   right hand.

1:27PM  3              Do you swear or affirm to tell the truth,

1:27PM  4   the whole truth and nothing but the truth, so help you

1:27PM  5   God?

1:27PM  6              THE WITNESS:  Yes, ma'am, I do.

1:27PM  7              THE COURT:  Okay.  You may proceed.

1:27PM  8                    RODERICK JONES,

1:27PM  9   was called as a witness by the Plaintiff, having been

1:27PM  10  first duly sworn, testified as follows via Zoom:

1:27PM  11                  DIRECT EXAMINATION

1:27PM  12  BY MR. WHARTON:

1:27PM  13      Q.   Can you state your name for the record, please.

1:27PM  14      A.   Hold on.  Okay.  Yes.  My name is Roderick

1:27PM  15  Jones, for the record.

1:27PM  16      Q.   And, Mr. Jones, how did you come to know Tina

1:28PM  17  Wilson?

1:28PM  18      A.   How did I know Tina Wilson?

1:28PM  19      Q.   Yes.

1:28PM  20      A.   I first met her at a Mr. Gatti's, a pizza hall,

1:28PM  21  back when we were like teens.  And then from there on we

1:28PM  22  went to the same school together.  And that's how I know

1:28PM  23  her, from that.

1:28PM  24      Q.   Were y'all boyfriend and girlfriend?

1:28PM  25      A.   You know, we were just girlfriend and

1:28PM 1   boyfriend.  Nothing intimate or nothing like that.

1:28PM 2        Q.   Okay.  So, to be clear, for this case, you never

1:28PM 3   had actual sex with her?

1:28PM 4        A.   No.  No.  Never.  Never.  Still to this day,

1:28PM 5   never.

1:28PM 6        Q.   Did Jacob Cannon or Birdie Wilson ever ask you

1:28PM 7   to say that you fathered Tina Wilson's child?

1:29PM 8        A.   Oh, yeah.  Man, yeah, they did.  They did that

1:29PM 9   back long when we were dating, man.  Just to -- really to

1:29PM 10  say -- like to take the heat off of him.  You know, he

1:29PM 11  knew that that was his baby, regardless.

1:29PM 12            So, meaning that me and Ms. Wilson was -- Tina

1:29PM 13  Wilson was, you know, how you could say, courting each

1:29PM 14  other during our younger teen age.  And he figured that

1:29PM 15  he could throw that in and say it like, as long as you

1:29PM 16  claiming saying this baby here is yours, you don't have

1:29PM 17  to want for nothing.  Yeah, that was...

1:29PM 18       Q.   So did he offer you money or gifts?

1:29PM 19       A.   Oh, yeah.  Like -- like he tried to offer me --

1:29PM 20  he gave me so-called, if you want to call it giving it

1:29PM 21  money, he giving gifts, if he want to so-called say that.

1:29PM 22            But, I mean, like, yeah, he just really wanted

1:29PM 23  me to take the fall for being the baby's father.

1:30PM 24            I mean, we even went to the extreme that, you

1:30PM 25  know, my mom, let her rest in peace, she was like, hey,

1:30PM   1   if this is your baby, cool.  If this is your baby, you

1:30PM   2   know, we gonna be involved and all this, it's cool.  All

1:30PM   3   right, then, I just need to know for myself.  Let's take

1:30PM   4   a DNA.

1:30PM   5          We all met up at the store, all except the baby

1:30PM   6   and Ms. Wilson.  Me, my mom, Birdie, and Jacob showed up

1:30PM   7   at the store out there in Midland, Texas.  And showed up,

1:30PM   8   said he'll agree to take this DNA test.  Cool.  My mom

1:30PM   9   went on and did it.  I took it.  He never showed up,

1:30PM   10  never heard nothing else ever again.

1:30PM   11      Q.   So he just didn't show up for this DNA test?

1:30PM   12      A.   Yes, sir.  He did not show up.

1:30PM   13      Q.   Did you ever see him acting inappropriately with

1:31PM   14  Tina Wilson?

1:31PM   15      A.   Oh, yeah.  Yeah.  Like -- like, it's crazy,

1:31PM   16  man.  It's crazy.  That's not how no father, no

1:31PM   17  stepfather or however you put it should be acting like

1:31PM   18  that inappropriate with no child.

1:31PM   19      Q.   Can you be as specific as you can, as possible?

1:31PM   20  Can you give details?

1:31PM   21      A.   Oh, yeah.  Like, for instance, like going to --

1:31PM   22  like, we have a mall like everybody else.  You have a

1:31PM   23  mall there.  You know what I'm saying?  Like, be like

1:31PM   24  this.  Birdie would be pushing the baby and he would be

1:31PM   25  like holding hands, like, you know, like boyfriend and

1:31PM   1   girlfriend at the time.  I'm like, huh-uh.  Man, I

1:31PM   2   ain't -- to see that, you know, to actually see it from

1:31PM   3   my own eyes, I was like -- because they already knew he

1:31PM   4   was already listening to our phone calls when we would be

1:32PM   5   talking on the phone.  He would pick up -- this is way

1:32PM   6   before cellphones.

1:32PM   7          He would pick up.  You could hear the other

1:32PM   8   phone in the other room.  He be sitting there listening

1:32PM   9   to me and Tina Wilson talking on the phone.  We know

1:32PM   10  that.  We know that.

1:32PM   11      Q.   Could you hear --

1:32PM   12      A.   Then coming in her room -- and going in there

1:32PM   13  in her room at like three, four, five -- not three, four,

1:32PM   14  but two or 3 o'clock in the morning, just to have a talk?

1:32PM   15  What?  You know.  Okay.  Okay.

1:32PM   16              THE COURT:  Now, sir, let me stop you.

1:32PM   17  How --

1:32PM   18              THE WITNESS:  Okay.

1:32PM   19              THE COURT:  Listen to me.  How did you

1:32PM   20  know he was coming in the room at 2 or 3 o'clock in the

1:32PM   21  morning?

1:32PM   22              THE WITNESS:  Because after -- you know,

1:32PM   23  coming in on that part, you know, that was -- like I

1:32PM   24  said, we would be on the phone talking.  You know, what

1:32PM   25  teens do, sit up on the phone and talk when we ain't

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 1:32PM | 1 | supposed to be talking and get off the phone. |
| 1:32PM | 2 | And I'd be like, what's wrong?  She was |
| 1:32PM | 3 | like, he came into the room and wants to have a talk.  I |
| 1:33PM | 4 | was like, a talk?  And this is probably like a little 45 |
| 1:33PM | 5 | minutes and then she would have to sneak back up on the |
| 1:33PM | 6 | phone and call me again. |
| 1:33PM | 7 | Then it would go to the fact like they |
| 1:33PM | 8 | would have people come up to ask me if I was the baby's |
| 1:33PM | 9 | father, just to like prove -- like just to say, yeah, |
| 1:33PM | 10 | yeah, he the one.  But I'm sorry, ma'am, Court -- |
| 1:33PM | 11 | THE COURT:  Let me ask you this.  What did |
| 1:33PM | 12 | the baby look like? |
| 1:33PM | 13 | THE WITNESS:  Man, just like Jacob Cannon, |
| 1:33PM | 14 | when it first came out.  I'm sorry, y'all.  I'm dark. |
| 1:33PM | 15 | Ms. Tina Wilson is dark.  Her mama is dark.  That baby -- |
| 1:33PM | 16 | if we came apart (sic) to have sex and that baby was from |
| 1:33PM | 17 | me, I'm sorry, that baby would be dark complected.  This |
| 1:33PM | 18 | baby is light skinned. |
| 1:33PM | 19 | I'm sorry.  It look just like Mr. Cannon. |
| 1:33PM | 20 | I'm sorry.  I'm sorry.  You don't need no court to prove |
| 1:33PM | 21 | that.  I'm sorry.  Hands down, you don't. |
| 1:33PM | 22 | Q.   (By Mr. Wharton)  And nothing personal, but how |
| 1:34PM | 23 | tall a man are you?  Just curious. |
| 1:34PM | 24 | A.   I'm 5'4".  Jacob is like -- he probably |
| 1:34PM | 25 | somewhere -- somewhere 5'6" -- about 5'9", 5'8". |

Direct Examination by Mr. Wharton

1:34PM   1          MR. MADUFORO:  Objection, Your Honor.

1:34PM   2          THE COURT:  Sir, he objected.  So wait for

1:34PM   3  another question.  You answered the question.  He asked

1:34PM   4  how tall you were.

1:34PM   5          THE WITNESS:  5'4".

1:34PM   6          THE COURT:  Let him ask another question.

1:34PM   7          THE WITNESS:  My bad.

1:34PM   8          MR. WHARTON:  That's okay.

1:34PM   9     Q.   (By Mr. Wharton)  How tall is Jacob Cannon,

1:34PM  10  approximately?

1:34PM  11     A.   Taller than me, sir.  Approximately, like I

1:34PM  12  said, like about 5 -- he look like from the range of

1:34PM  13  5'7", five up, stocky.

1:34PM  14     Q.   Significantly taller than you are, anyway.

1:34PM  15          Did he ever try to intimidate you?

1:34PM  16     A.   Oh, yeah, he did.  He did.  He tried to

1:34PM  17  intimidate me, you know, and saying -- once he seen my

1:35PM  18  mama had my back, he tried to back off.  You know what

1:35PM  19  I'm saying?  It wasn't like, sorry, you know.

1:35PM  20          I just had one of them mamas, like I said.  She

1:35PM  21  said, if this was my baby, we was going to be there.  I

1:35PM  22  was going to take care of it, be the man, the father or

1:35PM  23  whatever I needed to be to this child.

1:35PM  24          And he used to try to give me looks, stares,

1:35PM  25  you know what I'm saying, all of that kind of stuff.

1:35PM  1   That ain't do nothing.

1:35PM  2            THE COURT:  Okay.  Thank you.

1:35PM  3            Do you have any other questions, sir?

1:35PM  4       Q.   (By Mr. Wharton)  Are there any other facts or

1:35PM  5   details that highlight that Jacob -- that this happened,

1:35PM  6   that Jacob Cannon molested Tina Wilson when she was a kid?

1:35PM  7   Is there anything else I'm missing?

1:35PM  8       A.   If I'm not mistaken, man, see, like I say, you

1:35PM  9   know, Ms. Wilson told me some stuff, you know.  That like

1:35PM  10  I guess like the brother used to stay there.  She had a

1:35PM  11  brother that stayed there.

1:36PM  12            And like, I guess, he knew it or something.

1:36PM  13  They had got into it and he had -- he pretty much he got

1:36PM  14  kicked out.  You know what I'm saying?  So that's -- he

1:36PM  15  would be the other one that would know -- that would know

1:36PM  16  that was happening.  I could just go off -- you know,

1:36PM  17  that he say, you know, she say.  But --

1:36PM  18       Q.   I got you.

1:36PM  19       A.   I have seen this man act inappropriate toward

1:36PM  20  her like no father -- like I said, no father, stepfather

1:36PM  21  should not be acting.

1:36PM  22            And then, I mean, come on, my mama used to say

1:36PM  23  what's did in the dark come to the light.  You have this

1:36PM  24  child right here that looks just like you, man.  And you

1:36PM  25  trying to say that's me?  I'm sorry.  No.  I'll take a

| 1:36PM | 1 | DNA test right now if you want me to.  It'll come back |
| 1:36PM | 2 | zero. |
| 1:36PM | 3 | Q.   Yes, sir. |
| 1:36PM | 4 | MR. WHARTON:  We'll pass the witness. |
| 1:36PM | 5 | THE COURT:  Counselor? |
| 1:36PM | 6 | MR. MADUFORO:  Just a few questions. |
| 1:36PM | 7 | MR. WHARTON:  Just use the mic.  You have |
| 1:36PM | 8 | to use the mic for the Zoom. |
| 1:36PM | 9 | CROSS-EXAMINATION |
| 1:36PM | 10 | BY MR. MADUFORO: |
| 1:37PM | 11 | Q.   Just a few questions, Mr. Roderick.  Can you |
| 1:37PM | 12 | hear me okay? |
| 1:37PM | 13 | MR. WHARTON:  You have to speak into the |
| 1:37PM | 14 | mic. |
| 1:37PM | 15 | Q.   (By Mr. Maduforo)  Just a few questions for you, |
| 1:37PM | 16 | Mr. Roderick. |
| 1:37PM | 17 | A.   Okay. |
| 1:37PM | 18 | Q.   All right.  So you just testified that Mr. Jacob |
| 1:37PM | 19 | bought you some things and gave you money so that you will |
| 1:37PM | 20 | keep quiet about being the father of Jaquita? |
| 1:37PM | 21 | THE COURT:  That's not what he said. |
| 1:37PM | 22 | Rephrase the question. |
| 1:37PM | 23 | Q.   (By Mr. Maduforo)  Okay.  I'm sorry.  I'll |
| 1:37PM | 24 | rephrase the question. |
| 1:37PM | 25 | So how did Mr. Jacob convince you about not -- |

1:37PM  1   about being the father of Jaquita when you said you were

1:37PM  2   not?

1:37PM  3            THE COURT:  Rephrase -- he didn't say that

1:37PM  4   either.

1:37PM  5            THE WITNESS:  How can I -- ma'am -- ma'am,

1:38PM  6   I can answer it.  If you want to know how, he came and he

1:38PM  7   talked to me, out of his own mouth, the horse's mouth

1:38PM  8   that he said it.

1:38PM  9        Q.   (By Mr. Maduforo)  Okay.

1:38PM  10       A.   If you don't understand that, I don't know what

1:38PM  11  else to tell you.

1:38PM  12       Q.   Okay.  And you agreed?

1:38PM  13       A.   Yeah.  You know what I'm saying?  I don't know,

1:38PM  14  I was young.  I was a young teenager.  You know what I'm

1:38PM  15  saying?  Anything that -- I was just trying to stay close

1:38PM  16  to the chick.  You know what I'm saying?  Because we had

1:38PM  17  a relationship outside of what he was doing.

1:38PM  18       Q.   Okay.  And you mentioned you told your mom.  Did

1:38PM  19  you tell any of your friends what was going on at that

1:38PM  20  point?

1:38PM  21       A.   Man, I didn't even have to tell no friends or

1:38PM  22  no parents or nobody.  You know what I'm saying?  At that

1:38PM  23  point, I mean, it's like I said, there it is.  You have

1:38PM  24  this little girl.  You have this little girl.  What else

1:39PM  25  you need to know, man?  You have this little girl right

1:39PM  1    there.  That's --

1:39PM  2                    THE COURT:  Okay, I'm sorry.

1:39PM  3                    THE WITNESS:  That's enough in itself.

1:39PM  4                    THE COURT:  Mr. Jones, I need you to stop

1:39PM  5    because I'm totally not clear now.

1:39PM  6                    Can you clarify?  Are you saying that you

1:39PM  7    told people you were the father?

1:39PM  8                    THE WITNESS:  Did I tell people I was the

1:39PM  9    father?

1:39PM  10                   THE COURT:  Yes.

1:39PM  11                   THE WITNESS:  At the time, yeah.  Yes.

1:39PM  12   That's when the DNA came in.  When my mama said, okay, if

1:39PM  13   this is your child, then we'll -- then let's see a DNA

1:39PM  14   test.  When I took the DNA test, Mr. Jacob never showed

1:39PM  15   up, so therefore I could not claim no baby.

1:39PM  16       Q.   (By Mr. Maduforo)  You took a DNA test and the

1:39PM  17   DNA test returned negative that you are not the father of

1:39PM  18   Jaquita.  Is that what you are telling the Court?

1:39PM  19       A.   I'm telling the Court that he didn't never show

1:39PM  20   up to take the DNA test.  They took my sample of blood.

1:40PM  21   He kept giving some all kind of excuses or something.

1:40PM  22            Oh, well, I did my part.

1:40PM  23       Q.   And what was the results?

1:40PM  24       A.   How you going to get results if you ain't got

1:40PM  25   the other person's DNA to check it?

1:40PM  1      Q.   So we are assuming that you do not know what the

1:40PM  2  result is?

1:40PM  3      A.   Whatever.  Yeah.  The child is not mine.  Like

1:40PM  4  I said, if you didn't understand me clearly, I took the

1:40PM  5  DNA test.  Whatever they did after that, he was supposed

1:40PM  6  to be present and the baby was supposed to be present at

1:40PM  7  the same time and it wasn't.

1:40PM  8      Q.   That's fine.  We'll leave that part alone.

1:40PM  9           I have one last question for you.  You were

1:41PM 10  apparently speaking to Ms. Tina Wilson when you guys were

1:41PM 11  dating as Tina has said, to the point of talking to her

1:41PM 12  in your own words or testimony sometime 2 a.m. to 3 a.m.

1:41PM 13  in the morning; is that correct?

1:41PM 14      A.   That we would talk?  Yeah, we would talk summer

1:41PM 15  time.  We talk on the phone at all times of the night.

1:41PM 16  Daytime too.

1:41PM 17      Q.   Okay.  Within any of those times, did you hear

1:41PM 18  or heard Ms. Tina Wilson crying for help that Mr. Jacob

1:41PM 19  Cannon was at that point talking to her inappropriately or

1:41PM 20  physically abusing her or sexually assaulting her?

1:41PM 21      A.   No, man.  Didn't nobody hear that.  He hung up

1:41PM 22  the phone.  We was off the phone at that time.  Any other

1:42PM 23  time when we talked, it was about us, our relationship.

1:42PM 24      Q.   Okay.  So have you witnessed Jacob Cannon

1:42PM 25  sexually assaulting Ms. Tina Wilson?

| | | |
|---|---|---|
| 1:42PM | 1 | A.   If you want to consider what I told the Court |
| 1:42PM | 2 | earlier, seeing a father -- |
| 1:42PM | 3 | MR. MADUFORO:  Objection, Your Honor, |
| 1:42PM | 4 | nonresponsive. |
| 1:42PM | 5 | MR. WHARTON:  I want to object -- |
| 1:42PM | 6 | THE COURT:  Overruled.  You can answer it. |
| 1:42PM | 7 | Go ahead and answer it. |
| 1:42PM | 8 | THE WITNESS:  Okay.  Like I said before I |
| 1:42PM | 9 | was interrupted, no father, stepfather, boyfriend or |
| 1:42PM | 10 | however you put it to be up inappropriate with a child |
| 1:42PM | 11 | like that.  Hugging all close like boyfriend and |
| 1:42PM | 12 | girlfriend?  No, man.  And even kissing?  Come on, man. |
| 1:42PM | 13 | Come on. |
| 1:42PM | 14 | What's the next question, sir? |
| 1:43PM | 15 | MR. MADUFORO:  I pass the witness, Your |
| 1:43PM | 16 | Honor. |
| 1:43PM | 17 | REDIRECT EXAMINATION |
| 1:43PM | 18 | BY MR. WHARTON: |
| 1:43PM | 19 | Q.   Sir, did you see kissing? |
| 1:43PM | 20 | A.   Yeah, even though this dude, he used to try to |
| 1:43PM | 21 | have this vehicle that tried to have the tinted windows, |
| 1:43PM | 22 | but it wasn't like tint because you could see at the |
| 1:43PM | 23 | front.  You know what I'm saying?  You could see -- I |
| 1:43PM | 24 | don't even kiss my kids mouth to mouth.  I don't even let |
| 1:43PM | 25 | them kiss me mouth to mouth.  That's sickening, man.  I'm |

| | | |
|---|---|---|
| 1:43PM | 1 | just sick.  I really am. |
| 1:43PM | 2 | MR. WHARTON:  All right.  Nothing further. |
| 1:43PM | 3 | THE COURT:  Okay.  Is he free to go? |
| 1:43PM | 4 | MR. MADUFORO:  Yes, Your Honor. |
| 1:43PM | 5 | THE COURT:  Okay.  Mr. Jones, thank you |
| 1:43PM | 6 | for coming.  You are free to go. |
| 1:43PM | 7 | THE WITNESS:  Thank you. |
| 1:43PM | 8 | THE COURT:  Any argument?  You have five |
| 1:43PM | 9 | minutes. |
| 1:43PM | 10 | MR. WHARTON:  If by agreement we can do it |
| 1:44PM | 11 | by writing, I would agree to that. |
| 1:44PM | 12 | MR. MADUFORO:  Your Honor, yes, we can -- |
| 1:44PM | 13 | I agree to that. |
| 1:44PM | 14 | THE COURT:  What, you are going to submit |
| 1:44PM | 15 | your arguments in writing? |
| 1:44PM | 16 | MR. WHARTON:  Yes, I believe, Your Honor, |
| 1:44PM | 17 | I would prefer that. |
| 1:44PM | 18 | THE COURT:  Okay.  All right.  I'm going |
| 1:44PM | 19 | to be out of town next week so I'm not going to be |
| 1:44PM | 20 | available until after that.  So what is your deadline to |
| 1:44PM | 21 | get me your stuff? |
| 1:44PM | 22 | MR. WHARTON:  I am actually out of town |
| 1:44PM | 23 | myself starting tonight.  But end of next week?  Would |
| 1:44PM | 24 | that be okay? |
| 1:44PM | 25 | THE COURT:  That's fine. |

1:44PM   1                    Do we have exhibits 1, 2, 3, and 4?

1:44PM   2                    MR. MADUFORO:  Yes, Your Honor.

1:44PM   3                    MR. WHARTON:  There's just one other thing

1:44PM   4   we've got, which is a rebuttal photo of Jaquita Cannon.

1:44PM   5                    THE COURT:  Can I see it now, and then you

1:44PM   6   can text it to me -- or you can mail it to -- you can

1:44PM   7   e-file it to the court.  You can just put it on the Elmo.

1:45PM   8   It's coming up.

1:45PM   9                    All right.  And you can just produce that.

1:45PM  10   You can give it to the court reporter.  That will be

1:45PM  11   Exhibit 5?

1:45PM  12                    MR. MADUFORO:  Yes, Your Honor.  No

1:45PM  13   objection.

1:45PM  14                    THE COURT:  We'll stand in recess.  Thank

1:45PM  15   you.

1:45PM  16                    MR. MADUFORO:  Thank you, Judge.

1:45PM  17                    THE COURT:  If you-all can include in your

1:45PM  18   arguments, if the Court rules on either side's favor,

1:45PM  19   whatever the financial judgment should be, the requested

1:45PM  20   relief financially.

1:45PM  21                    MR. MADUFORO:  Okay.

1:45PM  22                    THE COURT:  If I rule that way, I need to

1:45PM  23   know.  I don't even have an idea what we're asking for

1:45PM  24   here.

1:45PM  25                    MR. WHARTON:  Yes, Your Honor.

| 1:45PM | 1 | (Proceedings concluded.) |
| 1:45PM | 2 | -o-0-o- |
| 1:45PM | 3 | |
| | 4 | |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

112

| | |
|---|---|
| 1 | STATE OF TEXAS &
| 2 | COUNTY OF DALLAS &

3    I, Vearneas W. Faggett, Official Court Reporter in

4  and for County Court at Law No. 4 of Dallas County, State

5  of Texas, do hereby certify that the above and foregoing

6  contains a true and correct transcription of all portions

7  of evidence and other proceedings requested in writing by

8  counsel for the parties to be included in this volume of

9  the Reporter's Record in the above-styled and numbered

10  cause, all of which occurred in open court or in chambers

11  and were reported by me.

12    I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if

14  any, offered by the respective parties.

15    I further certify that the total cost for the

16  original preparation of this Reporter's Record has been

17  be paid for by Defendant, Mr. Jacob Cannon.

18    WITNESS MY OFFICIAL HAND this the 3rd day of

19  January, A.D., 2024.

20    VEARNEAS W. FAGGETT, CSR# 3129
21    Official Court Reporter
22    County Court at Law No. 4
      George Allen Courts Building
23    600 Commerce Street
      Dallas, Tx 75202
24    Telephone: 214.653.7468
      Expiration: 01/31/2024
25    vearneas.faggett@dallascounty.org
      vwfreporting@gmail.com

1:45PM (lines 1–25)

D I S C L O S U R E

Note:  Supreme Court Rule Adopted and Promulgated in

Conformity with Chapter 52 of the Government

Code, V.T.C.A.

Please be advised that pursuant to Supreme Court

Rule IV, B.5., with regards to disclosure, I, to the best

of my knowledge, have no existing or past financial,

business, professional, family or social relationships

with any of the parties or their attorneys which might

reasonably create an appearance of partiality, except as

follows:  NONE.

VEARNEAS W. FAGGETT, CSR #3129
Expiration:  01/31/24
County Court at Law No. 4
George Allen Courts Building
600 Commerce Street
Dallas, Tx  75202

113

1

2

3

4                        Plaintiff's Exhibit No. 1

5                   Deposition of Jacob Cannon, Jr.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jacob Cannon

April 04, 2022

```
 1              CAUSE NO. CC-21-02654-D

 2    TINA WILSON              )  IN THE COUNTY COURT
                               )
 3    vs.                      )  AT LAW NO. 4
                               )
 4    JACOB CANNON             )  DALLAS COUNTY, TEXAS

 5

 6    ********************************************************

 7           ORAL AND VIDEOTAPED DEPOSITION OF

 8                  JACOB CANNON, JR.

 9                   APRIL 4, 2022

10    ********************************************************

11        ORAL AND VIDEOTAPED DEPOSITION OF JACOB CANNON,

12    JR., produced as a witness at the instance of the

13    Plaintiff, and duly sworn, was taken in the above-styled

14    and numbered cause on the 4th day of April, 2022, from

15    10:08 a.m. to 10:29 a.m., before Julie C. Brandt, RMR,

16    CRR, and CSR in and for the State of Texas, reported by

17    machine shorthand at 420 Throckmorton Street, Suite 200,

18    Fort Worth, Texas, pursuant to the Texas Rules of Civil

19    Procedure and any provisions stated on the record or

20    attached hereto.

21

22

23

24

25
```





PLAINTIFF'S
EXHIBIT

Jacob Cannon

April 04, 2022
Pages 2 to 5

Page 2

1                    APPEARANCES
2
3    FOR THE PLAINTIFF:
4        Jonathan Wharton
5        BRAD THOMAS LAW OFFICE, PLLC
6        P.O. Box 472027
7        Fort Worth, Texas 76147
8        jon@bradthomaslawoffice.com
9
10   FOR THE DEFENDANT:
11       Shawn C. Laney
12       UDESHI LAW FIRM
13       2201 Main Street, Suite 1250
14       Dallas, Texas 75201
15       shawn@udeshilawfirm.com
16
17   COURT REPORTER:
18       Julie C. Brandt, TX CSR, RMR, CRR
19       Magna Legal Solutions
20
21   VIDEOGRAPHER:
22       Jeremy Rovny
23       Magna Legal Solutions
24
25

Page 3

1                     INDEX
2                              PAGE
3    Appearances...................................   2
4    Proceedings....................................   4
5
6    JACOB CANNON, JR.
7        Examination by Mr. Wharton................   4
8
9    Signature and Changes..........................  14
10   Reporter's Certificate.........................  16
11
12
13            (No exhibits.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                 P R O C E E D I N G S
2            THE VIDEOGRAPHER: We are now on record
3    for the video deposition of Jacob Cannon on April 4,
4    2022, at 10:08 a.m.
5            Would counsel state your appearances for the
6    record.
7            MR. WHARTON: Jonathan Wharton for the
8    plaintiff.
9            MR. LANEY: Shawn Laney for defendant.
10           THE VIDEOGRAPHER: And would the court
11   reporter please swear in the witness.
12                JACOB CANNON, JR.
13   having been first duly sworn, testified as follows:
14                EXAMINATION
15   BY MR. WHARTON:
16       Q.  Can you state your name for the record,
17   please?
18       A.  Jacob Cannon, Jr.
19       Q.  Okay. So who is Jacquetta Cannon's father?
20       A.  I take the Fifth on that one.
21       Q.  Okay. Have you ever had sex with a minor?
22       A.  I take the Fifth on that one.
23       Q.  Have you ever had sex with Tina Wilson?
24       A.  I take the Fifth on that one.
25       Q.  Have you ever been involved with Tina Wilson

Page 5

1    having an abortion?
2        A.  I take the Fifth on that one.
3        Q.  Do you know who Roderick Jones is?
4        A.  Roderick Jones. I've heard of that name
5    before. But I don't know who he is. I don't know
6    anything.
7        Q.  Did Tina Wilson ever have boyfriends when she
8    was a child, when she was under 18?
9        A.  Yes, she did.
10       Q.  Who was her boyfriend?
11       A.  I could not tell you.
12       Q.  All right. How many boyfriends did she have?
13       A.  I could not tell you.
14       Q.  Did she ever have sex with her boyfriends?
15       A.  I could not tell you.
16       Q.  Have you ever taken a DNA test related to
17   Jacquetta Cannon?
18       A.  No, I haven't.
19       Q.  Do you know if Jacquetta Cannon has ever taken
20   a DNA test?
21       A.  No, I don't.
22       Q.  Who is Jacquetta Cannon's father?
23       A.  I take the Fifth on that. I don't know.
24       Q.  All right. How old is Jacquetta?
25       A.  Jacquetta? Right off the top of my head, I



Jacob Cannon                                      April 04, 2022
                                                  Pages 6 to 9

Page 6

1 couldn't tell you. I couldn't tell you.
2    Q. Now you received a letter from me about this,
3 right, before it was filed?
4    A. Right.
5    Q. And Jacquetta called me. Are you familiar
6 with that?
7    A. No.
8    Q. You didn't know that?
9    A. Not that I -- she called you?
10    Q. That's right. She called me.
11    A. I don't know anything about that.
12    Q. So the letter that went to you, you did
13 receive it. Right?
14    A. I received it.
15    Q. Okay. And then did you give that letter to
16 Jacquetta?
17    A. Unless -- I can't recall. I'm like -- I don't
18 know.
19    Q. Okay. Jacquetta called me and said that Tina
20 had been hiring a series of fake lawyers or been
21 pretending to hire lawyers before. Is that something
22 you're familiar with?
23    A. No, not familiar with none of that.
24    Q. Okay. So is this the first letter you've
25 received that at least appears to be from a lawyer

Page 7

1 related to Tina Wilson?
2    A. When I -- that -- when I got it, that was it.
3 I mean, that was it. That's all I know.
4    Q. That was the first time you've ever received a
5 letter that appeared to be from a lawyer related to Tina
6 Wilson. Is that right?
7    A. Right.
8    Q. Okay. Jacquetta on that phone call claimed
9 that had been happening. Do you have any idea why?
10 That you had been receiving fake letters from lawyers?
11    A. I'm not -- I couldn't tell you. I couldn't
12 tell you nothing about that.
13    Q. Have you ever been involved in a CPS case
14 involving Tina Wilson?
15    A. No.
16    Q. Did CPS ever --
17    A. CPS. CPS. State what you mean by "CPS."
18    Q. Child -- Children's Protective Services. It's
19 a state agency.
20    A. It's been so long. I don't know. I couldn't
21 tell you.
22    Q. Okay. Were you -- do you know whether Tina
23 Wilson has ever been involved in a CPS case?
24    A. Wow, that question would be for somebody else.
25 I wouldn't know. I don't know.

Page 8

1    Q. Do you --
2    A. It's been so long. I mean --
3    Q. So, obviously, you've hired -- there are two
4 different law firms that you had hired in this case.
5 Before this case, what attorneys have you ever -- have
6 ever represented you?
7    A. In this case right here?
8    Q. Not in this case. So, obviously, you have two
9 law firms in this case. Before this case -- before this
10 case, what attorneys --
11    A. No, I haven't. No, no.
12    Q. None?
13    A. Pertaining to this case?
14    Q. No, not pertaining to this case. So before
15 this case, so --
16    A. Oh, yeah. Yeah, it's a long time ago. I
17 mean, you know, it's --
18       Is it pertaining to this case or some other
19 case or what?
20    Q. Not pertaining -- not pertaining to this case
21 where I'm representing Tina.
22    A. Right.
23    Q. Before this case, so before this case, not
24 related to this case. Other than this case, where
25 you've had two law firms in this case -- other than this

Page 9

1 case, what attorneys have represented you?
2    A. In Midland, Texas, I had one.
3    Q. Okay. And who was that?
4    A. I would have to look it up. It's been a
5 while. It's been a while.
6    Q. All right. What kind of attorney is that?
7    A. It's a child support case.
8    Q. Okay. Any other attorneys that have
9 represented you?
10    A. Not that I can think of.
11    Q. All right. And so that case was for child
12 support for what child?
13    A. My three boys.
14    Q. All right. Have you ever kissed Tina Wilson
15 on the mouth?
16    A. I'll take the Fifth on that one.
17    Q. All right. Have you ever had any other kind
18 of sexual relationship with Tina Wilson?
19    A. I'll take the Fifth on that one.
20    Q. All right. Has Tina Wilson, has she ever had
21 an abortion that you know of?
22       MR. LANEY: Objection to form.
23    Q. (BY MR. WHARTON) And you can answer.
24    A. You say -- you said I can answer?
25    Q. Yeah. So when he -- when he objects, when he



Jacob Cannon

April 04, 2022
Pages 10 to 13

Page 10

1  objects to form, you can answer. If he doesn't want you
2  to answer a question, he will tell you not to answer the
3  question.
4      A.  I couldn't -- I don't know nothing about all
5  that. That's -- that's -- I wouldn't know anything
6  about all that. I take the Fifth on that. I don't know
7  anything about that.
8      Q.  Who took -- well,.yeah. Who took Tina Wilson
9  to get her abortions?
10     A.  I take the Fifth on that.
11     Q.  Has Tina Wilson ever gone by any kind of
12  alias?
13     A.  Alias?
14     Q.  Yeah. Like an alternate name.
15     A.  Alias what?
16     Q.  Has she ever used a fake name?
17     A.  I'll take the Fifth on that. I don't know.
18     Q.  Did she ever get abortions using a fake name
19  as a child?
20     A.  I'll take the Fifth on that. I don't know
21  nothing about that.
22     Q.  Did -- have you ever talked to Tina Wilson
23  about the accusations that are involved in this case?
24     A.  No, I haven't talked to Tina about nothing
25  like this.

Page 11

1      Q.  What witnesses do you intend to have for this
2  case?
3      A.  I'll take -- I'll take -- I don't know.
4      Q.  All right. What evidence do you intend to use
5  to defend yourself in this case?
6      A.  I'll take the Fifth.
7      Q.  When did you first meet Tina Wilson?
8      A.  I couldn't tell you. I really couldn't.
9      Q.  How old was she?
10     A.  I could not tell you.
11     Q.  Would you be willing to take a DNA test for
12  Jacquetta?
13     A.  I'll take the Fifth on that one.
14     Q.  Have you ever emailed with Tina Wilson? Have
15  you ever exchanged emails with her?
16     A.  Not that I recall.
17     Q.  When was the last time you text messaged with
18  her?
19     A.  The dates or whatever, I couldn't tell you.
20     Q.  Can you give me a year, a ballpark?
21     A.  Maybe a year and a half.
22     Q.  And what were those texts about?
23     A.  Picking up her kid from school.
24     Q.  Which kid?
25     A.  Iseland. Because she would text message me

Page 12

1  all the time about doing that.
2      Q.  How many times did Tina Wilson have sex when
3  she was a child, when she was under 18?
4      A.  I couldn't tell you nothing about that.
5      Q.  Are you pleading the Fifth or saying you don't
6  know?
7      A.  I'm pleading the Fifth.
8      Q.  When did --
9          (Cell phone ringing.)
10         THE WITNESS: Sorry about that. I'll cut
11  that off.
12         MR. WHARTON: You might want to just
13  press the red button to hang up that one.
14         THE WITNESS: No, I got it. Oh, okay.
15  Thank you.
16     Q.  (BY MR. WHARTON) At what age did Tina Wilson
17  first have sex?
18     A.  I couldn't tell.
19     Q.  You couldn't tell me or you're pleading the
20  Fifth?
21     A.  I plead the Fifth.
22     Q.  At what age did Tina Wilson first become
23  pregnant?
24     A.  I couldn't tell you. I plead the Fifth.
25     Q.  How many times did Tina Wilson get pregnant as

Page 13

1  a child?
2      A.  I couldn't tell you. I plead the Fifth.
3          MR. WHARTON: Let's take a short break.
4          THE VIDEOGRAPHER: Okay. We're going off
5  the record. The time is 10:23 a.m.
6          (Break from 10:23 a.m. to 10:28 a.m.)
7          THE VIDEOGRAPHER: We are back on the
8  record. The time is 10:28 a.m.
9      Q.  (BY MR. WHARTON) Sir, were you ever
10  investigated by CPS?
11     A.  It's been so long. I don't know. I take the
12  Fifth on that one.
13     Q.  Do you remember the name of the lawyer that
14  you had in Midland?
15     A.  I couldn't tell you. It's been so long.
16     Q.  Have you ever talked to the police about Tina
17  Wilson?
18     A.  Not that I know of. I take the Fifth.
19         MR. WHARTON: All right. I will pass the
20  witness.
21         MR. LANEY: No questions.
22         THE VIDEOGRAPHER: Okay. We're going off
23  the record. The time is 10:29 a.m.
24         (Proceedings ended at 10:29 a.m.)
25



Jacob Cannon

April 04, 2022
Pages 14 to 17

## Page 14

CHANGES AND SIGNATURE

1
2  WITNESS NAME:  JACOB CANNON, JR.
3  DATE OF DEPOSITION:  APRIL 4, 2022
4  PAGE    LINE    CHANGE    REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## Page 15

1       I, JACOB CANNON, JR., have read the foregoing
2  deposition and hereby affix my signature that same is
   true and correct, except as noted above.
3
4
5                       JACOB CANNON, JR.
6
7  THE STATE OF _____)
   COUNTY OF _____)
8
        Before me, _____, on
9  this day personally appeared JACOB CANNON, JR., known to
   me (or proved to me under oath or through
10 _____) (description of identity
   card or other document) to be the person whose name is
11 subscribed to the foregoing instrument and acknowledged
   to me that they executed the same for the purposes and
12 consideration therein expressed.
        Given under my hand and seal of office this
13 _____ day of _____, _____.
14
15
16                       NOTARY PUBLIC IN AND FOR
                         THE STATE OF _____
17                       COMMISSION EXPIRES: _____
18
19
20
21
22
23
24
25

## Page 16

1
2  CAUSE NO. CC-21-02654-D
   TINA WILSON                    ) IN THE COUNTY COURT
                                  )
3  vs.                            ) AT LAW NO. 4
                                  )
4  JACOB CANNON                   ) DALLAS COUNTY, TEXAS
5
6
7
8            REPORTER'S CERTIFICATION
9   VIDEOTAPED DEPOSITION OF JACOB CANNON, JR.
10              APRIL 4, 2022
11
12
13      I, Julie C. Brandt, Certified Shorthand Reporter in
14 and for the State of Texas, hereby certify to the
15 following:
16      That the witness, JACOB CANNON, JR., was duly sworn
17 by the court reporter and that the transcript of the
18 oral deposition is a true record of the testimony given
19 by the witness;
20      That the deposition transcript was submitted on
21 _____ to the witness or the attorney for
22 the witness for examination, signature and return to me
23 by _____;
24      That the amount of time used by each party at the
25 deposition is as follows:

## Page 17

1  Jonathan Wharton.....00 HOURS:16 MINUTE(S)
2  Shawn C. Laney.....00 HOURS:00 MINUTE(S)
3      That pursuant to information given to the
4  deposition officer at the time said testimony was taken,
5  the following includes counsel for all parties of
6  record:
7  FOR THE PLAINTIFF:
8      Jonathan Wharton
9      BRAD THOMAS LAW OFFICE, PLLC
10     P.O. Box 472027
11     Fort Worth, Texas 76147
12     jon@bradthomaslawoffice.com
13 FOR THE DEFENDANT:
14     Shawn C. Laney
15     UDESHI LAW FIRM
16     2201 Main Street, Suite 1250
17     Dallas, Texas 75201
18     shawn@udeshilawfirm.com
19     I further certify that I am neither counsel for,
20 related to, nor employed by any of the parties or
21 attorneys in the action in which this proceeding was
22 taken, and further that I am not financially or
23 otherwise interested in the outcome of the action.
24     Further certification requirements pursuant to Rule
25 203 of TRCP will be certified to after they have



Jacob Cannon

April 04, 2022
Pages 18 to 19

**Page 18**

1   occurred.
2        Certified to by me _____, 2022.
3
4                    *Julie C. Brandt*
5                    _____
6        Julie C. Brandt, RMR, CRR, CSR
         Texas·CSR No. 4018
         Expiration Date:  10/31/23
7
8        MAGNA LEGAL SERVICES
         Firm Registration No. 633
         1635 Market Street
9        8th Floor
         Philadelphia, PA 19103
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 19**

1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
2        The original deposition was/was not returned to the
3   deposition officer on _____;
4        If returned, the attached Changes and Signature
5   page contains any changes and the reasons therefor;
6        If returned, the original deposition was delivered
7   to Jonathan Wharton, Custodial Attorney;
8        That $_____ is the deposition officer's
9   charges to the Plaintiff for preparing the original
10  deposition transcript and any copies of exhibits;
11       That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate was
13  served on all parties shown herein on and filed with the
14  Clerk.
15       Certified to by me this _____ day of
16  _____, 2022.
17
18
19       _____
         Julie C. Brandt, RMR, CRR, CSR
20       Texas CSR No. 4018
         Expiration Date:  10/31/23
21
         MAGNA LEGAL SERVICES
22       Firm Registration No. 633
         1635 Market Street
23       8th Floor
         Philadelphia, PA 19103
24
25



Jacob Cannon

**1**

**10:08** 4:4
**10:23** 13:5,6
**10:28** 13:6,8
**10:29** 13:23,24
**1250** 2:13
**14** 3:9
**16** 3:10
**18** 5:8 12:3

**2**

**2** 3:3
**2022** 4:4
**2201** 2:13

**4**

**4** 3:4,7 4:3
**472027** 2:6

**7**

**75201** 2:14
**76147** 2:7

**A**

**a.m.** 4:4 13:5,6,8,23,24
**abortion** 5:1 9:21
**abortions** 10:9,18
**accusations** 10:23
**age** 12:16,22
**agency** 7:19
**alias** 10:12,13,15
**alternate** 10:14
**appearances** 2:1 3:3 4:5
**appeared** 7:5

**appears** 6:25
**April** 4:3
**attorney** 9:6
**attorneys** 8:5,10 9:1,8

**B**

**back** 13:7
**ballpark** 11:20
**Box** 2:6
**boyfriend** 5:10
**boyfriends** 5:7,12,14
**boys** 9:13
**BRAD** 2:5
**Brandt** 2:18
**break** 13:3,6
**button** 12:13

**C**

**call** 7:8
**called** 6:5,9,10,19
**Cannon** 3:6 4:3,12,18 5:17,19
**Cannon's** 4:19 5:22
**case** 7:13,23 8:4,5,7,8,9,10,13,14,
     15,18,19,20,23,24,25 9:1,7,11 10:23
     11:2,5
**cell** 12:9
**Certificate** 3:10
**child** 5:8 7:18 9:7,11,12 10:19 12:3
     13:1
**Children's** 7:18
**claimed** 7:8
**counsel** 4:5
**court** 2:17 4:10
**CPS** 7:13,16,17,23 13:10
**CRR** 2:18
**CSR** 2:18
**cut** 12:10

**D**

**Dallas** 2:14
**dates** 11:19
**defend** 11:5
**defendant** 2:10 4:9
**deposition** 4:3
**DNA** 5:16,20 11:11
**duly** 4:13

**E**

**emailed** 11:14
**emails** 11:15
**ended** 13:24
**evidence** 11:4
**Examination** 3:7 4:14
**exchanged** 11:15
**exhibits** 3:13

**F**

**fake** 6:20 7:10 10:16,18
**familiar** 6:5,22,23
**father** 4:19 5:22
**filed** 6:3
**FIRM** 2:12
**firms** 8:4,9,25
**form** 9:22 10:1
**Fort** 2:7

**G**

**give** 6:15 11:20

**H**

**half** 11:21
**hang** 12:13



Jacob Cannon

April 04, 2022
Index: happening..short

happening 7:9
head 5:25
heard 5:4
hire 6:21
hired 8:3,4
hiring 6:20

**I**

idea 7:9
INDEX 3:1
intend 11:1,4
investigated 13:10
involved 4:25 7:13,23 10:23
involving 7:14
Iseland 11:25

**J**

Jacob 3:6 4:3,12,18
Jacquetta 4:19 5:17,19,22,24,25
  6:5,16,19 7:8 11:12
Jeremy 2:22
jon@bradthomaslawoffice.com
  2:8
Jonathan 2:4 4:7
Jones 5:3,4
Jr 3:6 4:12,18
Julie 2:18

**K**

kid 11:23,24
kind 9:6,17 10:11
kissed 9:14

**L**

Laney 2:11 4:9 9:22 13:21
law 2:5,12 8:4,9,25

lawyer 6:25 7:5 13:13
lawyers 6:20,21 7:10
Legal 2:19,23
letter 6:2,12,15,24 7:5
letters 7:10
long 7:20 8:2,16 13:11,15

**M**

Magna 2:19,23
Main 2:13
meet 11:7
message 11:25
messaged 11:17
Midland 9:2 13:14
minor 4:21
mouth 9:15

**O**

Objection 9:22
objects 9:25 10:1
OFFICE 2:5

**P**

P.O. 2:6
pass 13:19
pertaining 8:13,14,18,20
phone 7:8 12:9
Picking 11:23
plaintiff 2:3 4:8
plead 12:21,24 13:2
pleading 12:5,7,19
PLLC 2:5
police 13:16
pregnant 12:23,25
press 12:13
pretending 6:21

proceedings 3:4 13:24
Protective 7:18

**Q**

question 7:24 10:2,3
questions 13:21

**R**

recall 6:17 11:16
receive 6:13
received 6:2,14,25 7:4
receiving 7:10
record 4:2,6,16 13:5,8,23
red 12:13
related 5:16 7:1,5 8:24
relationship 9:18
remember 13:13
reporter 2:17 4:11
Reporter's 3:10
represented 8:6 9:1,9
representing 8:21
ringing 12:9
RMR 2:18
Roderick 5:3,4
Rovny 2:22

**S**

school 11:23
series 6:20
Services 7:18
sex 4:21,23 5:14 12:2,17
sexual 9:18
Shawn 2:11 4:9
shawn@udeshilawfirm.com
  2:15
short 13:3



**Signature** 3:9

**Sir** 13:9

**Solutions** 2:19,23

**state** 4:5,16 7:17,19

**Street** 2:13

**Suite** 2:13

**support** 9:7,12

**swear** 4:11

**sworn** 4:13

---

### T

**talked** 10:22,24 13:16

**test** 5:16,20 11:11

**testified** 4:13

**Texas** 2:7,14 9:2

**text** 11:17,25

**texts** 11:22

**THOMAS** 2:5

**time** 7:4 8:16 11:17 12:1 13:5,8,23

**times** 12:2,25

**Tina** 4:23,25 5:7 6:19 7:1,5,14,22
8:21 9:14,18,20 10:8,11,22,24 11:7,
14 12:2,16,22,25 13:16

**top** 5:25

**TX** 2:18

---

### U

**UDESHI** 2:12

---

### V

**video** 4:3

---

### W

**Wharton** 2:4 3:7 4:7,15 9:23 12:12,
16 13:3,9,19

**Wilson** 4:23,25 5:7 7:1,6,14,23 9:14,
18,20 10:8,11,22 11:7,14 12:2,16,

22,25 13:17

**witnesses** 11:1

**Worth** 2:7

**Wow** 7:24

---

### Y

**year** 11:20,21



| | | |
|---|---|---|
| 1:45PM | 1 | |
| 1:45PM | 2 | **Plaintiff's Exhibit No. 2** |
| 1:45PM | 3 | |
| 1:45PM | 4 | **Deposition of Sharon Jackson George** |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

CAUSE NO. CC-21-02654-D

TINA WILSON                    ) COUNTY COURT AT LAW NO. 4
                              )
                              )
                              )
VS.                           ) IN AND FOR
                              )
                              )
JACOB CANNON                  ) DALLAS COUNTY, TEXAS


**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

SHARON JACKSON-GEORGE

OCTOBER 18, 2022

**********************************************************


    ORAL AND VIDEOTAPED DEPOSITION OF SHARON

JACKSON-GEORGE, produced as a witness at the instance of

the Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 18th day of

October, 2022, from 4:36 p.m. to 5:09 p.m., before Karen

Morris, Certified Shorthand Reporter, in and for the State

of Texas, reported by Stenographic Method, the witness

being duly sworn remotely via Zoom Video Communications,

Inc., in accordance with the Texas Rules of Civil

Procedure.

PLAINTIFF'S
EXHIBIT
2

**2**

1                    **APPEARANCES**
2    FOR THE PLAINTIFF:
        MR. JONATHAN WHARTON
3        SBN 24075764
        BRAD THOMAS LAW OFFICE, PLLC
4        ATTORNEYS AT LAW
        P.O. BOX 472027
5        FORT WORTH, TEXAS 76147
        (903) 931-3616
6        JON@BRADTHOMASLAWOFFICE.COM
7
8
9    ALSO PRESENT:
        VIDEOGRAPHER CORY LAWRENCE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1                    STIPULATIONS
2    FOR THE DEPOSITION OF SHARON JACKSON-GEORGE, taken on the
     18th day of October, 2022.
3
4    We, the attorneys here representing the parties
     listed herein, pursuant to the Texas Rules of Civil
5    Procedure, stipulate and agree to each of the following
     items, to-wit:
6
     THIS DEPOSITION SHALL BE TAKEN PURSUANT TO:
7    NOTICE:
8
     STIPULATIONS REGARDING OBJECTIONS:
9
10
     Make objections in accordance with the Texas Rules of
11   Civil Procedure;
12
     STIPULATIONS REGARDING SIGNATURE OF THE WITNESS:
13
     Signature of witness is waived.
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1                **INDEX**
                         PAGE
2
     CAPTION............................................   1
3
     APPEARANCES...................................   2
4
     STIPULATIONS...................................   4
5
     WITNESS:
6
        SHARON JACKSON-GEORGE
7
     EXAMINATION BY MR. WHARTON.......................   5
8
9    REPORTER'S CERTIFICATE............................   26
10
                **EXHIBITS**
11
     NO.    DESCRIPTION            PAGE
12
     NO EXHIBITS MARKED OR OFFERED.
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

1         (Deposition commenced at 4:36 p.m.)
2              THE VIDEOGRAPHER:  Today's date -- today's
3    date is October 18th, 2022.  The time is 4:36 p.m.  We are
4    on the record beginning the deposition of Sharon
5    Jackson-George.
6              Will counsel please identify themselves for
7    the record?
8              MR. WHARTON:  Jonathan Wharton for the
9    plaintiff.  And the defense counsel has not shown up.
10             THE VIDEOGRAPHER:  Does counsel agree that
11   this deposition can be taken by video conference, and the
12   court reporter can swear the witness remotely?
13             MR. WHARTON:  Yes, but I think we're going
14   to skip the video.
15             THE VIDEOGRAPHER:  Oh, yeah.  Sorry.
16             MR. WHARTON:  Yes.
17             THE VIDEOGRAPHER:  Will the court reporter
18   please swear in the witness?
19             THE COURT REPORTER:  Ma'am, would you raise
20   your right hand to be sworn?
21             (Witness sworn.)
22                SHARON JACKSON-GEORGE,
23   having been first duly sworn, testified as follows:
24                   EXAMINATION
25   BY MR. WHARTON:

Sharon Jackson-George
October 18, 2022

---

**6**

1      Q. All right. Ma'am, can you state your name for
2  the record, please?
3      A. Sharon Denise Jackson-George.
4      Q. And what is your relationship to Tina Wilson?
5      A. Tina Wilson is my stepdaughter. I was married to
6  Tina's father for over 20 years.
7      Q. And when did you first meet Tina?
8      A. I first met Tina in 1989.
9      Q. Okay. And was that --
10     A. I'm sorry. 1988.
11     Q. Okay. And was that before or after she started
12 living with Jacob Cannon?
13     A. I beg your pardon? Was that --
14     Q. Was that before or after she started living --
15     A. That was before she started living with Jacob
16 Cannon.
17     Q. All right. When did she begin living with Jacob
18 Cannon?
19     A. I do believe she started living with Jacob Cannon
20 in 1988.
21     Q. So later that year?
22     A. Yeah, later in that year.
23     Q. And how did that come to happen? How did she
24 come to live with Jacob Cannon?
25     A. Her mom and Jacob Cannon were dating, and so a --

---

**7**

1  the -- her mom was living with Jacob Cannon.
2      Q. And what's -- what's the name of Tina Wilson's
3  dad?
4      A. Tina Wilson's dad is Charles Wayne Miller.
5      Q. Okay. And so how did -- were you involved in the
6  custody fight between Gerald Miller and Tina's mother?
7      A. That -- the custody battle between -- in 1988,
8  and it seems as though when Gerald and I started dating,
9  and when we became -- when we got married there was
10 issues with where the kids were going to live, so they --
11 we started going to court to try to get petition for the
12 kids.
13          It started when one -- his son came home and
14 told us that he went in the bedroom and saw Tina in the
15 bed with the mom -- I mean, I'm sorry, in the bed with the
16 dad, with Jacob Cannon, and so that's when John started --
17 Gerald Wilson -- Gerald -- Gerald Miller started going to
18 court to try to get these kids.
19     Q. And why was he unsuccessful?
20     A. I do believe that we ran out of money. And not
21 just that we ran out of money, the kids not -- not saying
22 the kids, but Tina was brainwashed. They started buying
23 her all of these gifts. They started taking her on all of
24 these trips. Doing things for her. I would say that she
25 was brainwashed.

---

**8**

1      Q. And so at the time -- and how -- how old was Tina
2  at that time in 1988?
3      A. In 1988 she would have been, like, 12.
4      Q. And do you know when Jacob started having sex
5  with her?
6      A. Jacob started having sex with Tina when she was
7  nine years old.
8      Q. And how do you know that?
9      A. Tina's brother, Gerald Wilson -- we call him
10 Muka.
11         THE COURT REPORTER: You called him what?
12     A. He lived in the home with us --
13     Q. (BY MR. WHARTON) Hold on. Hold on.
14     A. -- with myself and my husband. And so he went to
15 visit his mom and Jacob Cannon. And he observed Jacob
16 getting out of the bed with Tina.
17     Q. And how do you spell Muka?
18     A. M-U-K-A.
19     Q. So Muka, or Gerald Wilson, told you-all, I saw
20 Jacob in bed with Tina Wilson?
21     A. That was correct.
22     Q. Is there any other source of your knowledge for
23 that?
24     A. To Jacob, no, there was no other source that we
25 had --

---

**9**

1      Q. Okay.
2      A. -- that Tina -- Tina --
3      Q. How old was --
4      A. Tina would never tell us if it was true or not.
5  And then probably about a year, maybe so later, she came
6  up pregnant. She might have been 13 years old at that
7  time.
8          And when she came up pregnant, they came to
9  us, and came to my husband and I, and said that -- this is
10 my -- my son, I had a 12-year-old son at the time. And so
11 they blamed it and say it was my son's baby. Tina was
12 pregnant with my son's baby.
13     Q. And what's your son's name?
14     A. Adren, A-D-R-E-N, Jackson.
15     Q. All right. And so who told you that the baby was
16 Adren's?
17     A. Berty (phonetic) Wilson told her -- that Tina had
18 told her that she and my son Adren had been having sex.
19     Q. Did you talk to Adren about that?
20     A. Of course. So I took Adren to the -- to the
21 doctor, because he told me he was -- there was no way that
22 he'd been having sex with Tina. Okay. His words was, I
23 -- I've not been having sex with that black dog.
24         And -- but I took him to the doctor, and the
25 doctor did an exam on him. And I kept those papers until

---

3  (Pages 6 to 9)

Sharon Jackson-George
October 18, 2022

10

1   I moved out here to Nebraska, and that's been over 20-plus
2   years ago, and I don't even know what happened to those
3   papers.
4       Q. And what -- what do you -- did Adren mean
5   when he said black dog?
6       A. He was just referring to her color, her skin
7   color.
8       Q. Is --
9       A. And that he did not -- wasn't sleeping with her.
10  He was, I guess, just talking down about her.
11      Q. I gotcha. And was -- and -- and you can say it
12  verbatim. Did he use the word dog or did he use a
13  different word like a curse word?
14      A. No, he used the word dog.
15      Q. He said dog? Okay. And so after -- after she
16  got pregnant, did you know about her abortions?
17      A. I knew about the first one, because right after
18  they came and said that my son got her pregnant, then all
19  of a sudden this baby just vanished, then she wasn't
20  pregnant anymore. Because I told -- we met up in church
21  at my husband's father's church, and I told them, you
22  know, I have these papers, and then all of a sudden she
23  just -- she didn't -- she's not pregnant anymore.
24      But I told my husband whoever was having
25  sex with Tina, they were going to keep on doing it, and

11

1   she was -- she was going to come up pregnant again.
2       Q. Did she come up pregnant again?
3       A. Yes, she did.
4       Q. And how do you know -- how'd you find out about
5   that?
6       A. I -- she came up -- we had moved to Nebraska.
7   Jacob kept harassing my husband. He would come on his
8   job, because he was -- Tina was skipping school. He was
9   going and checked Tina out of school, and take her home
10  and have sex with her. And so my husband found out about
11  all of the truancies, and all of the tardies, and
12  absences. So he approached the school, and the school
13  told him that my husband -- that Jacob was the one that
14  was taking her out of school.
15      And so we went to the police, went and got
16  an attorney, and Jacob was still coming at my husband
17  trying to -- I mean, was done -- fighting, trying to fight
18  with him, and all of that. So we ended up moving to
19  Nebraska.
20      And one of my friends called me up and she
21  was like, I see your -- your stepdaughter in the mall with
22  Jacob, and I didn't know she was pregnant. Well, neither
23  did my husband.
24      And so come to find out Tina was, I think,
25  14 years old at that time, and she was pregnant. She's

12

1   already had so many abortions they couldn't give her
2   anymore abortions. So she -- that's when she had Kweta --
3   Jaquita (phonetic).
4       Q. And if could spell that for the court reporter?
5       A. Jaquita, J- -- is -- I'm -- I'm not sure how
6   Jaquita's name's spelled. I don't want to even mess it
7   up.
8       Q. Okay. Fair enough.
9       And so did you see Jacob getting violent and
10  aggressive with your husband at other times? Did you see
11  that happening?
12      A. On many a times. There was a -- altercations
13  where they approached me. Came to the door and threatened
14  me, because I called Child Protective Services on several
15  occasions. And I'm just appalled. I mean, it just blows
16  me away that we're here today, because I've been trying to
17  do something about this for over 20 years.
18      Q. And what would happen with the CP- --
19      A. (Inaudible response.)
20      Q. I'm sorry. What -- what would happen with the
21  CPS investigations?
22      A. When the CPS got involved, they went to school
23  and tried to talk to Tina. And like I said, she was --
24  she was brainwashed. She was getting stuff that any other
25  kid her age and her -- in her community wasn't -- wasn't

13

1   getting, she was getting. Polo coats. Polo boots. You
2   know, stuff back in the '80s and the '90s, those -- those
3   were big deals I guess to kids, and so he was buying her.
4       Q. And --
5       A. I mean, he kept on to where we got her -- bought
6   her a car. She started doing things. She started going
7   out dating, because she -- this guy was her mom's man, so
8   she started going out dating, and he actually put sugar in
9   her gas tank.
10      Q. He what now with her gas tank?
11      A. He put sugar in the gas tank of the car that he
12  (sic) purchased for her.
13      Q. He destroyed the car?
14      A. Yeah.
15      Q. Did you ever find out more about Tina Wilson's
16  relationship with Jacob? Was there ever -- ever any
17  additional information that you received about that?
18      A. Well, Tina had already had Jacob -- I mean, I'm
19  sorry, Tina had already had Jaquita, and my husband and I
20  had moved back to Midland, Texas, because my mother was
21  dieing from cancer.
22      And so Tina moved in the house with us, and
23  Jacob would come by the house and pick her up from our
24  house, and, you know, they would go do whatever, and -- so
25  I -- I don't know.

4  (Pages 10 to 13)

14

1    Q. And did you -- I mean, so did you know what they
2    were doing, or did you just sort of at that point, you
3    know, believe what was going on? Did you -- did you see
4    anything that would tell you this is happening?
5    A. I didn't see anything. I didn't -- I just saw
6    her after the baby was born. Jaquita looked just like
7    Jacob. After the second baby was born, Mark Cannon, I
8    just saw that he looked just like Jacob, as well. I have
9    never seen any physical sexual anything going on.
10   Q. Did anyone else report that to you other than
11   that one time with Gerald, with Gerald Wilson? Did
12   anybody other than Gerald Wilson ever tell you, hey, I saw
13   something going -- physical going on with them?
14   A. No.
15   Q. Do you ever hear any rumors about that?
16   A. Oh, yeah, there was rumors all around our town.
17   People had just seen them checking in and out of hotels,
18   would come and tell my husband.
19        The school was telling us that he was
20   checking them -- checking her out of school. There was
21   all kind of people coming and telling us stories.
22        My sister had witnessed those guys being
23   together, but just -- I've never seen them be physically
24   sexual together.
25   Q. Have you ever talked to Jaquita about all of

15

1    this?
2    A. Vaguely. She came to me and told me to stop
3    lying about her grandfather, Jacob Cannon. And told me
4    that if that was what was going on why I didn't do
5    anything to help, because her mom was a -- a young girl at
6    the time. And I told her I had done everything in my
7    power to help, and -- and get this thing resolved, because
8    I wanted to see him go to jail.
9    Q. Did you ever talk to Jacob about it?
10   A. I've never had any kind of conversation with
11   Jacob.
12   Q. Did you ever talked to Tina's mom about it?
13   A. Oh, yes. Tina's mom and I have had all kind of
14   altercations about this situation. I have talked to her
15   in rude, rude manners. I just couldn't believe that she
16   sold her daughter. I've -- I -- we've had multiple
17   conversations. We've shared text messages.
18        Yeah. This has been going on for 20-plus
19   years. And this has been -- this is a situation that has
20   been like dear to my heart, because I lost a child, and to
21   see that Tina is just being sexually abused and -- and
22   misused by her own mama, it just -- I don't know, it just
23   did something to me.
24        I continued calling child CPS, which caused
25   me and my husband to have problems, because he kept

16

1    telling me, let the Lord handle it. And I would say the
2    Lord has been using me. And he'd say, let the Lord handle
3    it. Let the Lord handle it.
4        To this day, this is one of the reasons that
5    we are not together. I'm recently -- I'm recently married
6    five years now. But his thing was the Lord was going to
7    handle it.
8    Q. So Tina stayed with Jacob Cannon for -- for
9    years, right?
10   A. Yes.
11   Q. When did she end up deciding to tell what
12   happened?
13   A. When did she decide to tell her dad?
14   Q. Just -- yeah, to tell on him. To tell everybody,
15   hey, you know, I -- I -- you know, I was raped by Jacob?
16   A. She -- Tina has -- has come out several times and
17   tried to say something, but the way people looked at her,
18   she -- she kept on back -- backing and didn't want to
19   fully tell the story. So she will cut her hair out of
20   shame. She wore her hair like bald, bald. I mean, just
21   out of shame for what she -- what she done.
22        I think it was probably back in 2014, they
23   had the worst play, I think, and her mom pulled the gun on
24   her, and she didn't have nowhere to go.
25        And she started dating this guy, and I think

17

1    she confined in that guy to tell -- to come out to tell
2    the truth. But she'd been trying to come out, and I think
3    she just needed somebody to be down with her, to be on her
4    side.
5        I never thought her dad was really on her
6    side. I -- I just felt like he -- he felt like she was
7    getting things that he couldn't provide for her, because
8    at the age of 20 or maybe 21, Jacob built her a house from
9    the ground up, and so he boasted about it. Her father
10   boasted about it. He walked around telling me and whoever
11   wanted to listen, my daughter has a house built up from
12   the ground up. And then I would say, well, how did she
13   get it? Like, she had to lay on her back to get that
14   house, which is so bad.
15   Q. I hear you.
16   A. So that --
17   Q. So is there anything else you remember about the
18   whole situation you haven't -- you haven't told us,
19   anything important?
20   A. Oh, there's a lot of stories that came with the
21   situation. I seriously thought that the -- the movie
22   purchased -- somebody had got ahold of her story and told
23   her story.
24        There are situations where Jacob beat up his
25   brother Muka, and sent him to the hospital. Their -- they

5  (Pages 14 to 17)

Sharon Jackson-George
October 18, 2022

18

1  were all fighting, because Tina felt like Jacob was her
2  man at first. And the mamma and Tina fighting because she
3  caught Jacob and Tina together. And I'm, like, she's just
4  a child. She's only 16 years old. What do you mean you
5  caught them together? He should be in jail.
6      It's -- it's a lot to the story.
7  Q. I hear you.
8  A. They should be in jail. The mamma and Jacob
9  should be in jail. Seriously, they should be in jail.
10  Q. Tell me about the time that Muka got beat up.
11  A. What was that?
12  Q. Tell -- tell me about the time that Muka got beat
13  up.
14  A. The Muka -- we all took Muka out down to Midland
15  for the summer, and Tina was about maybe seven or
16  eight months pregnant at the time. And they got into a
17  big altercation when he got -- he got in the middle,
18  because he was trying to help his mom and his sister, and
19  he ended up in the hospital. Tina ended up in the
20  hospital.
21      I don't recall most about that incident, but
22  that we did have to send my husband's sister to the
23  hospital to check on Muka, because he ended up going to
24  the hospital during that time. And my sister's -- my
25  husband's sister's name is Brenda Haven.

19

1  Q. How did you find out about the fight and the
2  cause of it?
3  A. Brenda Haven had called us. Muka, while he was
4  there at the hospital, he ended up getting ahold of her, I
5  believe. I'm not sure how we -- how we -- how -- that's
6  been many years ago. I'm not sure how we found out.
7  Q. Okay. And but the -- but the -- the -- what
8  you're saying is that Muka got in between an argument
9  between Jacob and Tina about their relationship, or
10  whatever?
11  A. Yep. And he pulled a gun on them, like --
12  Q. On Muka?
13  A. Yep, Jacob did.
14  Q. All right. Are there any other major incidents
15  that you can recall that sort of centered around Jacob's
16  sexual relationship with Tina?
17  A. Hum. There was so many incidents. They just
18  sound like TV.
19      There was incidents where they came to the
20  mall, after they found out that I called child CPS. And I
21  saw them pull up, and so I locked the door. And then they
22  literally tried to break the door to get in.
23  Q. Sort of like kicking the door?
24  A. And -- and pulling on it. The -- the glass
25  screen door, yeah.

20

1  Q. And who's they, was it Jacob and someone else?
2  A. Jacob and Berty Wilson. He didn't do anything.
3  It was -- it was Berty, and he stood in the yard and
4  watched.
5  Q. Okay. How -- how big is Jacob, would you say?
6  A. I would say Jacob is maybe 6'4", 200 and maybe 50
7  pounds, maybe.
8  Q. And so was -- was he the one kind of pulling --
9  you're saying it was not him that was pulling on the door,
10  it was -- it was Berty?
11  A. It was Berty.
12  Q. Were there other times that you saw -- and,
13  actually, let me ask you this. How did that incident end
14  up? What ended up happening?
15  A. I ended up calling the police. Hello?
16  Q. Yes, ma'am. We're still here.
17  A. Okay. I ended up calling the --
18  Q. You say you ended up calling the police?
19  A. I still made -- I still made a police report.
20  Q. Okay. And they just didn't really do anything?
21  A. They didn't do anything. And sounds
22  like -- because my husband ended up in court a lot, you
23  know, trying to get custody of his kids. And I felt
24  like -- my husband was suing the city of Midland for
25  discrimination, and so I felt like because of him suing

21

1  the city of Midland, they was taking everything like --
2  you know, like a joke. Like he was saying all of these
3  things because Jacob made more money than he did, and Jacob
4  had his ex- -- the -- I don't -- I don't know. My belief
5  is that he was suing the city, and that they didn't do
6  nothing.
7      He was calling the police. He had went and
8  got an attorney. And we were in and out of courts trying
9  to get custody of these kids, because they were in a bad
10  situation, and there was nothing that we could do.
11  Q. And tell me, are there any other major incidents
12  you can think of where you saw -- that sort of centered
13  around Jacob's relationship with Tina? Just anything you
14  can think of. Just any of the stories that sort of focus
15  on that.
16  A. We were in court going through custody hearings,
17  and Jacob and Tina were sitting out in the -- in the
18  waiting room, and she was sitting there rubbing up and
19  down on his legs. He was -- had her wrapped up under --
20  wrapped in his arms like -- like this was his woman.
21  Q. Okay.
22  A. Other incidents, I don't know. I kept myself
23  away from all of this. I was in Nebraska, and Tina
24  remained in Texas with Jacob and her mom. So as far as
25  seeing anything other than what I saw was only during the

6 (Pages 18 to 21)

Sharon Jackson-George
October 18, 2022

|  | 22 |
|---|---|
| 1 | times if I was out there during the summers. |
| 2 | There was a time that they had put Tina |
| 3 | out -- when I say they, Jacob and Berty Wilson had put |
| 4 | Tina out of the house, because they found out she had a |
| 5 | boyfriend. She came up with condoms in her glove box in |
| 6 | her -- in her car, and so they put her out. He beat her |
| 7 | up and put her out of the house, and she started living |
| 8 | with my husband's mother. And that was a time that I -- I |
| 9 | could recall that he end up jumping on her, because he |
| 10 | found the condoms in the car. |
| 11 | But as far as me ever seeing them together |
| 12 | like a couple, I've never seen it. |
| 13 | Q. How -- how did you find out about the incident |
| 14 | with the condoms? |
| 15 | A. Her mom -- my husband's mother called us and told |
| 16 | us, because Tina ended up at her house. And so she told |
| 17 | my husband's mother the situation, what had happened. My |
| 18 | husband's mother told us what had happened. And my |
| 19 | husband's mother -- my husband's father was a bishop, so I |
| 20 | had no reason to think that she was lying to -- to us |
| 21 | about any of it. |
| 22 | Q. I gotcha. And a -- let's see. Is there anything |
| 23 | else you can think of? Just -- you know, I know you might |
| 24 | not remember everything, but is there any -- is there |
| 25 | anything that's like, you know, just fresh in your memory |

|  | 23 |
|---|---|
| 1 | that says, hey, you know, these are memories of them |
| 2 | having a relationship? |
| 3 | A. No. And I don't -- and -- and I'm not going to |
| 4 | be caught lying, because I've never -- I've never seen |
| 5 | them -- |
| 6 | Q. You've never seen it yourself? |
| 7 | A. -- hurt -- because I've not seen that part, |
| 8 | knowing that what I know, but I've not seen -- not seen |
| 9 | that. |
| 10 | Q. Okay. Fair enough. And I know that you'd like |
| 11 | to come to trial, if possible. You do understand that |
| 12 | we're -- we're taking this video deposition where, I |
| 13 | guess, at this point it's not really videotaped, but we're |
| 14 | taking your deposition with the idea that if for some |
| 15 | reason, due to a scheduling conflict you cannot show up, |
| 16 | that this deposition will be read instead; is that fair? |
| 17 | A. That's fair. |
| 18 | Q. Okay. All right. I appreciate your time. |
| 19 | MR. WHARTON: And I'll pass the witness. |
| 20 | THE COURT REPORTER: Excuse me. I do have |
| 21 | something I need to say, as far as a court reporter goes. |
| 22 | I forgot to ask the witness what state and what city |
| 23 | you're located in? |
| 24 | THE WITNESS: I live in Lincoln, Nebraska. |
| 25 | THE COURT REPORTER: Thank you. And I just |

|  | 24 |
|---|---|
| 1 | needed counsel to stipulate to her identity. Can you do |
| 2 | that? |
| 3 | MR. WHARTON: Yes, ma'am. Yes, this is -- |
| 4 | yeah, this is Sharon Jackson-George. |
| 5 | THE COURT REPORTER: Okay. I'm sorry. We |
| 6 | started so quickly. |
| 7 | MR. WHARTON: No worries. |
| 8 | THE COURT REPORTER: Okay. |
| 9 | MR. WHARTON: We had a little snafu here and |
| 10 | there, but we got through it. |
| 11 | THE COURT REPORTER: Thank you. |
| 12 | THE VIDEOGRAPHER: All right. Mr. Wharton, |
| 13 | you said you passed the witness? |
| 14 | MR. WHARTON: Yes, sir. |
| 15 | THE VIDEOGRAPHER: Just making sure. |
| 16 | All right. We are off the record at |
| 17 | 5:09 p.m. Ending the deposition of Shannon (sic) |
| 18 | Jackson-George -- Sharon Jackson-George. |
| 19 | THE WITNESS: Sharon. |
| 20 | THE VIDEOGRAPHER: Yeah, Sharon. Sorry. |
| 21 | THE COURT REPORTER: Do we need to read and |
| 22 | sign? Or how do you want to handle that, Mr. Wharton? |
| 23 | MR. WHARTON: I mean, I -- I don't know how |
| 24 | you'd possibly transcribe that accurately, but -- |
| 25 | THE COURT REPORTER: I'm going to try. |

|  | 25 |
|---|---|
| 1 | MR. WHARTON: Yeah, I hear you. I hear you. |
| 2 | Sharon, do you want to -- so what read and |
| 3 | sign means is you have the right to receive a copy of the |
| 4 | transcript, so you can read it and see if it's accurate to |
| 5 | what you said. You can fix any errors that are in it, if |
| 6 | you want to. Do you want to do that? |
| 7 | THE WITNESS: Um. |
| 8 | MR. WHARTON: You don't have to, it's |
| 9 | just -- it's just up to you. |
| 10 | THE WITNESS: No, I don't really want to. |
| 11 | MR. WHARTON: Okay. I hear you. All right. |
| 12 | Then we'll waive. |
| 13 | THE COURT REPORTER: Thank you. |
| 14 | (Final recess at 5:10 p.m.) |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

7 (Pages 22 to 25)

Sharon Jackson-George
October 18, 2022

26

```
 1              CAUSE NO. CC-21-02654-D
 2    TINA WILSON          ) COUNTY COURT AT LAW NO. 4
 3                         )
                           )
 4    VS.                  ) IN AND FOR
                           )
 5                         )
      JACOB CANNON         ) DALLAS COUNTY, TEXAS
 6
 7           REPORTER'S CERTIFICATION
          DEPOSITION OF SHARON JACKSON-GEORGE
 8               OCTOBER 18, 2022
 9        I, Karen Morris, Certified Shorthand Reporter in
10    and for the State of Texas, hereby certify to the
11    following:
12        That the witness, Sharon Jackson-George was duly
13    sworn by the officer and that the transcript of the oral
14    deposition is a true record of the testimony given by the
15    witness;
16        That examination and signature of the witness to
17    the deposition transcript was waived by the witness and
18    agreement of the parties at the time of the deposition.
19        That the amount of time used by each party at the
20    deposition is as follows:
21        MR. JONATHAN WHARTON, Attorney for the Plaintiff,
22    0 hour (s), 33 minute(s).
23        That $      is the deposition officer's
24    charges to the PLAINTIFF for preparing the original
25    deposition transcript and any copies of exhibits;
```

27

```
 1        That pursuant to information given to the
 2    deposition officer at the time said testimony was taken,
 3    the following includes counsel for all parties of record:
 4        MR. JONATHAN WHARTON, Attorney for the Plaintiff.
 5        That a copy of this certificate was served on all
 6    parties shown here on the    day of      2022, and
 7    filed with the Clerk pursuant to Rule 203.3.
 8        I further certify that I am neither counsel for,
 9    related to, nor employed by any of the parties or
10    attorneys in the action in which this proceeding was
11    taken, and further that I am not financially or otherwise
12    interested in the outcome of the action.
13        Certified to by me this 31st day of October,
14    2022.
15
16
17        Karen Morris, Texas CSR 334
          Expiration date: 04/30/2023
18        SLS LITIGATION SERVICES, LLC
          322 SPRING HILL DRIVE, A700
19        SPRING, TEXAS 77386
          FIRM REGISTRATION NO. 761
20
21
22
23
24
25
```

8 (Pages 26 to 27)

| | |
|---|---|
| 1:45PM | 1 |
| 1:45PM | 2 |
| 1:45PM | 3 |
| 1:45PM | 4 |

Plaintiff's Exhibit No. 3

Deposition of Gerald Miller

1

NO. CC-21-02654-D

TINA WILSON                    )      COUNTY COURT AT LAW NO. 4
                              )
                              )
                              )
VS.                           )      IN AND FOR
                              )
                              )
                              )
JACOB CANNON                  )      DALLAS COUNTY, TEXAS

_____

ORAL AND VIDEOTAPED DEPOSITION OF GERALD MILLER
Taken October 18, 2022

_____

        ORAL AND VIDEOTAPED DEPOSITION OF GERALD

MILLER, produced as a witness at the instance of the

Plaintiff and duly sworn, was taken in the above styled

and numbered cause on October 18, 2022, from 10:28 a.m.

to 10:55 a.m., at the offices of Permian Court

Reporters, 605 W. Texas Avenue, Midland, Texas, before

Cathy Cummins, Certified Shorthand Reporter Number 5837

in and for the State of Texas, reported by computerized

stenotype, pursuant to the Texas Rules of Civil

Procedure (and the provisions stated on the record or

attached therein).

PLAINTIFF'S
EXHIBIT
3
PENGAD 800-631-6989

1                    A P P E A R A N C E S:

2

3    FOR THE PLAINTIFF:
     (via Zoom)
4                        MR. JONATHAN WHARTON
                         Brad Thomas Law Office
5                        P.O. Box 472027
                         Fort Worth, Texas   76147
6                        (903) 931-3616
                         jon@bradthomaslawoffice.com
7

8    THE VIDEOGRAPHER:

9                        MS. EMILY DAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2                                                    PAGE

   Appearances......................................  2
3

4  GERALD MILLER
   EXAMINATION BY MR. WHARTON........................  4

5

   Reporter's Certificate........................... 26
6

7

8

9

10                        EXHIBITS

11 NO.        DESCRIPTION                         PAGE

12                    (None Marked)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE VIDEOGRAPHER:  We are on the record.

2    Today is October 18th, 2022.  The time is 10:28.

3           Would the court reporter please swear in

4    the witness?

5                    GERALD MILLER,

6    having been first duly sworn, testified as follows:

7                    EXAMINATION

8    BY MR. WHARTON:

9        Q.   All right, sir.  Could you state your name for

10   the record, please?

11       A.   Gerald W. Miller.  Gerald, G-e-r-a-l-d,

12   W-a-y-n-e, Miller, M-i-l-l-e-r.

13       Q.   All right.  Thank you.

14           And what's your relationship to Tina

15   Wilson?

16       A.   She's my daughter.

17       Q.   Okay.  And tell me, how did Tina Wilson end up

18   living with Jacob Cannon?

19       A.   The Courts gave him custody of her.

20       Q.   Okay.  And tell me a little bit more about

21   that.  Did -- did you -- did you get to meet Jacob

22   Cannon in those -- you know, when you were going through

23   the court process?

24       A.   Yes, sir, I met him several -- on several

25   occasions.  I guess Midland County courthouse is what

1    gave him custody of my daughter, Birdie Wilson, Tina's

2    mother.  And at the time, Birdie and Jacob were staying

3    together, and I met -- had several run-ins with Jacob.

4         Q.    Okay.  Tell me about those run-ins.

5         A.    Well, one incident, he had -- I guess he

6    actually had jumped on my son.  My son was, at that

7    time, maybe like 9 or 10 years old.  And so me and him

8    had some words behind that.

9              And so what led to him hitting my son, I

10   think that my son had -- my son had told me that he had

11   seen Tina -- Jacob getting off top of Tina, pulling his

12   pants up.  And he told Jacob he was going to go and tell

13   his dad.  And so we went to court behind that incident,

14   as well, about him hitting my son.

15        Q.    Got you.

16             So your son -- your son was reporting that

17   he seen Jacob inappropriately acting with your daughter,

18   and so Jacob hit your son; is that right?

19        A.    I think -- yeah, I think that's what -- the way

20   it went.  It's been so long ago.  But I can remember

21   Muka -- my son, we call him Muka Gerald, Jr. -- excuse

22   me -- we call him Muka Gerald, Jr.  And at the time,

23   Jacob and Birdie, they lived, like, maybe 10 miles or 12

24   miles out in the country away from where I lived at.

25             And that night he jumped on little Gerald,

1   I think Gerald was 10 years old.  And he ran and -- he

2   was running into town to try to get some help and get to

3   me, his dad, for safety.  And a white gentleman picked

4   him up and came to court and told the Court that he seen

5   my son running through the night out in the wilderness.

6   Anybody could have picked him up and maybe killed him.

7   But he was able to tell him -- show him where he lived

8   at.

9            And so he brought my son to me, and my son

10  had bloody clothes on him.  And I immediately alerted my

11  attorney the next morning, and we went to court behind

12  that, as well.  And he told about Jacob had beat him up

13  and Jacob had -- was messing with his sister Tina, seen

14  him being inappropriate with her.

15       Q.   So how did that play out in court?  What

16  happened in court?

17       A.   They took my son from me -- I mean -- I'm

18  sorry.  They had taken my son from Birdie, the mother,

19  and gave me custody of my son and gave Birdie full

20  custody of Tina.  And the man just kept molesting my

21  daughter.

22            And I would -- I would drive the school

23  buses at the time, and some kids on the bus told me they

24  seen Jacob and Tina kissing.  I think at the time, Tina

25  might have been 7 years old.  I'm sorry, sir.  I'm

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document   Page 153 of 205
GERALD MILLER

7

1   sorry. At the time, Tina might have been in 7th grade.

2   And some kids told me they seen them on the bus kissing.

3           And so I never did say anything to Birdie

4   or Tina about it, but I told my attorney that Jacob is

5   still fumbling with my daughter. So he said that he

6   will set up another court hearing. And I don't know.

7   We might have went to court again. I'm not for sure.

8   I'm kind of confused about some things right now. It's

9   been so long. Everything is court record, on court

10   records, how many times we've been to court. Maybe

11   three or four times fighting for custody for the kids.

12   And Jacob was molesting my daughter, a clear picture

13   he's molesting my daughter.

14       Q.   All right. Understood.

15           And did the Courts ever actually get Tina

16   Wilson out of that situation?

17       A.   For a short period of time, I'm thinking they

18   gave me back custody of Tina. They kept playing with my

19   kids. They was taking them from me, giving them to

20   Birdie, taking them from Birdie, giving them to me.

21   Clearly, I was the safest one for them to stay with, and

22   I kept trying to prove that to the Court.

23           And I think -- at the last, my attorney's

24   name was Tom Morgan, who was representing me through

25   this whole time, this custody battle, he told me that

1   the judge told him to tell me that if I come back to

2   court again with this mess, about Jacob raping my

3   daughter, they was going to put me in jail.  And he --

4   my attorney also said, "Well, you plan on moving to

5   Nebraska.  If I was you, I would take your son and get

6   the hell out of Midland."  And I did do that.

7           But at the same time this was taking place

8   with my daughter, I was suing the City of Midland for

9   discriminating.  I won the case.  And I feel like the

10  Court failed to help my daughter because I was suing the

11  City of Midland.  And later, I won the case.  It was

12  during the same time.  All this stuff was going on about

13  the same time.

14          And it's pretty heartbreaking to me to see

15  this going on with a little baby.  And the man was

16  sleeping with the momma, and he's going to sleep with

17  the daughter.  He whipped the momma's ass.  He whipped

18  the daughter's ass.  He whipped the son's ass.  And I

19  done everything I could do to try to save my daughter,

20  but the Court failed me.  It failed us.

21          Now, I've got a 25-year-old granddaughter.

22  And she had two or three abortions behind this man.

23  They tried to cover it up.  And it's pretty bad.

24      Q.   Okay.  How did you find out about the

25  abortions?

1    A.    Well, Tina told me.  She told me when she told

2    everyone on Facebook.  I never -- I tried to get Tina to

3    talk to the people -- to the Court, but she loved her

4    momma so much, she didn't want nothing to happen to her

5    mother.  And her mother brainwashed her.

6         And later on down the line with everybody

7    else, I guess maybe seven or eights months ago, she got

8    on Facebook, and she just started telling the whole

9    story about all the abortions they gave her and

10   everything.

11        At the time -- I'm going to back up for a

12   minute.  At the time, my stepson was 12 years old, maybe

13   11 years old.  They tried to make -- they had made this

14   remark that Tina was raped by him.  Tina was the same

15   age he was.  And they had to drop that lie immediately

16   because of the boy wasn't even in puberty to produce any

17   kind of baby.  I think that's her first abortion.  But

18   we knew then it was Jacob.  We knew it, you know.  It's

19   just -- it's a -- it's a mess.

20    Q.    Got you.

21        And we'll -- we have -- we'll have his

22   testimony.  You're talking about Robert Jones, right?

23    A.    Who?

24    Q.    The boy you're talking about.

25    A.    No.  His name is -- his name is Adrian Jackson.

1   He's a grown man now.  He was my stepson, and his

2   mother's name is -- Adrian's mother's name is -- oh,

3   man.  My head has gone crazy -- Sharon Denise Jackson.

4   She's my ex-wife.  I've been married to her 26 years.  I

5   couldn't think of her name.

6        Q.   Sharon Jackson-Jordan?

7        A.   Sharon Denise Jackson.  That's her full name.

8        Q.   Got you.

9        A.   And she can -- I might have a phone number for

10   y'all if y'all want a phone number.  I think it might

11   help.

12        Q.   No.  We have her set up -- we have her set up

13   for a deposition, as well.

14        A.   Okay.  Good.  Thank you.

15        Q.   Yeah.

16        A.   Thank you.

17        Q.   No problem.

18             Okay.  And so when you -- you know, after

19   this all happened, did you ever see the effect that it

20   had on Tina?

21        A.   No.  I lived in Nebraska.  And thank God that I

22   didn't see none of this, sir, besides the incident with

23   Jacob.  I can remember one time Jacob came up on my bus.

24   I had bought my daughter some $75 Fila shoes that came

25   out.  And --

1   That's the thing.  They never wanted me to

2   do anything for my daughter, because they know if they

3   could keep me away from my daughter, the story wouldn't

4   come out.

5   So I happened to buy her some Fila shoes

6   one day.  And she was getting on the school bus, and she

7   was giving my shoes back to me.  She said, "Dad, I can't

8   take these shoes because Jacob don't want me to have

9   them.  He said that if I keep these shoes, that he's

10  going to do something to you or something."  I'm not for

11  sure what it was.

12  But it caused a big commotion, because --

13  I told her to keep the shoes, and she said, "No, Dad.

14  I'll just keep them at school.  I'll wear them at

15  school.  I'll take them off before I go home."

16  So anyway, Jacob came up on the school bus

17  one day, and he was threatening to beat me up, "Get off

18  the bus."  Jacob was a way bigger man than I was.  I was

19  afraid of Jacob.  But I was trying to get off the bus to

20  fight him, because the kids kept telling me, "Mr. Bus

21  Driver, please don't get off the bus."  They was holding

22  on me, "Don't get off the bus, Mr. Bus Driver, please."

23  And I was calling for the bus barn -- to my bosses and

24  telling them to get there as soon as possible, because I

25  was just panicking.  I was scared that this big man is

1    fixing to jump on me.

2              Right after that, I started going on the

3    school bus with a gun, because I just knew he was going

4    to come again and try to attack me.  It's a bad

5    situation, man.  These people failed to help us.  They

6    just left us in harm's way.

7        Q.   I hear you.  I hear you.  If you need a minute,

8    just let me know.

9              (Pause)

10       A.   Jacob seemed to be a pretty -- pretty violent

11   man, you know.  One day, the Court gave me custody of my

12   kids and told me to go pick my kids up at Jacob's place.

13   I didn't want to go do it.  I kept telling them that I

14   don't want to go do it because the man was pretty

15   violent, seemed to be pretty violent, you know.

16             And sure enough, the sheriff had to come

17   out there and go get my son out of the house, because

18   Jacob was trying to fight me then.  He was making sure

19   that I wouldn't be around Tina because he didn't want

20   the story to get out.  He was doing everything to cover

21   his mess up.

22             Tina went to the school here in town and

23   told the school that this man was raping her.  They

24   failed to notify Child Protective Services.  My attorney

25   knew of this.  He failed to notify us -- to know -- to

1   let the police and Child Protective Services know, you

2   know, all the legal things that he could have done to

3   try to help this little baby from being helped.

4        And by her being black in the face and her

5   daddy, they was calling niggers here in this town, they

6   failed to render us any kind of aid.  They just didn't

7   care about us.  Now look at all the mess that's going on.

8        And, you know, they try to say, you

9   know -- you know, Attorney, they try to say I'm a bad

10  man.  But look at my record.  Still clean.  And all this

11  that my daughter has been through, I haven't done

12  nothing to no one.  (Indiscernible) God help us.

13  Q.   Were you relying on your attorney to tell you

14  what to do in this kind of situation?  Were you relying

15  on --

16  A.   Huh?

17  Q.   Were you relying on your attorney to tell you

18  whether to call the cops or whether to call CPS or who

19  to report it to properly?

20  A.   I was doing everything.  He knew what to do.

21  And he knew -- I was paying him money to represent us.

22  And later on, I found out through Tina that he also

23  represented Jacob.  Conflict of interest.  Dirty man.

24  Dirty man.  He done that to himself.  I had nothing to

25  do with none of that.  He was taking my money.

1    Q.    Did CPS ever investigate?

2    A.    Not to my knowledge.  I don't even know.  When

3  I went to Nebraska, my way of functioning was to try to

4  just keep praying like my mother told me and let God

5  bring it out.  That's the only way I could have dealt

6  with this.  And I done what she asked me to do.  And my

7  daughter paid the price.

8    Q.    Okay.  And so did you keep in touch with Tina

9  while you were in Nebraska?

10   A.    No.  I may have talked to her maybe once or

11 twice a year.  Not very -- not like she was here in town

12 with me, because I was -- I was with her all the time.

13 They wouldn't -- they made sure I would -- because she

14 would have came -- she would have told me.  We wouldn't

15 be in this situation right now.  It would have been a

16 badder situation.  I'm telling you.

17          I haven't seen her on Facebook talking

18 about this story, but my family and friends have

19 all everybody talking about it, and they're just telling

20 me all -- but I don't want to see my baby sitting there

21 crying.  I can see this big man getting up off top of

22 her.  Oh, boy.

23   Q.    When you talked to Tina, you know --

24   A.    I don't even -- go ahead.  I'm sorry.

25   Q.    Okay.  When you talked to Tina, you know,

1    through the years, did she ever tell you about this?

2        A.   I couldn't -- she never mentioned it to me.

3    No, sir.  She just didn't want to see me acting out.

4    And I guess she didn't want to hurt me.  She just kept

5    it in.  And then she went out on Facebook and told the

6    story.

7        Q.   And so you had been seeing -- you had been

8    hearing about these incidents through other people?

9        A.   Yes, sir.

10       Q.   Okay.  And then your direct relationship with

11   Jacob at the time also told you what kind of guy he was?

12       A.    Oh, man.  His wife told me.  I met with his

13   wife one day at the 7-Eleven store.  And this was -- but

14   this -- well, it was a meeting between me and her,

15   because me and this man have gotten into it so many

16   times, and I was just trying to find out who this man

17   was related to so I could ask them to please tell him to

18   leave me alone, because I didn't want to get killed and

19   I didn't want to kill him.  I'm just begging for help.

20            And I -- my son told me, she said -- he

21   said, "Dad, she work at Channel 9 news station, Jacob's

22   wife do."  And I was able to contact her.

23            And I met with her at a store and -- at a

24   7-Eleven store.  And at the time, he was still molesting

25   Tina.  And when I met with her, I told her the story,

1   that -- about everything that Jacob was putting my kids

2   through and I think that he's molesting my daughter.

3                    And she said, "Well, let me tell you

4   something, Mr. Miller.  Jacob have a past."

5                    I said, "He have a past?"

6                    She said, "Yes, ma'am."  I -- she said,

7   "Yes, sir."

8                    And I said, "Well, what is it?"  She

9   wouldn't tell me.

10                   At that time, Jacob showed up at the

11  7-Eleven store.  And I said, "What are you doing showing

12  up here?"

13                   She said, "I don't know."

14                   I said, "Did he know we was going to be

15  here at this time?  This is just a meeting between me

16  and you."

17                   She said, "I don't know."

18                   I said, "Well, if he gets out of that

19  truck and come over here, I'm going to defend myself."

20  I said, "I don't have no other choice, you know."

21                   She said, "Oh, well, he don't know we're

22  supposed to be here meeting."  But she told me that he

23  had a past, but she never told me what it was.

24       Q.   What -- so what did that mean to you?  Did you

25  ever find out?

1    A.   Well, when Tina spoke with me maybe two or

2   three months ago about something -- the situation over

3   the phone, she told me that -- I think one of Jacob's

4   family members said that Jacob was messing with one of

5   the girls in the family.

6            I don't know anything about it to go into

7   details about anything.  I was just kind of like, "Oh,

8   okay.  Well" -- so that might be something you need to

9   look into.  I don't know.

10   Q.   Well, what does -- what does it mean when she

11   says he has a pass?  Do you have any idea what that

12   means?

13   A.   Well, I don't know if she was saying being

14   violent or messing with little girls.  I didn't -- I

15   don't know.

16   Q.   Oh, a past, p-a-s-t.

17   A.   Yeah, past.  Yes, sir.

18   Q.   Oh, okay.  I've got you.  I thought you said

19   p-a-s-s, pass.

20   A.   Yeah.

21   Q.   Okay.  He has a past.  Okay.  So he might have

22   a history of doing this with other people?

23   A.   Yes, sir.

24   Q.   Got you.  Okay.

25   A.   Oh, I got a phone call from Tina's mother one

1    day, and she told me to tell Tina -- I was here in

2    town -- to talk to Tina and tell Tina to leave Jacob

3    alone, because she is the one that goes with Jacob.  The

4    momma is the one going with Jacob, not her.

5                     And I said, "Well, y'all got that mess

6    stirred up.  Whatever y'all got going on, you know it's

7    not right.  I'm not going to tell Tina anything," you

8    know.  "Let her -- let her come out with whatever she

9    has got to come out with."  And I was very serious about

10   that, because I thought that if she loved this man so

11   much, she ought to protect him by going to the law and

12   reporting him for what he was doing, if she loved him so

13   much.

14                    Not our daughter, because she clearly

15   should have done that also, but she didn't.  She was so

16   afraid of this man, I'm thinking.  I seen cat marks

17   around her neck when he got ahold of her, so I guess she

18   was afraid of him, the momma with the cat marks.

19        Q.    Okay.  So you had seen her with, you said, cat

20   marks?

21        A.    Cat marks.  Where he scratched up around her

22   neck fighting her.  And I told her, I said, "Boy, you've

23   got cat marks on your neck already, huh?"

24        Q.    So you think he was -- he was beating her up?

25        A.    Oh, yeah.  Yeah.  Yeah.  Yeah.  He was a

1   violent man.  He whipped -- he whipped the momma,

2   whipped the daughter, whipped my son, go lay up with the

3   momma, go lay up with the daughter.  The man was a bad

4   man.

5       Q.   Did you -- so how many times did you see them

6   with marks on their bodies?

7       A.   Well, never Tina, because I never would have

8   made it to the courtroom.  But Birdie, one time.

9   Uh-huh.  That's right after she caught herself leaving

10  me for him.  And I was teasing her about the cat marks

11  she had around her neck.  I said, "He don't want you no

12  more, huh?"

13      Q.   And then how about your son?  How many times

14  did he have marks on him?

15      A.   Well, he come home with a bloody nose and a

16  bloody shirt, all -- blood all over his shirt where he

17  had been bleeding.  And he said Jacob had hit him in the

18  nose.  And --

19      Q.   And is that the time that he ran -- he ran

20  through the woods and got picked up?

21      A.   Yeah.  Yeah.  There was nothing out there but

22  just a two-way road and just out in the wilderness.

23  Nothing but coyotes and whatever else could have been

24  out there could have got ahold of my son, or maybe some

25  murderer, because they have found bodies out there in

1   the past.

2            And I just thank God he was smart enough

3   to know how to come home.  You should have seen where he

4   had come from, to know where he stayed, that the man

5   came to court and said he knew exactly where he stayed

6   at.  This kid, man, was -- you know, there was just

7   nothing out there but maybe -- Jacob lived in a big

8   mansion.  Him and two or three other people live out

9   there in a big mansions, you know, and that was the only

10  thing out there.

11       Q.   How old was your son at that time?

12       A.   Oh, he could have been like 9 -- between 9 and

13  11 years old at that time.  I'm not for sure.  I can't

14  remember exactly.

15       Q.   Oh, that's okay.  I mean, how many years ago

16  are we talking here?

17       A.   Oh, he's 40 years old now, so you're talking at

18  least about 30 years.

19       Q.   Okay.  And when --

20       A.   My granddaughter is 26 years old, I think, and

21  I know for a fact she's Jacob's if they just take a

22  blood test.  And Tina might have been 15 when she had

23  the baby.  So, you know, that's still a good picture

24  again this man is molesting this little girl.

25       Q.   How do you -- how do you know that that -- that

1   your granddaughter is Jacob's?

2     A.   Oh, she looks just like him and everything.

3   Tina told me that that's her baby, everybody -- told

4   everybody in the family, you know. We all know.

5         The girl -- from my understanding, the

6   girl and Tina had a run-in maybe four months ago behind

7   this situation. She couldn't understand why her mother

8   was going after her grandfather, but it's her dad. And

9   so the family is torn up. The kids -- all the kids --

10   Tina's kids are torn up behind their granddaddy and Tina

11   telling the story. And so -- that it caused Tina some

12   hardship.

13         And Tina called me up and told me, "My son

14   was telling me some things." And I was saying, "Well,

15   that's going to happen, you know, now all truth is

16   coming out now. That's what's going to happen," you

17   know. And she knows Jacob's her daddy. And I was told

18   that the boy might be even Jacob's, my son -- my

19   grandson might even be Jacob's. But Tina hasn't said

20   that, though.

21     Q.   When did you find out that your granddaughter

22   is Jacob's?

23     A.   When she had him.

24     Q.   All right. At the time?

25     A.   When she had the baby, I knew it. Yeah, I knew

1  it.  I knew it was Jacob's baby then.  Tina didn't have

2  to tell me that.

3       Q.   How did you know?

4       A.   Well, they've been screwing since she was

5  probably about 10 or 11 years old.  She wasn't allowed

6  to have no boyfriends, no friends.  He was always

7  covering her.  People was telling me around town that

8  they seen them kissing and all that.  You know, I'm

9  just -- just know, you know.  I --

10            Go get the baby now, give her a blood

11  test.  There's some -- I mean, you know, there's ways of

12  finding out the truth.  If he's in denial, it's only to

13  save his ass.  That's all, you know.  And they --

14  everybody gave him cover in town because he's got money.

15  Now, they're all running now because the truth done came

16  out.  They've been running behind this rapist, working

17  for this rapist, child molester, murderer.  He's a

18  murderer.

19            Anybody that gave this girl abortions is a

20  murderer.  That's what going on right now.  You're

21  talking about two or three abortions.  This is stuff

22  that's serious here, and they are running.  They're

23  scared.  They're trying to save their hiney.  Even

24  attorneys, my attorney.  The people that gave her the

25  abortion should be at the table right now speaking.

1   Everybody -- the State of Texas.

2       Q.   I hear you.

3       A.   Yeah.  It's coming out.

4       Q.   For -- let's see here.  So you were saying that

5   you had heard -- you had heard word about town about

6   Jacob and her kissing.  Is there any other -- is there

7   any other -- is there anything else you heard or saw

8   that let you know at that time that it was going on?

9       A.   No, because I had went on to Nebraska.  I left,

10  went to Nebraska.  I was -- had to get out of here.  The

11  town was being pretty rude to me.

12          Like I said, I was -- I had sued twice

13  here for discriminating.  I won both cases against an

14  oil company discriminating, called me black ass,

15  niggers, black motherfuckers, and all that kind of

16  stuff; then the second case, I won against the City of

17  Midland, the same thing going on.  And I won that case.

18  I settled that case in '97.  This is -- back it up two

19  or three years, Tina was getting raped at that time.

20          It was just really -- didn't want to

21  really know any to know one, besides just cover up their

22  dirty deeds.  And if I wouldn't have got out of town, I

23  would probably be a dead man some way or another.

24          And there's some stuff going on now with

25  me that the law is looking into, I've got the Feds

1    looking into.  It's -- it's serious.  It's people -- I'm

2    making some serious allegations here.  I'm talking about

3    attempted murder, people being held responsible.  And

4    I'm talking about attempted murder on my part, but

5    murder on my daughter's part.  It's important stuff

6    going on right now.  Do I fear for my life?  No.  When

7    you're walking with Jesus, you don't have to worry.

8        Q.    All right.  I hear you.

9        A.    Yeah, faith.

10       Q.    So is there anything else that you saw or heard

11   anytime that lends weight or suggests that this was

12   happening?  Even if Jacob denies it, is there anything

13   else that we haven't talked about that supports what

14   you're saying?

15       A.    No.  At this time, I've done said pretty well

16   what I wanted to say.  But I just want to say this to

17   you.  And thank you all for everything you're doing for

18   my baby, and I'm sorry that y'all had to be into this.

19              Tina come from a great family on my side.

20   We have six celebrities in this family, and one of them

21   is a war hero that I'm wearing his picture right now on

22   the front of my shirt.  And for her to be treated like

23   this is terrible.

24              And I just want the truth to come out, and

25   those that are responsible, pay for what they've done.

1   And I want to thank you for everything you've done for

2   my baby.  If you need me, call me.  And I told y'all the

3   truth.

4        Q.   Okay.  I appreciate it.  And I -- and I --

5   just, for the record, your intention is to show up for

6   trial if you're able, right?

7        A.   Oh, man, I would do it.  I will do it on the

8   flick of a dime if I have to.

9        Q.   Okay.  And then just in case, we've got this

10  video, right?

11       A.   Yes, sir.

12       Q.   Just in case?  Okay.  Got you.

13            MR. WHARTON:  All right.  I appreciate

14  your time, and I will pass the witness.  That means

15  we're done.

16            THE WITNESS:  Okay.  Thank you.

17            THE VIDEOGRAPHER:  This concludes the

18  video record.  The time is 10:55.

19                  (WITNESS EXCUSED)

20

21                  (SIGNATURE WAIVED)

22

23

24

25

1                          NO. CC-21-02654-D

2    TINA WILSON                    ) COUNTY COURT AT LAW NO. 4
                                    )
3                                   )
                                    )
4    VS.                            ) IN AND FOR
                                    )
5                                   )
                                    )
6    JACOB CANNON                   ) DALLAS COUNTY, TEXAS

7

8                     COURT REPORTER'S CERTIFICATE
9                 ORAL DEPOSITION OF GERALD MILLER
                       Taken October 18, 2022
10

11

12         I, Cathy Cummins, Certified Shorthand Reporter

13   Number 5837 in and for the State of Texas, hereby

14   certify to the following:

15         That the witness, GERALD MILLER, was duly sworn

16   by the officer and that the transcript of the oral

17   deposition is a true record of the testimony given by

18   the witness;

19         That examination and signature of the witness

20   to the deposition transcript was waived by the witness

21   and agreement of the parties at the time of the

22   deposition;

23         That the amount of time used by each party at

24   the deposition is as follows:

25              MR. JONATHAN WHARTON - 0:26

1          That pursuant to information given to the

2   deposition officer at the time said testimony was taken,

3   the following includes all parties of record:

4   FOR THE PLAINTIFF:

5                    MR. JONATHAN WHARTON
                     Brad Thomas Law Office
6                    P.O. Box 472027
                     Fort Worth, Texas   76147
7                    (903) 931-3616
                     jon@bradthomaslawoffice.com
8

9   FOR THE DEFENDANT:

10                   MR. OKWUOMA C. MADUFORO
                     Maduforo & Osimiro Law Office
11                   1111 W. Mockingbird Lane, Suite 800
                     Dallas, Texas   75247
12                   (214) 267-0103

13

14

15          I further certify that I am neither counsel

16   for, related to, nor employed by any of the parties or

17   attorneys in the action in which this proceeding was

18   taken, and further that I am not financially or

19   otherwise interested in the outcome of the action.

20

21          Further certification requirements pursuant to

22   Rule 203 of TRCP will be certified to after they have

23   occurred.

24

25

1          Certified to by me this 24th day of October,

2     2022.

3

4                              

5                              Cathy Cummins

6                              CSR No. 5837 - Exp. 7/31/24
                               Firm Registration No. 155

7                              Permian Court Reporters, Inc.
                               605 W. Texas

8                              Midland, Texas 79701
                               (432) 683-3032

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        FIRM'S CERTIFICATION UNDER RULE 203, TRCP

2

3            The original deposition was delivered in

4   accordance with Rule 203.3 to Mr. Jonathan Wharton,

5   Custodial Attorney;

6            $_____ is the deposition officer's

7   charges to Plaintiff for preparing the original

8   deposition transcript and any copies of exhibits;

9            A copy of the Reporter's Certificate and this

10  certificate were served on all parties shown herein and

11  filed with the Clerk.

12            Certified to by me this ___ day of _____,

13  2022.

14

15

16

17                              _____
                                Permian Court Reporters, Inc.
                                Firm Registration No. 155
18                              Expires:  12/31/22
                                605 W. Texas
19                              Midland, Texas 79701
                                (432) 683-3032

20

21

22

23

24

25

1:45PM  1
1:45PM  2                    Plaintiff's Exhibit No. 4
1:45PM  3
1:45PM  4          Deposition of Gerald Wayne Wilson, Jr.
        5
        6
        7
        8
        9
       10
       11
       12
       13
       14
       15
       16
       17
       18
       19
       20
       21
       22
       23
       24
       25

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document      Page 177 of 205
GERALD WAYNE WILSON, JR.

1

1                    Cause No. CC-21-02654-D

2    TINA WILSON,                    *   COUNTY COURT AT LAW
                                     *
3    VS.                             *   NO. 4 IN AND FOR
                                     *
4    JACOB CANNON                    *   DALLAS COUNTY, TEXAS

5

6

7    ********************************************************

8               ORAL AND VIDEOTAPED DEPOSITION OF

9                   GERALD WAYNE WILSON, JR.

10                  Taken November 7, 2022

11   ********************************************************

12               ORAL AND VIDEOTAPED DEPOSITION of GERALD

13   WAYNE WILSON, JR., produced as a witness at the instance

14   of the Plaintiff, and duly sworn, was taken in the

15   above-styled and numbered cause on Monday, November 7,

16   2022, from 10:02 a.m. to 10:25 a.m., in the offices of

17   Permian Court Reporters at 605 West Texas, Midland,

18   Texas, before Stephanie J. Blair, Certified Shorthand

19   Reporter Number 6819 in and for the State of Texas,

20   pursuant to the Texas rules of Civil Procedure (and the

21   provisions stated on the record or attached therein).

22

23

24

25

PLAINTIFF'S
EXHIBIT
4
PENGAD 800-631-6989

Case 24-40553-elm7    Doc 64    Filed 01/22/26    Entered 01/22/26 17:53:41    Desc Main
Document    Page 178 of 205
GERALD WAYNE WILSON, JR.

2

1                    A P P E A R A N C E S

2    For the Plaintiff (appearing via Zoom):

3         Mr. Jonathan Wharton
          Brad Thomas Law Office, PLLC
4         P.O. Box 472027
          Fort Worth, Texas 76147
5         (903) 931-3616
          jon@bradthomaslawoffice.com
6

7    Also Present:  Martin Lilly, Videographer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GERALD WAYNE WILSON, JR.

3

1                         I N D E X

2   Witness:                                          Page

3   GERALD WAYNE WILSON, JR.

4         Examination by Mr. Wharton                     4

5         Reporter's Certificate                        23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GERALD WAYNE WILSON, JR.

4

1          THE VIDEOGRAPHER:  We are on the record

2     at 10:02.

3          Would the court reporter please swear in

4     the witness.

5          GERALD WAYNE WILSON, JR.,

6     having been first duly sworn by the Certified Court

7     Reporter, testified as follows:

8                    EXAMINATION

9     BY MR. WHARTON:

10         Q.   All right.  Good morning.  My name is Jonathan

11    Wharton.  I represent Tina Wilson.

12              And you understand you're here today to

13    give a deposition for potential use at trial.

14         A.   Yes, sir.

15         Q.   Okay.  Now, I -- we -- you know, just

16    depending on the date, the time, all that, I know that

17    you're interested in appearing live at trial.  Do you

18    understand that if we -- if that is just for whatever

19    reason not feasible, we will be using this video?

20         A.   Yes, sir.

21         Q.   Okay.  So let's start.

22              Just state your name for the record,

23    please.

24         A.   My name is Gerald Wayne Wilson, Jr.

25         Q.   And where are you from?

GERALD WAYNE WILSON, JR.

5

1     A.    I'm from Midland, Texas.

2     Q.    And what is your relationship to Tina

3  Wilson?

4     A.    She's my sister.

5     Q.    Now, when -- who -- let me ask you this.

6            Who is your father?

7     A.    My father is Gerald Miller.

8     Q.    And you were raised by Jacob Cannon for many

9  years.  Is that right?

10    A.    Yes, sir.  I rai- -- I was raised with my mom

11 and Jacob off and on until I moved to Nebraska, and then

12 when I came back to Texas, I stayed with my mom.  But

13 like I always came down -- like I moved to Nebraska when

14 I was in seventh grade and I always came back down for

15 like summer, Christmas, and holidays and things like

16 that, but like during the summertime, I stayed with my

17 mom.

18    Q.    When did you first meet Jacob Cannon?

19    A.    Probably like -- I'd say I's probably like in

20 second grade, first grade.

21    Q.    And how did you -- how did you meet him?

22    A.    My mom was going with him.

23    Q.    And wh- -- at what point did you move in and

24 start living with -- with your mom and Jacob Cannon?

25    A.    Instantly like -- because if -- like back then

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document   Page 182 of 205
GERALD WAYNE WILSON, JR.

6

1   my mom and my dad, they -- they didn't have a legal --

2   they -- they didn't -- like my dad didn't have custody

3   of me and so my mom -- like they shared time with me, I

4   would say.  And then like when -- my dad got full

5   custody of me when I was in sixth grade.  Then that's

6   when I moved with my dad full time.

7        Q.   So in between -- when you were -- when you

8   were living with Jacob, tell me about that.  What was

9   that like?

10       A.   Man, like -- I don't even really know where to

11  start, you know what I'm saying.  It's still affecting

12  me today because they got my son.  Like my mom and my

13  stepdad, they have my son so it's been -- it's been

14  tumultuous to say the least.

15       Q.   I hear you.  I understand that.

16             Let's -- let's start before we get into

17  all of it with just what Jacob is like in general.

18       A.   I would say he's -- as a person he's -- he

19  comes off like as a good person, you know what I'm

20  saying.  He comes off as a good person.  He's

21  well-mannered.  He has, like I said, good mannerisms and

22  things of that nature, but like behind the doors, he's

23  somebody totally different, like he's jac- -- like

24  multiple personalities like far as like you -- what you

25  see is not what you get behind closed doors.

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document    Page 183 of 205
GERALD WAYNE WILSON, JR.

7

1     Q.    And describe that to me.  I mean what --

2     when -- when did you first realize that Jacob was kind

3     of a different person in private?

4     A.    Well, like Jake, he used to -- like bi- --

5     when -- when I was little, you know what I'm -- when I

6     was second, third grade, I stayed with my mom and them,

7     and he was -- he was okay.  Like we always used to go to

8     his softball games and they'd take us around the country

9     like to go to AstroWorld and Six Flags and things of

10    that nature.  And so it looked like that -- like on the

11    outside that like we were pretty, you know what I'm

12    saying, well taken care of, you know what I'm saying,

13    but on the inside it was a whole bunch of things going

14    on.

15           But like far as him as a person, like

16    he's -- he's all right.  I -- I can't really just -- I

17    won't just -- because he -- he raised my -- my -- my

18    son.  He got my mom but -- like I think he took care of

19    my mom.  He didn't -- took care of my sister, took care

20    of me to a degree.  So it's hard for me to just sit

21    there and be like I dislike the guy, but due to the

22    things that he done and has done and doing, like I'm not

23    just the greatest fan of him because he pre- -- he was a

24    manipulator.  He was a manipulator.

25    Q.    Fair enough.

GERALD WAYNE WILSON, JR.

8

1        And -- and so tell me about times when

2   Jacob has been violent.  Was he ever violent?

3        A.   Oh, yeah, like, Man, several times.  I

4   remember one time he threw me through a wall.  He threw

5   me through a wall and I came out of the wall and I hit

6   him with a vase and it was like he was just -- you know

7   what I'm saying.  And it was because we were playing

8   basketball and I's beating his sons and I'm very

9   competitive and he -- I guess he didn't like what was

10  going on and -- like and -- you know what I'm saying, he

11  became like real aggressive with me.

12       But like he'd chunk rocks at me.  We

13  stayed in country.  They used to -- they'd chunk rocks

14  at me.  I ran from the country barefooted back to

15  Midland hiding in the bushes and stuff like that.  Like

16  he pulled a gun on me.

17       Q.   How -- how old were you when these things were

18  happening?

19       A.   Like when -- when I got threw through the

20  wall, I'd say I was probably like -- around like 11

21  years old because I -- like 11, 12 years old.  I wasn't

22  out of Midland yet.  And then when he pulled a gun on

23  me, it was like probably when I was just coming out of

24  high sch- -- col- -- college.  I was like 19, 20 years

25  old.  And it's just been like -- you know what I'm

Case 24-40553-elm7 Doc 64 Filed 01/22/26 Entered 01/22/26 17:53:41 Desc Main
Document Page 185 of 205
GERALD WAYNE WILSON, JR.

9

1  saying, when he was throwing rocks at me, I was probably

2  like nine, 10 years old, you know, and --

3       Q.   So going through those, why did he pull a gun

4  on you?

5       A.   Well, we [sic] pulled a gun on me because my

6  sister and him was getting into a altercation and --

7  they was arguing and he was trying to chastise my niece,

8  Jaquita, and that's supposed to be my n- -- my

9  niece's -- that's -- that's why -- that's -- that's --

10  that's his qui- -- this is her dad, you know.  It's all

11  crazy, Man.  Like they was getting into a altercation

12  and -- and I was like, "Why are you always trying to

13  jump in between my sister disciplining her child and you

14  don't want to take responsibility of being -- saying

15  that -- claiming that this is your daughter," you know

16  what I'm saying.  And so like he got mad at the things

17  that was I saying and, you know what I'm saying, like he

18  went back and he grabbed a pistol out of the closet.

19  And my mom tried to hold him, my sister, and I took off

20  running out the house and...

21       Q.   So wa- -- was it more that he was trying to

22  cover up -- like he was mad that you mentioned --

23       A.   Like I think he was mad because like I stepped

24  out of place like far as being -- not -- you know what

25  I'm saying, not like -- I'm a bo- -- I'm a kid to him

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document      Page 186 of 205
GERALD WAYNE WILSON, JR.

10

1    and -- and, you know what I'm saying -- and then like me

2    throwing that in his face, like telling him about

3    hisself [sic] probably, too.  I can't really just -- I

4    can't speak to his mind, but that's what I would say.

5         Q.   And -- okay.  So how do you -- how do you know

6    that Jaquita is the daughter of Jacob Cannon?

7         A.   Well, like just by the name.  Like her name is

8    Jaquita and like -- you know what I'm saying, like my

9    dad is Gerald.  I have my dad's first name, but like he

10   doesn't have -- that's just part of it.  Like Jaquita is

11   half name for Jacob.  And then like just the skin tone,

12   the -- you know what I'm saying, like the things like

13   her DNA makeup.  But far as DNA test, I know that my

14   sister has never had a DNA test to say that that's her

15   dad -- that's my niece's dad.

16        Q.   When you say complexion, I mean my -- my

17   memory is that Jacob's lighter skin.  Is that right?

18        A.   Yes, he's very fair complected.

19        Q.   Okay.  He's fair.

20             And then -- and then yo- -- and then your

21   fa- --

22        A.   My niece is very --

23        Q.   -- you and your father --

24        A.   -- fair complected.

25        Q.   -- are dark.  Right?

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document    Page 187 of 205
GERALD WAYNE WILSON, JR.

11

1    A.    Yeah, me and my sister and my da- -- my -- my

2    sister and my dad's are dar- -- we're dark.

3    Q.    Okay.  And Jacob's a -- a pretty big guy.

4    Right?

5            How -- how tall is he, do you know?

6    A.    Probably like 6-1, 6-2.  Probably like --

7    he's -- he's 280 pounds, 300 pounds in his -- in his

8    day --

9    Q.    (Indiscernible.)

10   A.    -- really back in his -- in his prime.

11   Q.    Yeah.  Did he play sports or anything?

12   A.    Like he -- I think he played football back

13   in -- back in his day and shot put and track and things.

14   They -- he played softball when was I little.  So, yeah,

15   he was athletic guy.

16   Q.    And he was getting violent with you when you

17   were pretty young.  Your dad was telling me about a time

18   when you showed up out of the woods --

19   A.    Yeah.

20   Q.    -- covered in blood.

21   A.    Yeah, I was hiding in the woods.  Like they

22   were throwing rocks at me -- Jacob and my mom, they was

23   throwing rocks at me.  Like I said, we stayed in the

24   country and so there was plenty of rocks everywhere and

25   so it was like -- I don't -- they -- like they were

Case 24-40553-elm7    Doc 64    Filed 01/22/26    Entered 01/22/26 17:53:41    Desc Main
Document      Page 188 of 205
GERALD WAYNE WILSON, JR.

12

1  coming and so I had to hide off into the mesquite, you

2  know what I'm saying, run barefooted, I didn't have no

3  shoes on or nothing, and tried to hide.  And like I see

4  them driving up and down the street looking for me and

5  I'd be hiding in the dirt and -- and in -- in the

6  mesquite, yeah.  And so when my -- arrived to my dad

7  house, I probably did look like somebody running from

8  something.

9       Q.   Yeah.

10           So what -- so who's "they"?  Who was

11  throwing the rocks?

12       A.   My mom and my dad -- my mom and my stepdad.

13       Q.   So your mom was throwing the rocks, too.

14       A.   Yeah.  Yeah.

15       Q.   And why were they doing this?

16       A.   I -- I believe it was about a game or

17  something like that.  Like it was a game, a basketball

18  game or something to that degree, and like we had

19  like -- we had a section in the house where we had a

20  basketball court outside the house, like a nice little

21  court where his shop was at.  And so we were out there

22  playing, and I think he heard -- his sons a little -- a

23  little younger than me.  Like one of them was like a

24  year and a half younger than me, and the other one was

25  like two, three years.  And therefore -- and so I guess

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document      Page 189 of 205
GERALD WAYNE WILSON, JR.

13

1  he thought I was bullying his sons or things of that

2  nature and -- you know what I'm saying, and he didn't

3  like it.

4      Q.    All right.  And so were there any other kind

5  of events -- violent events with Jacob that stand out to

6  you?

7      A.    Oh, like, shoot, me walking in when my mom's

8  gone in the room seeing him with my sister, always

9  seeing him creeping around corners and doors and things

10  of that nature.  Like me and his sons be off in the

11  living room watching TV and you'll see him like --

12  like a -- you know, creeping around corners, peeping

13  around corners to see what we're doing to like go to my

14  sister's room and stuff like that.

15      Q.    So you -- you actually saw him with her.

16      A.    Yeah, I walked in before.  Like my si- -- my

17  mom left and went to work.  I walked into the room, you

18  know what I'm saying.  Because I already knew at that

19  age like what was -- like what sex was like way -- when

20  I was young, you know what I'm -- I knew what sex was

21  and so I knew -- when I walked in the room, you know

22  what I'm saying, I already had idea like every time my

23  mom leaves to work, he'll -- he'll -- you know what I'm

24  saying, he'll come out and be tipping around.

25          Because at that time my mom went to work

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document      Page 190 of 205
GERALD WAYNE WILSON, JR.

14

1  and I catch the bus to school and my mom wo- -- my mom

2  worked -- worked at the school and so she'll leave early

3  to go -- like to go to work, you know what I'm saying,

4  and me and my sister be at the house by ourself [sic].

5     Q.   So you would -- you -- you kind of knew that

6  it was going on already.  How did you know that?

7     A.   Just walking in and -- walking in and just

8  putting one and one together, like me just knowing

9  like -- like, you know what I'm saying, like what sex is

10 and seeing the manipulation, seeing how like he fa- --

11 gave her -- like gave my sister favor and like bought

12 her things and stuff like that and when it came to me, I

13 wouldn't get the same favor.

14          And then I told my -- told my dad and

15 them back then about what was going on way back when

16 and -- and then I think that lost a lot of favor with me

17 with Jacob, too, because I was -- kind of dropped the

18 ball when I was a kid about what was going on.

19    Q.   So who did you -- were you -- I guess you were

20 telling your father about it.

21    A.   Yeah, I was telling my father, my mom and

22 them, people that was around me, you know what I'm

23 saying.

24    Q.   Did -- did the cops or did CPS ever get

25 involved?

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document     Page 191 of 205
GERALD WAYNE WILSON, JR.

15

1    A.    Let's -- let me -- like there was so much

2    stuff going on back then.  Like I don't know if the --

3    did the cops get invo- -- I know my dad went to the --

4    to the CPS and things of that nature, to the -- you

5    know, and like I think at one point in time they were

6    trying to blame -- to my -- another guy for one of my

7    sister's -- like for being pregnant by Jacob and -- you

8    know what I'm saying, and like -- so I don't -- there

9    was so much going on when I was a kid and so like more

10   than likely the cops -- CPS were involved in the

11   situation.

12   Q.    Did they ever interview you?

13   A.    No.

14   Q.    So do you know how that -- how they managed to

15   miss that?

16         Do you -- do you know whether Jacob

17   intervened or --

18   A.    Like it's so much like -- like, you know what

19   I'm saying, like being in Midland, I don't know who

20   knows who or what goes on with -- you know what I'm

21   saying, and -- and like, you know what I'm -- I know he

22   has a lot of connections by business and selling houses

23   and things of that nature and so I don't -- I can't

24   really -- you know, I don't know what be going on behind

25   the scenes and...

1      Q.    Yeah.

2      A.    Like -- but like -- but like dealing with him,

3  it makes me like -- you know what I'm saying, like I see

4  manipulation and stuff.  I see how people can use

5  systems and things of that nature to get favor or people

6  with money have -- have influence on people who don't

7  have money.

8      Q.    And so you saw -- you saw that with Jacob.

9      A.    Yeah, I see -- yes.  Yes, sir.

10     Q.    All right.  How -- just give me any specifics,

11 any just --

12     A.    Oh, like my --

13     Q.    -- an example.

14     A.    -- like my -- my family, my -- my granny, my

15 aunties, my uncles, they all accept money from him, but

16 like when it come to me like going to college or doing

17 anything, my mom -- they wouldn't support me at all, you

18 know what I'm saying.  He wouldn't support nothing I --

19 nothing I did.

20            I played high -- football from when I was

21 in -- down -- when I stayed in Midland from when I was

22 sixth grade, fifth grade and high school and college.

23 My mom never came to none of my games.  I have

24 stepbrothers that's like his age [sic], and my mom went

25 to his games and colleges and everywhere, you know what

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document      Page 193 of 205
GERALD WAYNE WILSON, JR.

17

1   I'm saying.

2              So, you know what I'm saying, like I just

3   see like him -- I know the difference.  Like -- like my

4   aunties and uncles, they could get -- get stuff from him

5   and I could ask for -- for a favor or need something

6   and, "No.  No."  He'll be like, "Let me kick it over and

7   I'll think about it," and never respond.

8       Q.   Is that still going on like say with Jaquita

9   or --

10      A.   Oh, Man, shew -- excuse me?  Is what going on,

11  I'm sorry?

12      Q.   Mo- -- more of the same.

13             But I -- if you were thinking of saying

14  something, go ahead.

15      A.   Oh, yeah, like far as -- like my mom just had

16  a birthday two weeks ago in Dallas and my -- my aunt and

17  my mom birthday staggers each other.  I think my aunt's

18  birthday's on the 15th and my mom's is on the 18th.  And

19  my mo- -- my aunt stays in Midland and she has -- her

20  son stay here and we have lot of family that stays here,

21  and they all traveled to Dallas and threw my mom a

22  surprise birthday party, and the only person didn't know

23  about it was me.  And my sister didn't go, of course,

24  but me, I didn't have no earthly idea about it until I

25  got on Facebook.

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document      Page 194 of 205
GERALD WAYNE WILSON, JR.

18

1    Q.   And is he still doing similar types of things

2  with Jaquita?

3    A.   Like -- like I'm not around.  They stay in

4  Dallas and I don't -- they -- I don't get invited to no

5  functions or anything.

6         You know, they have my son.  They raising

7  my son, and I like -- I barely get to see -- like my mom

8  just came down here this weekend and Jacob just came

9  down here this weekend for a funeral.  My son, he's in

10  seventh grade.  They didn't bring him.  They left him.

11  They always -- I only get to see my son like parts of --

12  like one year out of the last five summers.

13    Q.   How do they have your son?

14    A.   Because I got in trouble back in 2012 and they

15  granted my mom temporary rights of my son when I was in

16  prison and -- but when I got out, my mom moved to Dallas

17  and took my son and I didn't have the resources to go

18  get my son, fight for my son.  And I already -- like all

19  the stuff that was going on with me, my family, I'm not

20  really too fond on going to court behind my mom and

21  like -- like tal- -- talking about my mom or -- or

22  Jacob.  I'm not really -- I ain't into that really.

23  Like that's not my -- you know what I'm saying, I rather

24  settle -- settle things just talking instead having to

25  go those steps.

Case 24-40553-elm7    Doc 64    Filed 01/22/26    Entered 01/22/26 17:53:41    Desc Main
Document      Page 195 of 205
GERALD WAYNE WILSON, JR.

19

1    Q.    Well, and you -- and you haven't -- and y'all

2    haven't had much success is my understanding going

3    against them --

4    A.    Huh-uh.

5    Q.    -- in general.  Like your father and everybody

6    else --

7    A.    None.

8    Q.    -- is basically --

9    A.    Because like we don't -- like we don't have

10   the same resources that he's allocated, you -- you know.

11   He's -- he's pretty wealthy.  He's done good for hisself

12   in life.  And so we don't have the same resources that

13   he has and -- and lack of resources like far as me

14   getting attorney and going through all those things to

15   get my son, I just -- I don't have -- like then I got a

16   heart problem.  I don't ha- -- probably don't have the

17   energy.  I don't have the energy to go through all

18   that.

19   Q.    Okay.  Tell me -- tell me about Tina and the

20   way this has all affected her.

21   A.    Man, like I just can only imagine not being

22   able to raise your kids because they raised -- took

23   her -- her two oldest kids from her and they pretty much

24   raised her and -- you know what I'm saying, and raised

25   her kids.  So I just know that as a mom, that's got to

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document   Page 196 of 205
GERALD WAYNE WILSON, JR.

20

1    be tearing her up on the inside because just you -- your

2    oldest daughter, she's against you like -- and she

3    goes -- she -- she takes Jake's side and they haven't

4    been communicating ever since all this been taking place

5    and so I just know that just breaks her down like...

6        Q.   Okay.  Is there anything else that kind of

7    jumps into your mind about this that you -- that you can

8    think of as far as your memory of it?

9        A.   Just like -- like I know -- I was around,

10   Jacob's sons was around, but like I don't think that

11   they probably -- they're not like -- ever since

12   everything came out like -- like was transpiring,

13   whatever, like they haven't -- I haven't really talked

14   to them at all, haven't -- like so they -- I can only

15   imagine they grow up with their dad or whatnot, but

16   they -- I know before their relationship with their dad

17   wasn't spectacular at all.  Like they -- they were

18   knowing like since -- like me, they don't pretty much

19   mess with their father at all neither and so -- but at

20   the end of the day, that's their dad so I don't think

21   that they're willing to speak out against their dad.

22       Q.   I gotcha.

23            How many times did you see like directly

24   Tina with Jacob?

25       A.   Man, like --

GERALD WAYNE WILSON, JR.

**21**

1    Q.   Is that once?

2    A.   Like -- well, like you -- I seen them like

3    just sexually one time, but like as far as like -- you

4    know what I'm saying, like the games and stuff that --

5    like him -- her sitting on his lap and things of that

6    nature and playing like -- like puppy love like when

7    you're in like school -- grade school, like boys and

8    girls chasing around -- each other around the house.

9         Majority of the time my mom would be gone

10   and -- and then that's when the games would start, you

11   know what I'm saying.  That's when all the -- the crazy

12   stuff would start like, you know what I'm saying.  Like

13   my mom wouldn't be there and then all the crazy stuff

14   would start, but then you -- like you could see the fuel

15   between my mom and my sister, me raising up in the house

16   with them and being in the house with them, that like,

17   you know what I'm saying, like -- it was like they were

18   competing over Jacob.  To me, you know, it was weird,

19   you know, but like -- like -- (descriptive sound).  I'm

20   like this is crazy.

21   Q.   It is crazy.  Yeah.

22        Do you have any other memories of any

23   other specifics you can -- just kind of details of it?

24   A.   Not offhand.

25   Q.   Okay.  Fair enough.  Well, that's it.

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document      Page 198 of 205
GERALD WAYNE WILSON, JR.

22

1      MR. WHARTON:  I'll pass the witness.  So

2   that means this is done.

3      THE VIDEOGRAPHER:  All right.  We're off

4   the record at 10:25.

5      (Deposition concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document     Page 199 of 205
GERALD WAYNE WILSON, JR.

23

CHANGES AND SIGNATURE

WITNESS NAME:  GERALD WAYNE WILSON, JR.

DEPOSITION DATE:  November 7, 2022

PAGE LINE    CHANGE OR CORRECTION   REASON FOR CHANGE

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

_____ - _____ - _____ - _____

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document     Page 200 of 205
GERALD WAYNE WILSON, JR.

24

1          I, GERALD WAYNE WILSON, JR., have read

2    the foregoing deposition and hereby affix my signature

3    that the same is true and correct, except as noted

4    above.

5                  _____

                  GERALD WAYNE WILSON, JR.

6

7    THE STATE OF TEXAS )

8    COUNTY OF _____)

9

10

11          Before me, _____, on

12    this day personally appeared GERALD WAYNE WILSON, JR.,

13    known to me (or proved to me under oath through

14    _____) (description of identity card or other

15    document) to be the person whose name is subscribed to

16    the foregoing instrument and acknowledged to me that

17    he/she executed the same for the purposes and

18    consideration therein expressed.

19          Given under my hand and seal of office

20    this _____ day of _____, _____.

21

22                  _____

23                  NOTARY PUBLIC

24                  My Commission expires: _____

25

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document   Page 201 of 205
GERALD WAYNE WILSON, JR.

25

Cause No. CC-21-02654-D

TINA WILSON,                    *   COUNTY COURT AT LAW
                               *
VS.                            *   NO. 4 IN AND FOR
                               *
JACOB CANNON                   *   DALLAS COUNTY, TEXAS

---

REPORTER'S CERTIFICATE

DEPOSITION OF GERALD WAYNE WILSON, JR.

Taken November 7, 2022

---

        I, Stephanie J. Blair, Certified

Shorthand Reporter in and for the State of Texas, do

hereby certify to the following:

        That the witness, GERALD WAYNE WILSON,

JR., was duly sworn by the officer and that the

transcript of the oral deposition is a true record of

the testimony given by the witness;

        That the amount of time used by each

party at the deposition is as follows:

    Mr. Jonathan Wharton -  23 minutes;

        That pursuant to information given to the

deposition officer at the time said testimony was taken,

the following includes counsel for all parties of

record:

Case 24-40553-elm7   Doc 64   Filed 01/22/26   Entered 01/22/26 17:53:41   Desc Main
Document      Page 202 of 205
GERALD WAYNE WILSON, JR.

26

FOR THE PLAINTIFF:

    Mr. Jonathan Wharton
    Brad Thomas Law Office, PLLC
    P.O. Box 472027
    Fort Worth, Texas 76147
    (903) 931-3616
    jon@bradthomaslawoffice.com

       I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

       Further certification requirements pursuant to Rule 203 of the Texas Rules of Civil Procedure will be certified to after they have occurred.

       Certified to by me this 15th day of November, 2022.

*Stephanie Blair*

Stephanie J. Blair
CSR No. 6819, Expires 10/31/23
Firm Registration No. 155
Permian Court Reporters, Inc.
605 W. Texas
Midland, Texas 79701
(432) 683-3032

GERALD WAYNE WILSON, JR.

27

FIRM'S CERTIFICATION UNDER RULE 203, TRCP

The deposition transcript was submitted on November 15, 2022 to the witness at 932 N. Baird, Midland, TX 79701, for examination, signature and return to me by December 7, 2022.

The original deposition (was/was not) returned to the deposition officer;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered in accordance with Rule 203.3 to MR. JONATHAN WHARTON, Custodial Attorney, and $_____ is the deposition officer's charges to MR. JONATHAN WHARTON for preparing the original deposition transcript and any copies of exhibits;

A copy of the Reporter's Certificate and this certificate were served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of _____, _____.

_____
Permian Court Reporters, Inc.
Firm Registration No. 155
Expires 12-31-2022
605 W. Texas
Midland, Texas 79701
(432) 683-3032

| | |
|---|---|
| 1:45PM | 1 |
| 1:45PM | 2 |
| 1:45PM | 3 |
| 1:45PM | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

Plaintiff's Exhibit No. 5

Photo

PLAINTIFF'S
EXHIBIT
5
PENGAD 800-631-6989

